**UNITED STATES of America, Plaintiff,**

v.

**Wayne R. BRYANT, et al., Defendants.**

**No. 07–CR–267 (FLW).**

United States District Court, D. New Jersey.

June 5, 2008.

---

Adam S. Lurie, Office of the US Attorney, Newark, NJ, Joshua Drew, William E. Fitzpatrick, Norman Joel Gross, Office of the US Attorney, Camden, NJ, for the Government.

Carl D. Poplar, Cherry Hill, NJ, Lisa Mathewson, Welsh & Recker, Esqs., Philadelphia, PA, for Wayne R. Bryant.

Jeremy D. Frey, Pepper Hamilton, LLP, Philadelphia, PA, Ralph A. Jacobs, Ralph A. Jacobs & Associates, LLC, Haddonfield, NJ, for R. Michael Gallagher.

## Opinion

WOLFSON, District Judge:

Presently before the Court are the motions of Defendants, Wayne Bryant

("Bryant") and Michael Gallagher ("Gallagher") (collectively "Defendants"), to dismiss all counts of the Indictment against them, pursuant to *Fed. R. Crim P.* 12(b)(3), and to sever various sets of counts in the Indictment, as well as for separate trials on Counts 1–8. At all times relevant to the allegations in the Indictment, Bryant was a State Senator of New Jersey and Gallagher was the Dean of the School of Osteopathic Medicine ("SOM"), which operated within the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Counts 1–6 allege that Bryant and Gallagher engaged in a scheme to defraud the New Jersey public of Bryant's honest services in violation of 18 U.S.C. §§ 1341, 1343, and 1346.[1] Count 7 charges Bryant with solicitation and acceptance of a corrupt thing of value involving an organization receiving federal funds in violation of 18 U.S.C. § 666. Count 8 charges Gallagher with offering and giving a corrupt thing of value involving an organization receiving federal funds in violation of 18 U.S.C. § 666. Counts 9–14 allege that Bryant engaged in a scheme to defraud the New Jersey Division of Pensions and Benefits of money and property in violation of 18 U.S.C. § 1341. Counts 15–17 allege that Gallagher engaged in a scheme to defraud SOM and UMDNJ of his honest services and money and property in violation of 18 U.S.C. §§ 1341, 1343, and 1346. Finally, Counts 18–20 charge Gallagher with fraud involving an organization receiving federal funds in violation of 18 U.S.C. § 666.

Defendants have filed separate briefs, but have also joined in each other's motions and briefing. The Government has opposed the motions and oral argument was heard on March 11, 2008. For the reasons that follow, Defendants' motions to dismiss are denied, with the exception of Bryant's motion to dismiss Count 9, and

Defendants' motion to dismiss the failure to disclose theory of honest services fraud plead in paragraph 18 of Counts 1–6. As to Defendants' severance motions, the Court finds that Counts 1–14 are appropriately tried in a single trial, Defendants are properly joined in Counts 1–6, and that Counts 15–20 require a separate trial. For clarity of presentation, the Court will summarize the pertinent factual background relating to each set of Counts within the separate sections analyzing those Counts.

## I. Standard of Review

Defendants move to dismiss all Counts of the Indictment pursuant to Rule 12(b)(3). "Rule 7(c)(1) requires that an indictment contain only a 'plain, concise, and written statement of the essential facts constituting the offense charged' and include the statute(s) that the defendant(s) are alleged to have violated." *United States v. Delle Donna,* 552 F.Supp. 475, 482, 2008 WL 1961485, *5 (D.N.J. Mar. 14, 2008) (citation omitted). As succinctly stated by the Third Circuit, the standard for evaluating the sufficiency of an indictment is as follows:

> We deem an indictment sufficient so long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." Moreover, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."

---

1. Each set of Counts also alleges a violation of 18 U.S.C. § 2.

*United States v. Kemp,* 500 F.3d 257, 280 (3d Cir.2007) (citations omitted). Dismissal under Rule 12(b)(3) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges," *United States v. DeLaurentis,* 230 F.3d 659, 661 (3d Cir.2000), and thus the Court must assume that the allegations in the Indictment are true. *United States v. Besmajian,* 910 F.2d 1153, 1154 (3d Cir. 1990). The Court will review the Indictment "using a common sense construction," *United States v. Hodge,* 211 F.3d 74, 76 (3d Cir.2000), "examine the [statutes at issue] as applied to the facts as alleged in the Indictment, and determine whether Defendants' conduct, as charged, 'reflect[s] a proper interpretation of criminal activity under the relevant criminal statute[s].'" *Delle Donna,* 2008 WL 1961485 at *5 (quoting *United States v. Wecht,* No. 06–0026, 2007 WL 3125096, *5 (W.D.Pa. Oct. 24, 2007)).

## II. Counts 1–8

### A. Factual Background

Counts 1–6 allege that Bryant and Gallagher engaged in a scheme to defraud the New Jersey public of Bryant's honest services as a State Senator. Counts 7–8 allege that Bryant solicited and accepted, and Gallagher offered and gave, a corrupt thing of value involving an organization receiving federal funds. The following facts are based on the allegations relevant to these Counts of the Indictment.

From 2002 through 2006, Bryant was a State Senator representing New Jersey's Fifth Legislative District. Indictment, Counts 1–6, ¶ 2. In or about 2002 and 2003, Bryant was Assistant Democratic Leader and co-Chairman of the Senate Budget and Appropriation Committee. In or about 2004, 2005 and 2006, Bryant was the Deputy Majority Leader and sole Chairman of the Senate Budget and Appropriations Committee. *Id.* From in or about May 13, 2002 until April 30, 2006, Gallagher was Dean of SOM and the Chairperson of the Headache Center, a department within SOM. *Id.* at ¶¶ 8–9.

The honest services fraud scheme, Counts 1–6, centered around UMDNJ, the State of New Jersey's school of health sciences, which was a recipient of several hundred million dollars of annual funding from the State of New Jersey. One of UMDNJ's eight schools was SOM. *Id.* at ¶ 1. In early 2002, Gallagher was the Vice Dean of SOM. It is alleged that, in or about February 2002, Bryant and others assisted Gallagher in his effort to become the Dean of SOM, including arranging meetings between Gallagher and members of the state legislature, and drafting a letter, which was signed by Bryant and four other members of the legislature, and sent to the Governor of New Jersey and to the President of UMDNJ in support of Gallagher's bid to become Dean. *Id.* at ¶ 7. In or about May 2002, Gallagher was selected as interim Dean, and in November 2002, Gallagher became the permanent Dean of SOM.

In or about March 2002, the Governor created a Commission of Health Science, Education and Training, chaired by P. Roy Valegos ("the Vagelos Commission"), to evaluate the medical education offered by New Jersey's state funded universities, including UMNDJ and SOM. In or about October 2002, the Vagelos Commission submitted findings to the Governor, which identified numerous problems, found that UMDNJ failed to "achieve excellence," and recommended that Rutgers University, UMDNJ, and the New Jersey Institute of Technology merge into a single university system. This recommendation, if adopted, directly threatened the independence of SOM, as well as future funding for SOM. *Id.* at ¶¶ 10–12.

Additionally, in or about April 2003, Gallagher reported to SOM staff that

since in or about July 2002, SOM had "been in the midst of unprecedented 'financial strain' ... caused in large part by significant reductions in State funding." *Id.* at ¶ 13. As Dean, Gallagher was responsible for oversight of the budget and fiscal management of SOM, *Id.,* and, in or about April 2003, he imposed budget cuts and other cost-cutting measures at SOM. *Id.* at ¶ 15. During this time, based upon his performance evaluation, including "administrative competency, leadership, and organizational/business development," Gallagher was eligible for annual incentive bonuses. *Id.* at ¶ 14.

It is alleged that Bryant and Gallagher devised and engaged in a scheme to defraud the New Jersey public of Bryant's honest services by agreeing to a *quid pro quo* bribery arrangement:

> It was an object of [the] scheme and artifice to defraud that defendant R. MICHAEL GALLAGHER used his position as Dean of SOM to put defendant WAYNE R. BRYANT on the SOM payroll, and thereafter, with others, caused defendant BRYANT to receive a stream of corrupt payments and other financial benefits from SOM, in exchange for defendant BRYANT using his position as a State Senator to take official action to advocate on behalf of SOM, including (a) to protect the interests of SOM against the recommendations of the Vagelos Commission and (b) to obtain and attempt to obtain additional funding and other benefits from the State of New Jersey for SOM and its programs. It was a further object of this scheme and artifice to defraud that defendants BRYANT and GALLAGHER did not disclose and attempted to conceal material information regarding the nature of

defendant BRYANT's corrupt arrangement at SOM.

*Id.* at ¶ 18.

Allegedly, in furtherance of the scheme, Gallagher created a paid position at SOM for Bryant entitled "Program Support Coordinator," which included "planning, directing, organizing and implementing" efforts "to improve University communications, image, receptivity and relationships with local governments, community and civic organizations, and local residents," and Bryant assumed that position in March 2003. *Id.* at ¶ 19.d., g.[2] In addition, Gallagher took steps "to make it falsely appear that ... Bryant was assuming a legitimate and bona fide position and that there had been a competitive process leading to defendant BRYANT's selection." *Id.* at ¶ 19.f. Further, Bryant falsely stated to SOM staff that his position at SOM had been approved by the Office of Legislative Services ("OLS"), when Bryant never received any opinion from OLS regarding the propriety of his employment with SOM. *Id.* at ¶ 19.e. As a result of his position at SOM, Bryant received a stream of payments for the years 2003 through 2006. *Id.* at ¶ 19.g.

In exchange for his position at SOM, and the resulting payments he received, Bryant allegedly used his office as a State Senator in various ways to aid SOM. In or about 2003, Bryant used his State Senate staff to arrange meetings between Gallagher and members of the Senate Budget and Appropriations Committee, at which Gallagher presented a "white paper" regarding SOM's need for funding. *Id.* at ¶ 20.a. In or about March 2003, Bryant directed changes in the New Jersey state budget to benefit UMDNJ and SOM. *Id.*

---

**2.** The Indictment further alleges that "UMDNJ already employed a Director of Urban and Community Relations for South Jersey, whose responsibilities included planning, developing, coordinating and monitoring 'programs designed to improve University relations with local governments, residents and businesses.'" Indictment, Counts 1–6, ¶ 19.d.

at ¶ 20.b. From in or about March 2003 to June 2006, Bryant "represented, appeared for, and negotiated on behalf of SOM with state agencies, and used his official position to influence those agencies to take action favorable to SOM." *Id.* at ¶ 21.a.-d.

These actions by Bryant redounded to the benefit of Gallagher, as Dean of SOM: Bryant's "actions on behalf of SOM directly and indirectly helped defendant R. MICHAEL GALLAGHER meet or exceed his performance goals as Dean, and defendant GALLAGHER received favorable performance appraisals and incentive bonuses of approximately $42,000 in the fall of 2003 and $56,875 in the fall of 2004." *Id.* at ¶ 23.

Also in furtherance of their scheme, it is alleged that both Defendants took actions to conceal the nature of their corrupt agreement. Even though Bryant's "primary role at SOM was to use his official position to advocate on behalf of SOM ... and to provide official assistance in obtaining state funds for SOM," Gallagher caused Bryant's publicly-disclosed job description to misleadingly state that his job was to "improve University communications, image, receptivity, and relationships with local governments, community and civic organizations and local residents." *Id.* at ¶ 22.a. Bryant, in violation of the New Jersey Legislative Code of Ethics, "intentionally failed to disclose his payments from SOM on his 2003 Legislator's Financial Disclosure Statement," which he filed in April 2004. *Id.* at ¶ 22.b. Further, "[a]t meetings with state officials regarding UMDNJ and SOM business, and in his dealings with staff and members of the New Jersey State Legislature with whom he worked on state budget issues related to UMDNJ and SOM, defendant WAYNE R. BRYANT did not disclose that he was being paid by SOM." *Id.* at ¶ 22.d.

### B. Analysis of Counts 1–6

Counts 1–6 allege that Bryant and Gallagher engaged in a scheme to defraud the public of Bryant's honest services in violation of 18 U.S.C. §§ 1341, 1343, 1346 and 2. The Third Circuit has recently laid out the elements of honest services fraud, which is a species of mail and wire fraud:

> To prove mail fraud, the government must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails ... in furtherance of the scheme." *United States v. Antico,* 275 F.3d 245, 261 (3d Cir.2001). Congress has clarified that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Honest services fraud, in turn, typically occurs in either of two situations: "(1) bribery, where a [public official] was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." *Antico,* 275 F.3d at 262–63.

*Kemp,* 500 F.3d at 279. "Identical standards apply to the 'scheme to defraud' under both the mail and the wire fraud statutes." *Antico,* 275 F.3d at 262. The Indictment in the case at bar charges both theories of honest services fraud set forth in *Kemp,* i.e., bribery and failure to disclose a conflict of interest, and Defendants challenge the sufficiency of the allegations with respect to both theories. The Court will consider each theory in turn. First, however, the Court must consider Defendants' contention that the Indictment fails to adequately allege either theory of honest services fraud, but instead, charges a plainly inadequate "structural fraud." Gallagher's Brief, 20–23.

### 1. The Indictment Does Not Allege a "Structural Fraud"

Defendants argue that the Indictment merely alleges a "structural fraud"—that is, they are charged with honest services fraud because Bryant received and held a paid position at SOM, an institution which happened to benefit from official actions he took as a state legislator. Gallagher's Brief, 20–23. However, it is plain that the Indictment does not charge the Defendants with honest services fraud merely because Bryant was a dual office holder.[3] The Indictment alleges that Bryant and Gallagher had a *quid pro quo* bribery arrangement, whereby Bryant exercised discretion in his official capacity as a state legislator favorably towards SOM in exchange for a salary from SOM. Indictment, Counts 1–6, ¶ 18. Thus, Defendants' "scheme and artifice to defraud the State of New Jersey and its citizens of the right to defendant WAYNE R. BRYANT's honest services" was a classic bribery scheme. And, Gallagher does not suggest that "a classic bribery scheme would not violate Section 1346." Gallagher's Brief, 13. As charged, a bargain was struck: Gallagher caused Bryant to receive a salary from SOM in exchange for Bryant using his office as a state legislator to benefit SOM, and in turn, to benefit Gallagher.[4]

### 2. The *Quid Pro Quo* Bribery Theory

#### a. The Legal Standard

The Third Circuit has repeatedly stated that, in the honest services fraud context, bribery occurs when "a public official [is] paid for a particular decision or action."

*Kemp*, 500 F.3d at 279 (citing *Antico*, 275 F.3d at 262–63); *United States v. Panarella*, 277 F.3d 678, 690 (3d Cir.2002). In *Kemp*, the court elaborated: "bribery requires a specific intent to give or receive something of value *in exchange* for an official act." *Kemp*, 500 F.3d at 281 (citation and internal quotations omitted) (emphasis in original). In sustaining the trial court's jury instructions for honest services fraud under a bribery theory, the court stated that "the District Court repeatedly emphasized the critical *quid quo pro*, explaining that '[t]o establish such a bribery the government must prove beyond a reasonable doubt that there was a quid quo pro, . . . that the benefit was offered in exchange for the official act.'" *Id.* at 281 (citation omitted). Again, the court explained that "[t]he key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action." *Id.* at 282.

Moreover, the court specifically addressed the sufficiency of the allegations in the indictment with respect to the bribery theory of honest services fraud against bankers who allegedly bribed a public official with loans. The court stated:

> The indictment refers to "the benefits that HOLCK and UMBRELL extended to Kemp with the intent to influence KEMP's official actions," and charges that "defendants GLENN K. HOLCK and STEPHEN M. UMBRELL, on behalf of their employer, Commerce Bank, provided benefits to Kemp in the form

---

3. Defendants' briefing repeatedly mentions that New Jersey permits legislators to hold multiple positions with public employers, but the New Jersey system of dual office holding, despite its many publicized shortcomings, is not the subject of this Indictment.

4. The allegations pertaining to Counts 1–6 are silent as to whether Bryant did any legitimate

work at SOM in addition to using his Senate Office to further the interests of SOM. As explained *infra* at § II.B.2.b., this does not undercut the sufficiency of the allegations of a *quid pro quo* bribery agreement in the Indictment (although it may be relevant to the proofs).

of otherwise unavailable loans *in exchange* for favorable decisions by KEMP as Treasurer of Philadelphia." These allegations were sufficient to charge Holck and Umbrell with honest services fraud under a bribery theory.

*Id.* at 280–81 (citations omitted) (emphasis added).

The Indictment here tracks the language that the Third Circuit found sufficient in *Kemp* for a *quid pro quo* bribery arrangement. The Indictment specifically alleges that "defendant R. MICHAEL GALLAGHER used his position as Dean of SOM to put defendant WAYNE R. BRYANT on the SOM payroll, and thereafter ... caused defendant BRYANT to receive a stream of corrupt payments and other financial benefits from SOM, *in exchange* for defendant BRYANT using his position as a State Senator to take official action to advocate on behalf of SOM." Indictment, Counts 1–6, ¶ 18 (emphasis added). The *quid* was Bryant's pensionable salary from SOM, i.e., the "corrupt payments and other financial benefits from SOM." The *quo* was Bryant taking official action as a state legislator to benefit SOM, i.e., "Bryant using his position as a State Senator to take official action to advocate on behalf of SOM." Finally, there was a *pro*, a linkage[5] between the *quid* and the *quo*, i.e., Bryant's SOM salary was given "in exchange" for taking official action favorable to SOM. Nonetheless, Defendants argue that the Indictment fails to adequately allege a *quid pro quo* bribery; it fails to allege either a sufficient *quid* or a sufficient *quo*. I disagree.

### b. The *Quid*—Bryant's SOM Salary

■ Defendants argue that *Kemp* stands for the proposition that in order for a payment to a public official in exchange for official action to constitute a *quid,* the payment must be given *solely* because of the official action at issue. In *Kemp,* bankers were convicted of bribing a public official by granting him loans that were otherwise unavailable to the official. *Kemp,* 500 F.3d at 281, 284. Finding that there was sufficient evidence for the jury to conclude that the loans were the *quid* in a *quid pro quo* bribery arrangement, the court held, "[a]s a factual matter, a reasonable jury certainly could have found that these loans were not advanced in the usual course of business and were instead extended to Kemp and his friends *solely* because of Kemp's position." *Id.* at 284 (emphasis added). In other words, a reasonable jury could find that the loan was not a normal commercial transaction between the bankers and the public official, but rather the equivalent of a cash-stuffed envelope given "solely because of Kemp's position." *Id.*

Seizing on this quotation from *Kemp*—that the loans were otherwise unavailable and given to Kemp "solely because of Kemp's position"—Defendants argue that the Indictment here is deficient because it fails to allege that Bryant's salary payments were given "solely" because of his official actions. The portion of the Indictment dealing with honest services fraud does not deny that Bryant did any legitimate work for SOM; it simply does not address the matter.[6]

---

5. Defendants raise the issue of precisely what *kind* of causal linkage is required to allege an adequate *quid pro quo.* Their arguments on this point are addressed *infra* at § II.B.2.c.

6. When the Indictment lays out Bryant's alleged scheme to defraud the New Jersey Division of Pension Benefits in Counts 9–14, which are not incorporated into the allegations of Counts 1–6, it alleges that Bryant "did little or no meaningful work in exchange for the pensionable income that he received from SOM." Indictment, Counts 9–14, ¶ 11d.

Defendants' argument is based on a misreading of *Kemp* and reflects an improbably narrow conception of the *quid* required for a *quid pro quo* bribery. For example, suppose the Government had alleged that Bryant and Gallagher specifically agreed to the following: SOM would pay Bryant a pensionable salary, and in exchange, Bryant would take both official action benefiting SOM and perform some legitimate work for SOM. According to Defendants, that salary is not a sufficient *quid* because it was not given "solely" on account of Bryant's official action; it was also given for another reason, i.e., that Bryant agreed to perform legitimate work for SOM. But these factual allegations clearly satisfy the standard that *Kemp* articulates for a *quid pro quo* bribery in the context of an honest services fraud: "a reasonable jury could conclude beyond a reasonable doubt that Kemp 'was paid for a particular decision or action.'" *Id.* at 279 (citation omitted). "[B]ribery requires 'a specific intent to give or receive something of value in exchange for an official act.'" *Id.* at 281 (citation omitted). In the foregoing hypothetical, there is no question that, even though the salary payments are not given "solely" in exchange for official

action, they are made with "a specific intent to give ... [salary payments] in exchange for official action." *Id.* Similarly, the exchange alleged in the Indictment, which differs from the hypothetical only insofar as it is alleged that Bryant's "primary role" at SOM was to use his official position as a state legislator to advocate on behalf of SOM and assist SOM in obtaining state funds, includes a sufficient *quid*, i.e., payment of Bryant's SOM salary. *Cf. United States v. Coyne*, 4 F.3d 100, 113 (2d Cir.1993) ("we noted that there could be dual purposes for payments, stating that a 'valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability'") (citation omitted); *United States v. Urciuoli*, 513 F.3d 290, 292, 297 (1st Cir.2008) ("Celona's actions in promoting or blocking legislation to favor RWMC" were "properly considered as potentially criminal" even though the "disguised bribe" was "in the form of a sham *or largely* sham job") (emphasis added). Thus, even if Bryant's salary may have been paid in exchange for legitimate work at SOM, *in addition* to his taking official action on behalf of SOM, that does not mean that the salary cannot constitute payment for official action, and hence a sufficient *quid*.[7]

7. Indeed, a careful reading of *Kemp* indicates that Defendants derive their *"Kemp standard"* by reading the phrase "solely because of Kemp's position" out of context. The court there was answering the Defendants' argument that loans made in the usual course of business cannot constitute the *quid* of a *quid pro quo* bribery scheme. The court responded that "[a]s a factual matter, a reasonable jury certainly could have found that [the loans at issue] were not advanced in the usual course of business and were instead extended to Kemp and his friends solely because of Kemp's position," *Id.* at 284, i.e., they were not made in the usual course of business. That a jury could find that the loans were made "solely because of Kemp's position" rather than in the usual course of business was relevant to the issue of whether the loans (as opposed to a cash payment or other thing

of value) could constitute a bribe. Hence, in the next paragraph, the court held that "as a legal matter, a loan to a public official ... that would have otherwise been unavailable to that official ... may constitute a bribe." *Id.* at 285. In other words, the court held that a loan that was given "solely because of Kemp's position," just like cash and other things of value, could serve as a *quid*. The court simply did not hold that a sufficient *quid* must be given "solely" in exchange for official action.

This reading of *Kemp* is confirmed by the court's conclusion: "Thus, we conclude that loans, so long as they are granted in exchange for an official act, may drive a bribery prosecution." *Id.* at 285. The court did not say that the loans must be granted "solely" in exchange for official acts. Further, in a footnote, the court stated: "Indeed, given that the

### c. The *Quo*

Defendants also challenge the sufficiency of the *quo*, i.e., Bryant's taking official action to benefit SOM, for a different reason. They acknowledge that an allegation of a *quid pro quo* exchange is the essential element of the bribery theory of honest services. Defendant's Reply Brief, 8; *Kemp*, 500 F.3d at 281 ("bribery requires a specific intent to give or receive something of value *in exchange* for an official act") (citation and internal quotations omitted) (emphasis in original). However, they argue that even though the Indictment explicitly states that there was an "exchange," the "exchange" as plead is inadequate without a further allegation: that Bryant took official action he would not have taken absent the bribery arrangement with Gallagher. Hence, Defendants assert that "the government has alleged no facts on which any reasonable jury could find that Bryant deviated from his usual position of supporting South Jersey institutions. Thus, the government has not alleged that Bryant ... engaged in an 'exchange.'" Defendants' Reply Brief, 9.

For a public official to give a thing of value, i.e., a *quo*, to the payor of the bribe, the official must accept the bribe with the intent to be *influenced* by the bribe. Thus, according to Defendants, without a specific allegation that Bryant took actions he otherwise would not have taken, the Indictment does not allege that Bryant was *influenced* by the bargain he struck with Gallagher, and despite the Indictment's use of the word "exchange," Bryant "exchanged" nothing. Hence, there was no *quid pro quo* bribery arrangement. *See* Defendants' Reply Brief, 10 ("[O]nly

government must also prove the loan was given *in exchange* for some official action, there is little danger that honest loans will trigger criminal liability." *Id.* at 285 n. 16 (emphasis added).

when the government charges 'influence'—and the 'exchange' that it denotes—does the government state a *quid pro quo* bribe" and "[a]s a matter of pure logic, a person who intends to do exactly what he would have done all along, payment or no, does not 'intend to be influenced' by the payment") (emphasis in original).

This argument fails because the Indictment's allegation of an "exchange" necessarily signifies that Bryant accepted the bribe, his SOM salary, with the intent to be influenced in the official actions listed in the Indictment. The Supreme Court has made clear that an allegation that an official "exchanged" official acts for a bribe, as plead in paragraph 18 of the Indictment, is just another way of stating that the official intended to be influenced:

> Bribery requires intent ... "to be influenced" in an official act ... In other words, for bribery there must be a *quid pro quo*-a specific intent to give or receive something of value *in exchange* for an official act.

*United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 404–05, 119 S.Ct. 1402, 143 L.Ed.2d 576. Thus, the "specific intent to ... receive something of value in exchange for an official act" is another way of stating that the official had an intent " 'to be influenced' in an official act." *Id.* at 404–05, 119 S.Ct. 1402. The Indictment does allege—through the allegation of an "exchange"—that Bryant was influenced in his official acts.

Of course, as Defendants' argument suggests, another way of alleging that a public official accepted a payment with the intent to be influenced is to state that, as a result

Again, this indicates that the court's use of the word "solely" related to the issue of whether a loan can serve as a *quid*, i.e., as a thing of value, not, as Defendants here contend, the required connection between a *quid* and a *quo*.

of the bribe, the official took actions he otherwise would not have taken. Indeed, a fair reading of the Indictment suggests that, as a result of an agreement to exchange official actions for an SOM salary, Bryant did take at least some actions that he otherwise would not have taken, as the following paragraphs will illustrate. *See Hodge*, 211 F.3d at 76 ("In evaluating whether Hodge's indictment sufficiently sets forth the essential facts of the offense charged, we review the indictment using a common sense construction").

The Indictment alleges that the scheme to defraud ran from "in or about the fall of 2002 to in or about February, 2006," Indictment, Counts 1–6, ¶ 17. The scheme began in late 2002 through early 2003, when Bryant first started receiving his salary from SOM, and involved Bryant using his Senate office to further the interests of SOM through as late as 2006. The Indictment alleges that in the fall of 2002, in the same meeting where Bryant informed the President of UMDNJ that he wanted UMDNJ to pay property taxes on a proposed building in Camden County, Bryant solicited the President to give him a paid position at UMDNJ. *Id.* at ¶ 19.a. Between then and March 2003, Gallagher and Bryant took steps to secure a position for Bryant at SOM, including meeting with the UMDNJ Vice President and Gallagher's creation of new position at SOM for Bryant. *Id.* at ¶ 19.b., d., f.-g.

The Indictment further alleges that contemporaneous with, and subsequent to, Bryant's efforts to secure a position at SOM, over more than a three year period, Bryant took an assortment of official actions that favored SOM. In December 9, 2002, at a meeting of the Senate Education Committee, Bryant strongly criticized the findings of the Vagelos Commission to protect the interests of SOM. *Id.* at ¶ 19c. In or about 2003, Bryant "used his State Senate staff to arrange meetings for defendant R. MICHAEL GALLAGHER with members of the Senate Budget and Appropriations Committee, at which defendant Gallagher presented a 'white paper' regarding capital projects at SOM that needed funding." *Id.* at ¶ 20.a. From in or about March 2003 through June 2006, Bryant directed changes in the budget of the State of New Jersey that allocated large sums of money to SOM. *Id.* at ¶ 19.b. For fiscal year 2004, Bryant inserted "*specific language provided by defendant Gallagher into the state budget* which described the merits of SOM's Center for Children's Support, and supported an $800,000 allocation for SOM," which he ensured was included in the state budget in fiscal years 2004, 2005 and 2006. *Id.* at ¶ 20.b.ii.-iii. (emphasis added).

Further, from in or about August 2003 through late 2005, Bryant "represented, appeared for, and negotiated on behalf of SOM with state agencies, and used his official position to influence those agencies to take action favorable to SOM." *Id.* at ¶ 21. These included setting up a meeting between himself, Gallagher, and the Commissioner of the New Jersey Department of Health and Senior Services where Bryant and Gallagher sought to influence the Commissioner to allocate to SOM a portion of funds appropriated to the Cancer Institute of South Jersey, *Id.* at ¶ 21.a.; setting up a meeting between himself, Gallagher, and the Treasurer of the State of New Jersey at Bryant's legislative office in Camden, New Jersey, "in an effort to influence the Treasurer to disburse 'special' targeted tax relief payments to the Borough of Stratford, New Jersey, to compensate the borough for the land that SOM was planning to acquire," *Id.* at ¶ 21.-c.; and two other instances where Bryant persuaded state agencies to provide funding to SOM. *Id.* at ¶ 21.b., d.

Given these allegations, it is implausible to read the Indictment to suggest that Bryant could have already intended, *in advance of the quid pro quo arrangement,* to take *all* the official actions he would take on behalf of SOM throughout the approximately three year duration of the scheme. For example, by alleging that Bryant wrote specific language crafted by Gallagher into the state budget, the Indictment clearly implies that Bryant's course of conduct was affected by the bargain he had struck with Gallagher. Even if Bryant had a strong proclivity to take favorable action in favor of SOM prior to the commencement of the alleged scheme, the Indictment's allegation of an "exchange" indicates that any pre-existing inclination on Bryant's part was affected by the agreement, resulting in a change of conduct. In sum, only a strained reading of the Indictment could suggest that (1) Bryant agreed to exchange official actions for his SOM salary and (2) Bryant would have taken every single official act enumerated in the Indictment even absent that agreement. Thus, Defendants' argument that "the government has alleged no facts" to support the proposition that Bryant "deviated from his usual position of supporting South Jersey institutions," Defendants' Reply Brief, 9, fails on its own terms.

More importantly, the Indictment need not allege that Bryant ultimately took some official actions that he would not have otherwise taken. That is not the legal standard for *quid pro quo* bribery under § 1346. To prove *quid pro quo* bribery under *Kemp,* the Government does not need to allege and prove that Bryant took actions that he otherwise would not have taken. Instead, the Indictment must allege, and the Government must prove, that Bryant engaged in a *quid pro quo* exchange with Gallagher, whereby Bryant exercised his official discretion with "a specific intent to ... receive something of value in exchange for ... official act[s]." *Kemp,* 500 F.3d at 281 (citation omitted).

Defendants' argument that a further allegation is required proceeds on an incorrect premise: that unless, as a result of a bribe, an official takes *actions that he otherwise would not have taken,* the official was not influenced by the bribe. But an official can have the intent to be influenced by a bribe, i.e., the "intent to make good on the bargain," *United States v. Ford,* 435 F.3d 204, 213 (2nd Cir.2006), even if, ultimately, the official ends up taking *the same action* he would likely have taken if he were not bribed. *See United States v. Quinn,* 359 F.3d 666, 675 (4th Cir.2004) (with respect to a conviction for bribery under 18 U.S.C. § 201(b), "it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"); American Criminal Law Review, 834 (Spring 2008) ("Significantly, a payment or promise need not alter a public official's actual course of conduct, as long as the parties to the transaction possessed corrupt intent") (citing *Quinn,* F.3d at 675); cf. 4 Wharton's Criminal Law, § 646 (2007) ("To constitute bribery, there must be a corrupt intent, i.e... from the standpoint of the bribee, an intent to use his public office as a means of acquiring an unlawful benefit").

When an official makes a *quid pro quo* bribery agreement, explicitly or implicitly, he ceases making decisions according to his best judgment as a legislator on behalf of all the citizens he serves, and allows the payor to place a thumb on the scale of his decision-making process. When a legislator has a "specific intent to ... receive something of value *in exchange* for ... official act[s]," *Kemp,* 500 F.3d at 281 (citation omitted), in addition to whatever considerations he would have brought to bear regarding the merits of such official acts, he also has a corrupt consideration, the

bribe. Thus, even if the official actions he ultimately takes in favor of the payor are unchanged, the legislator's decision-making process is still influenced. The exercise of a legislator's discretion in unremitting favor of a constituent in the future, even if likely, cannot be certain in light of the competing concerns of the general citizenry and changing, as well as unforeseen, circumstances. Thus, an allegation that a legislator "exchanged" official actions for a bribe necessarily means that the bribe had some influence on that discretion—even if, as things turned out, the official's actions were the same as they would have been absent the bribe. This is because the "exchange" removes discretion from the legislator—which he is obligated to exercise in the best interests of the public—and instead locks him into a position favoring one constituent, as dictated by the *quid pro quo* arrangement.

Moreover, a legislator who makes an implicit or explicit agreement to exchange official acts for a payment or benefit clearly has a corrupt intent. The existence of an agreement to exchange official actions for a payment or benefit means that the legislator is aware that the payor intends to influence his official action through the bribe and, by agreeing to the "exchange," confirms to the payor that he will be influenced. Thus, even if his course of conduct remains the same as it would have absent the agreement, the legislator has the corrupt intent to deliver on his end of the bargain, and confirm the payor's expectations. *See Ford*, 435 F.3d at 213 ("The recipient's 'awareness' that the donor gave something of value for the purpose of influencing the recipient might well constitute strong circumstantial evidence that the recipient acted with the requisite culpable state of mind in accepting the item,

but a jury should be clearly instructed that it is *the recipient's intent to make good on the bargain,* not simply her awareness of the donor's intent that is essential to establishing guilt under [the bribery prong of] Section 666") (emphasis added).[8]

Defendants support their interpretation of the "exchange" required by *Kemp*—that a *quo* must be action that an official would not have otherwise taken—with two further arguments. First, Defendants point out that the loans that constituted the *quid* in *Kemp* were not otherwise available. The court stated that a jury could have found that the "loans were made available to Kemp only because he was the treasurer." *Kemp*, 500 F.3d at 285. Second, Defendants argue that, unless their interpretation of an "exchange" is adopted, the distinction between a gratuity and a bribe collapses.

For the reasons explained above, *see supra* at II.B.2.b., the Third Circuit's description of the loans in *Kemp* was not meant to impose a requirement that an official must take actions that he otherwise would not have taken to be convicted under the *quid pro quo* bribery theory. First, the court simply did not say that. To the contrary, when discussing the sufficiency of the evidence of the *quo*, the court found that "accepting money in exchange for an official action is a form of honest services fraud." *Kemp*, 500 F.3d at 280. In describing Kemp's official actions, which the court found sufficient for honest services fraud, the court stated:

> The government presented evidence that Kemp and Anderson had an *arrangement* where Anderson would locate owners of unredeemed city bonds and attempt to help them cash their bonds. This project required Kemp to exercise

**8.** Of course, the issue of intent is for the jury to decide. *United States v. Gordon*, 183 Fed.

Appx. 202, 214 (3d Cir.2006).

his authority as treasurer: he provided Anderson with a list of holders of outstanding bonds and a form letter for her to use; also, the treasurer's office was responsible for contacting the banks to facilitate the ultimate repayment. When Anderson was asked at trial what Kemp would contribute to the business to earn his share of its proceeds, she identified only these first two official actions. *A reasonable jury certainly could have concluded that Kemp was paid for the reasons that Anderson pinpointed-taking official action that aided the business.*

*Id.* at 279 (emphasis added). Thus, when assessing the sufficiency of the evidence of *quid pro quo* bribery in the context of honest services fraud, the court found it sufficient that the there was an "arrangement" whereby "Kemp was paid for ... taking official action" that aided the payor's business. The Third Circuit did not require evidence that *Kemp* would not have taken the official actions at issue if not for the payment.

Second, the relevance of the court's finding that a jury could find that the loans were otherwise unavailable was that, as a legal matter, "a loan to a public official ... that would have otherwise been unavailable to that official or available at a higher interest rate may constitute a bribe." *Id.* at 285. The issue was whether the loan was a thing of value sufficient to constitute a bribe:

Our conclusion that a loan may constitute the *quid* in a bribery prosecution is also supported by the relevant caselaw. Most notably, in *United States v. Gorman*, 807 F.2d 1299 (6th Cir.1986), the defendant argued that a loan was not a "thing of value" under § 201 because he fully repaid the loan with interest. *Id.* at 1304. The Sixth Circuit rejected that argument, because at the time that the defendant received the loan he was having "severe financial difficulties" and it

was unclear whether such a loan would have been available to him in the ordinary course of business. *Id.* at 1305. The court focused on the value that the recipient "subjectively attache[d] to the items received." *Id.* A loan was also recognized as a potential *quid* in *United States v. Williams*, 705 F.2d 603 (2d Cir.1983). There, a United States Senator was convicted under the federal bribery statute for "seeking funds for the financing and purchase of a mining venture in which he had an interest in exchange for his assistance in obtaining government contracts for the venture." *Id.* at 612. One of the two sorts of funds that the senator sought was a $100 million loan that was to be repaid with interest. *Id.* at 620. The court never questioned that the loan could serve as a bribe, and termed the evidence against the senator "overwhelming." *Id.* at 612; *see also United States v. Crozier*, 987 F.2d 893, 901 (2d Cir.1993) ("[A]s we have held in connection with § 201, any payment that the defendant subjectively believes has value, including a loan, constitutes a thing 'of value' within the meaning of § 666(c)"). Thus, we conclude that loans, so long as they are granted in exchange for an official act, may drive a bribery prosecution.

*Id.* Thus, the court did not address the nature of the causal connection between a *quid* and a *quo*, much less hold that *quid pro quo* bribery requires that the *quo* (Kemp's official actions; Bryant's official actions) would not have occurred without the *quid* (the loans extended to Kemp; Bryant's SOM salary).

Defendants' second argument is that an allegation that Bryant would not have taken the official actions at issue were it not for his agreement with Gallagher is required in order for the Indictment to charge that the salary was a bribe rather than a mere illegal gratuity. According to Defendants, "[c]ontrasting 'influence' with

'reward' (that is, bribe with gratuity) underscores the need for an impact on the official's actions." Defendants' Reply Brief, 10. But as was just explained, an allegation that Bryant's course of conduct changed from what it otherwise would have been absent the bribery arrangement is *not* needed to allege that Bryant's official discretion was influenced by the agreement. Thus, such an allegation is not needed to preserve the distinction between a bribe, which involves a *quid pro quo* exchange, and a mere gratuity, which is a reward that does not influence the judgement of the official. As Justice Scalia stated in *Sun–Diamond Growers of California,* the crucial distinction between a bribe and gratuity is the required element of intent, and the allegation of an "exchange" is another way of stating that the an official intended to be influenced. *Sun–Diamond Growers of California,* 526 U.S. at 404–5 (holding that bribery requires an "intent to be influenced," and then stating that "[i]n other words, for bribery there must be a *quid pro quo*-a specific intent to give or receive something of value in *exchange* for an official act"). Thus, the Court finds that the Indictment adequately alleges a sufficient *quid* and a sufficient *quo* under § 1346.

### 3. Must the Government Prove the Violation of a State Law Under the *Quid Pro Quo* Bribery Theory?

The role that state law plays in the context of honest services fraud with respect to (1) the sufficiency of the Indictment and (2) what the Government must ultimately prove at trial is heavily disputed

by the Government and the defense. The sufficiency of the Indictment and what the Government must prove at trial, are, of course, different issues. But in the context of the arguments made by the parties regarding the Indictment, they are interrelated.

■ Following the assertion that "the State of New Jersey and its citizens had an intangible right to the honest services of their State Senators," Indictment, Counts 1–6, ¶ 16, the Indictment cites obligations imposed by two New Jersey state laws and an uncited obligation to disclose, which may or may not be derived from state law, as duties that Bryant "owed the State of New Jersey and its citizens." *Id.* There is a substantial dispute between the parties as to why those citations to state law are included in the Indictment, including whether there need be any reference to state law and whether it must be alleged in the Indictment and proven at trial that at least one of these state law duties was violated. Thus, it is necessary for the Court to clarify what the Government must prove at trial regarding the state law duties cited in the Indictment. In order for an Indictment to pass muster, it must "sufficiently apprise[ ] the defendant of what he must be prepared to meet." *Kemp,* 500 F.3d at 280.

■ The Government contends that, even if a violation of a state law predicate is required by the failure to disclose theory of honest services fraud, a violation of a state law predicate need not be proven under the *quid pro quo* bribery theory. Oral Argument, 88–89.[9] Instead, the Gov-

---

9. At oral argument the Government stated:
"Mr Gross: We will have to prove that there was a bribe.
The Court: ... Now, a bribe under what? You are saying not the state law.
Mr. Gross: That's right.
The Court: But under federal common law defined as simply *quid pro quo*?

Mr. Gross: ... [T]he elements would be that defendant was offered something of value in exchange for his official conduct ... [W]e would have to prove ... that there was an agreement that [Bryant] would perform official duties in exchange for payments that he received from [SOM.]"
Oral Argument, 88–89.

ernment argues that it need only allege, and ultimately prove, a *quid pro quo* bribery arrangement as described in the case law interpreting § 1346; specifically, cases involving the bribery prong of honest services fraud.[10] *Id.;* Government's Brief, 32 ("the indictment need not allege a violation of state law"). Why then, as asked by the defense, is the New Jersey Bribery Act and bribery provision of the New Jersey Conflicts of Interest Laws cited in the Indictment? According to the Government, these state laws "give contour" to Bryant's fiduciary duty to the New Jersey public. Oral Argument, 84. In Defendants' view, however, to sufficiently allege honest services fraud under § 1346, the Indictment must allege a violation of a predicate state law, and the Government must prove that violation at trial.

For the reasons that follow, the Court finds that (1) once the Indictment adequately alleges that a duty of honest services was owed to the public, the Government need not allege a violation of an independent state law to adequately allege a violation of §§ 1341, 1343 and 1346 under the *quid pro quo* bribery theory, and (2) beyond establishing that a duty of honest services was owed to the public, the Government need not prove a violation of state law at trial to sustain a conviction under the *quid pro quo* bribery theory of honest services fraud.

a. **The Source of the *Quid Pro Quo* Bribery Theory of Honest Services Fraud**

■ In relevant part, the mail and wire fraud statutes provide:

Whoever, having devised or intending to devise any *scheme or artifice to defraud,* or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises ... [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice ... shall be fined ... or imprisoned.

18 U.S.C. §§ 1341, 1343 (emphasis added). Again, to prove mail or wire fraud, the Government "must establish '(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails [or interstate wires] ... in furtherance of the scheme.' " *Kemp,* 500 F.3d at 279 (citing *Antico,* 275 F.3d at 261).

By enacting 18 U.S.C. § 1346, Congress clarified the meaning of the phrase "scheme or artifice to defraud" in the mail and wire fraud statutes: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In *Antico,* the Third Circuit stated: "Given Congress' clear intent in enacting § 1346, we join with those courts that recognize that the scope of the amendment includes the prosecution of state and local officials and public employees for depriving the citizens they serve of their right to honest services." *Antico,* 275 F.3d at 262.

Further, *Antico* explicitly held that "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, includes *quid pro quo* bribery. "Honest services fraud typically occurs in two scenarios: *(1) bribery, where a legislator was paid for a particular decision or action;* or (2) failure to disclose a conflict of interest resulting in personal gain." *Antico,* 275 F.3d at 262–63 (citing *United States v.Woodward,* 149 F.3d 46, 54–55 (1st Cir.1998)) (emphasis added);

---

**10.** Presumably, the Government has in mind the standard articulated in *Kemp,* discussed

*supra* at II.B.2.a.

*see also Panarella,* 277 F.3d at 690 ("'Honest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action'") (quoting *Antico,* 275 F.3d at 262–63); *United States v. Murphy,* 323 F.3d 102, 114 (3d Cir.2003) ("bribery . . . may even be the paradigm case of honest services fraud committed by public officials"); *United States v. Mangiardi,* 962 F.Supp. 49, 51 (M.D.Pa.1997) ("The typical case of honest services fraud is the bribery of a public official"); *United States v. Mariano,* Docket No. 05–614, 2006 WL 487905, *3 (E.D.Pa. Feb. 27, 2006) ("A person of ordinary intelligence should know that bribery, conducted through the U.S. Mail or otherwise, is illegal") (citation omitted); Third Circuit Model Jury Instructions, Fraud Offenses, 13 (2007) ("So, for instance, a public official who accepts a bribe or corrupt payment breaches the duty of honest, faithful and disinterested service"). Thus, since *Antico* was decided in 2001, it has been clear in this Circuit that a scheme whereby "a legislator [is] paid for a particular decision or action," *Antico,* 275 F.3d at 263, constitutes a "scheme or artifice to defraud" within the meaning of § 1346, and as such, is prohibited by the mail and wire fraud statutes.

In the Third Circuit's recent decision in *Kemp,* the court embraced *Antico's* construction of § 1346. In rejecting a challenge to the sufficiency of the evidence to establish the bribery theory of honest services fraud, the court held: "a reasonable jury could conclude beyond a reasonable doubt that Kemp 'was paid for a particular decision or action.'" *Kemp,* 500 F.3d at 279 (citing *Antico,* 275 F.3d at 263). Further, the court elaborated on *Antico's* description of the bribery prong of honest services fraud by emphasizing the crucial concept of a *quid pro quo* exchange: "We have repeatedly recognized that accepting money in exchange for an official action is a form of honest services fraud." *Kemp,*

500 F.3d at 280 (citations omitted). The court further explained:

> As we held above, bribery requires a specific intent to give or receive something of value *in exchange* for an official act. We note that evidence of a "*quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." *Antico,* 275 F.3d at 257. As we have recognized, "'the official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.'" *Id.* at 258 (quoting *United States v. Bradley,* 173 F.3d 225, 231 (3d Cir.1999)).

*Kemp,* 500 F.3d at 284 (emphasis in original). Thus, the *quid pro quo* bribery theory of honest services fraud is derived from §§ 1341, 1343 and 1346.

**b. No State Law Violation is Required**

Defendants contend that the *quid pro quo* bribery theory of honest services fraud requires that the Indictment allege, and the Government ultimately prove, an additional element beyond a *quid pro quo* exchange: the violation of a state law predicate. However, *Kemp* made clear that an indictment need only allege a *quid pro quo* exchange to sufficiently allege the bribery prong of honest services fraud. The defendant bankers who were convicted of bribing a public official, there argued that the indictment failed to allege the bribery theory of honest services fraud. The court responded:

> We conclude that the indictment here adequately charged Holck and Umbrell with the bribery theory of honest services wire fraud. The wire fraud counts of the indictment (counts 15–22) plainly alleged honest services fraud,

charging Holck and Umbrell with engaging in "a scheme to defraud the City of Philadelphia and its citizens of the right to defendant COREY KEMP'S honest services in the affairs of the City of Philadelphia." (App. at 587.) Then, the specific factual allegations—some of which were incorporated by reference to the allegations of the conspiracy charge, see Fed.R.Crim.P. 7(c)(1) ("A count may incorporate by reference an allegation made in another count."); see also United States v. Markus, 721 F.2d 442, 444 (3d Cir.1983)—were sufficient to alert Holck and Umbrell that the government planned to pursue both theories. The indictment refers to "the benefits that HOLCK and UMBRELL extended to Kemp with the intent to influence KEMP's official actions" (App. at 491), and charges that "defendants GLENN K. HOLCK and STEPHEN M. UMBRELL, on behalf of their employer, Commerce Bank, provided benefits to Kemp in the form of otherwise unavailable loans in exchange for favorable decisions by KEMP as Treasurer of Philadelphia" (App. at 554). These allegations were sufficient to charge Holck and Umbrell with honest services fraud under a bribery theory, and accordingly, we reject Holck and Umbrell's argument that the indictment should have been dismissed.

Id. at 280–81 (emphasis added). Thus, the Third Circuit found the indictment to be sufficient without referring to any allegation that the defendants violated a state law predicate. Moreover, prior to its analysis of the indictment's allegations, the court had just explained that "[w]e deem an indictment sufficient so long as it … contains the elements of the offense intended to be charged." Id. at 280 (emphasis added). The allegation that the defendants intended to give a public official "benefits … in exchange for favorable decisions," Id. at 281, contained the elements of the bribery theory of honest services fraud and no more was required.[11]

The recent decision in United States v. Flemming, 223 Fed.Appx. 117 (3d Cir. 2007), confirms the proposition that the quid pro quo bribery prong of honest services does not require the Government to allege or prove the violation of a state law. The court held that there was sufficient evidence to support a conviction for honest services fraud where the defendant, the owner of company that had a contract with the Virgin Islands Housing Authority ("VIHA"), bribed a VIHA procurement officer to expedite payments: "the jury could logically infer that Flemming and the [procurement officer] intended to work together to achieve the common goal of defrauding the VIHA by expediting payments to Flemming's company ahead of payments to other vendors." Flemming, 223 Fed.Appx. at 121. After stating that "honest services fraud typically occurs … where a legislator was paid for a particular decision or action," Id. at 122 (quotations omitted), the court explained what was required to meet that standard:

As described above, a reasonable jury could infer from the established facts and circumstantial evidence that Flemming and John knowingly and willfully

11. This is in accord with other Circuits that do not require a state law violation to adequately allege and prove honest services fraud. United States v. Warner, 498 F.3d 666, 698 (7th Cir.2007) (honest services fraud does not "require the jury to find a violation of a specific state law in order to convict"); United States v. Walker, 490 F.3d 1282, 1299 (11th Cir.2007) ("an honest services mail fraud … does not require proof of a state law violation") (citing United States v. Hasner, 340 F.3d 1261, 1269 (11th Cir.2003)); but see United States v. Brumley, 116 F.3d 728, 734 (5th Cir.1997) (requiring a state law violation for honest services fraud).

participated in a scheme to expedite VIHA payments to Flemming's company. The jury could also logically conclude that the money Flemming paid John was intended to influence John in this regard, thereby depriving the citizens of the Virgin Islands of the honest services of a VIHA employee. The government also elicited testimony establishing that the checks were processed in interstate commerce through electronic wires.

*Id.* at 122–123. Thus, evidence that the defendant intended to influence a procurement officer with payments was sufficient for a finding that he "depriv[ed] the citizens of the Virgin Islands of the honest services of the VIHA employee," in violation of §§ 1343 and 1346. *Id.* In the context of *quid pro quo* bribery, then, the Third Circuit did not require a violation of a local law for a conviction under § 1346. Hence, the Government need not allege or prove a state law violation to sustain a conviction under the *quid pro quo* bribery theory of honest services fraud.[12]

### c. The Duty to Provide Honest Services As Distinguished from Duties that Constitute Honest Services

*Kemp* does reference a state law predicate in connection with the *quid pro quo* bribery theory of honest services fraud, albeit in another context. When discussing the sufficiency of the evidence with respect to the conviction of the defendant public official for honest services fraud under the bribery theory, the court stated:

> We have repeatedly recognized that accepting money in exchange for an official action is a form of honest services fraud.

*See United States v. Panarella,* 277 F.3d 678, 690 (3d Cir.2002); *Antico,* 275 F.3d at 262–63. As Pennsylvania law provides, "public office is a public trust and ... any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." 65 Pa. Cons.Stat. § 1101.1. Here, the government presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Kemp violated that trust by soliciting and accepting payment in exchange for taking official action. Accordingly, we find no plain error and reject Kemp's challenge to his mail fraud convictions.

*Kemp,* 500 F.3d at 280. If *Kemp's* holding, as I have discussed, is that the indictment sufficiently alleged the bribery theory of honest serves fraud absent an allegation that any state law was violated, then it may be asked why the Third Circuit pointed to Pennsylvania law for its finding that the the public official violated the "public trust" of his public office. The answer to that question requires a focus on an important distinction drawn by the Third Circuit between two prongs of the analysis of a "state law predicate": (1) whether a defendant has a fiduciary *relationship* such that he owes a duty of honest services to the public; and (2) whether a defendant's conduct violated a type of state law duty that falls within the meaning of "honest services," as defined in § 1346, and is therefore sufficient to constitute honest services fraud. The Third Circuit's analysis in *Murphy* compels this analytical distinction. In *Murphy,* the county chairman of a political

---

**12.** The failure to disclose a conflict of interest theory of honest services fraud may, on the other hand, require the violation of a state law or duty. *See Kemp,* 500 F.3d at 283 (noting the violation of a state criminal law in the context of the failure to disclose theory); *Gordon,* 183 Fed.Appx. at 211. However, the boundaries of that theory are far more imprecise than the *quid pro quo* bribery theory, which requires "a specific intent to give or receive something of value in *exchange* for an official act." *Kemp,* 500 F.3d at 281 (citation and internal quotations omitted) (emphasis in original).

party was convicted of honest services fraud under the failure to disclose theory, but the Third Circuit reversed the conviction for lack of an adequate fiduciary *relationship* between the party chairman and the citizens of New Jersey.[13] In other words, there was no basis to hold that the defendant owed a duty of honest services to the public. *Murphy*, 323 F.3d at 116.

The government argued that Murphy's conduct violated the New Jersey Bribery Act, N.J.S.A. 2C:27–2, and therefore that he had violated a sufficient state law duty to warrant a conviction for honest services fraud. But the Third Circuit found that, even though the bribery statute applied to the defendant's conduct, the bribery statute could not itself create the requisite fiduciary relationship between the defendant and the public:

> While the Government is correct in noting that N.J.S.A. 2C–27–2 applies to party officers as well as public officials, it cannot point to anything in the statute that creates a fiduciary duty on the part of party officials to disclose information to the government ... Moreover, while bribery may often accompany breaches of a duty to disclose, *see Panarella*, 277 F.3d at 695, and may even be the paradigm case of honest services fraud committed by public officials, *see United States v. deVegter*, 198 F.3d 1324, 1327 (11th Cir.1999), *the Government points to no case that found that a bribery statute can create an obligation to provide honest services without any preexisting legal duty.*

*Id.* at 115 (emphasis added). Thus, being the chairman of a political party was insufficient to establish a sufficient fiduciary relationship with the public to give rise to a duty of honest services, a prerequisite for applying § 1346 to a scheme to defraud the public of the defendant's honest services.

The court's analysis in *Murphy* clearly distinguishes between the fiduciary relationship necessary for a defendant to *owe* honest services to the public, and the kind of state law violations that can constitute *deprivations of the honest services* that are owed by a defendant. The court carefully drew the distinction in the following passage:

> This final point is the crux of the issue and it presents a slightly different question from that which we addressed in *Antico* and *Panarella*. In those cases we assumed, based on extensive pre-*McNally* case law, that public officials have a duty to provide honest services to the public[, i.e., the requisite fiduciary relationship with the public necessary to owe honest services under § 1346.] We then looked to state law to ascertain what standards of fiduciary care the public officials were required to meet in order to determine whether the officials defrauded the citizens of their right to honest services[, i.e., which state law violations can constitute fraudulent deprivations of honest services, assuming the defendant owes a duty of honest services.] For example, in *Antico*, we referred generally to state and local con-

---

**13.** In the prosecution that lead to the defendants's conviction, the government relied on three theories of fraud. Only the third, where the government "charged Murphy with depriving the County of its right to Murphy's own honest services," *Murphy*, 323 F.3d at 104, was contested by the defendant. "The Government's ... theory was that Murphy had attained such a dominant role in the political system of Passaic County that he could be considered the equivalent of a publicly elected official, and that Murphy had a fiduciary duty to the County and its citizens to provide honest services which he breached by not informing County officials about the fraudulent nature of the contracts-for-payments scheme." *Id.*

flict of interest laws to identify what fiduciary duties the defendant owed to the public. 275 F.3d at 264. And, in *Panarella,* we found "that the clarity of [the state's] disclosure statute criminalizing a public official's nondisclosure of his sources of income addresses rule of lenity concerns ... more effectively than does [a general prohibition against] 'misuse of office for personal gain.' " 277 F.3d at 693.

*Id.* at 115–16. The court explained that while *Antico* and *Panarella* addressed the question of whether a defendant defrauded the public of his honest services, "[t]hese cases do not however, answer the question of whether the New Jersey Bribery Act alone can create a fiduciary *relationship* that could then serve as the predicate for determining that Murphy himself *owed* honest services to Passaic County and its citizens." *Id.* at 116 (emphasis in original).[14]

Again, drawing the distinction between a fiduciary relationship whereby a defendant owes a duty of honest services, and what types of state law duties constitute the honest services of which a defendant may defraud the public in violation § 1346, the court stated:

> Murphy urges us to address the issue we reserved in a footnote in *Panarella:* Whether a violation of a state-law created fiduciary duty is *required* to sustain an honest services fraud conviction. Although federalism concerns are paramount in federal prosecutions of local political party officials, we do not think that this case requires us to resolve that question. This is because *Panarella*

and *Antico* address the different issue of what *types* of fiduciary duties are required, within the meaning of honest services, [i.e., the type of state law duties that constitute the honest services owed,] when either state or federal law already clearly establishes a fiduciary relationship [, i.e., the requisite fiduciary relationship to the public.] Here, in contrast, the Government cannot identify any clearly established fiduciary relationship or legal duty in either federal or state law between Murphy and Passaic County or its citizens. In other words, it cannot point to an established "right" of honest services that Murphy owed to the County or its citizens beyond a criminal statute, which we do not believe can create a fiduciary relationship.

*Id.* at 117 (internal citation omitted) (emphasis in original). In sum, *Murphy* holds that honest services fraud requires a fiduciary relationship to the public, but did not reach the separate issue of whether a state law violation is required for an honest services fraud conviction. In other words, *Murphy* is consistent with the proposition that the "types of fiduciary duties" that must be breached for an honest services conviction may include duties flowing from § 1346 itself, rather than state law.

Once the fiduciary relationship that triggers the obligation to provide honest services within the meaning of § 1346 is distinguished from what actions constitute breaches of that fiduciary relationship, so as to violate the duty to provide honest services, it becomes clear why *Kemp* referenced state law. The court prefaced its

---

**14.** The Court found that the government's second theory, that Murphy participated in a scheme to defraud the county of the County Administrator's honest services, was supported by *Antico* and *Panarella* "since the bribery statute clearly relates to services that DiDonna, as a public official and fiduciary, owed to the citizenry." *Murphy,* 323 F.3d at

116. Nonetheless, the Court found that the jury's consideration of evidence in support of the theory that Murphy defrauded the public of his own honest services, which was invalid because Murphy lacked a fiduciary relationship to the public, tainted Murphy's conviction under the government's other theories of liability. *Id.* at 122.

discussion of the sufficiency of the evidence needed for a conviction under the bribery theory with a footnote indicating that "Kemp does not dispute that as treasurer, he was a public official who owed a duty to provide honest services to the public," *Kemp*, 500 F.3d at 279, n. 11 (citing Pa Cons.Stat. § 1102; *Antico*, 275 F.3d at 262 n. 18), thereby recognizing that the defendant's fiduciary relationship with the public was a prerequisite to finding that he defrauded the public of honest services in violation of §§ 1341 and 1346. The court's subsequent reference to the "public trust" (imposed on public officials by Pennsylvania law) made clear that a reasonable jury could conclude that the defendant breached that fiduciary relationship by engaging in a *quid pro quo* bribery scheme. In other words, the court confirmed that the defendant, who owed the public a duty of honest services as a matter of Pennsylvania law, had defrauded the public of his honest services by "accepting money in exchange for an official action." *Kemp*, 500 F.3d at 279 (citations omitted). Thus, *Kemp's* reference to Pennsylvania law merely related to the existence of a fiduciary relationship to the public, and did not require state law to set forth a specific standard of "honest services" that was owed and fraudulently breached. With respect to the *quid pro quo* bribery theory of honest services, that standard is derived from §§ 1341, 1343 and 1346 as a matter of statutory interpretation, not state law.

The distinction drawn above is unavoidable when one recognizes that *Kemp* did not find a violation of any specific Pennsylvania law. Indeed, the court referred to 65 Pa. Cons.Stat. § 1101.1, the legislative "declaration" of purpose that prefaces Pennsylvania's Public Official and Employee Ethics Act: "[t]he Legislature hereby declares that public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." 65 Pa. Const. Stat. § 1101.1. Next, the court found that a reasonable jury could find beyond a reasonable doubt that "Kemp violated that trust" by engaging in *quid pro quo* bribery, i.e., "soliciting and accepting payment in exchange for taking official action." *Kemp*, 500 F.3d at 280. The court did *not* state that the defendant's conduct violated 65 Pa. Cons.Stat. § 1103(c), the section of the Ethics Act that specifically prohibits the accepting of bribes by a public official: "Accepting improper influence.—No public official ... shall solicit or accept anything of monetary value ... based on any understanding of that public official ... that the ... official action or judgment of the public official ... would be influenced thereby." 65 Pa. Cons.Stat. § 1103(c). If the *quid pro quo* bribery theory of honest services fraud requires the violation of a specific state law, surely the court would have mentioned 65 Pa. Cons.Stat. § 1103(c). Instead, the court referred to 65 Pa. Cons.Stat. § 1101.1, the legislative "declaration," because the court was pointing out the defendant's fiduciary relationship with the public. Thus, state law was cited to confirm that the defendant owed a duty of honest services, while *quid pro quo* bribery was the means by which the defendant violated that duty. If anything, the manner in which *Kemp* references Pennsylvania law supports the proposition that the *quid pro quo* bribery theory of honest services fraud does not require that the Government prove the violation of a state law.[15] Once it is established that a public

---

15. *Kemp's* discussion of the sufficiency of the evidence with respect to the public official's conviction is thus consistent with *Kemp's* discussion of the sufficiency of the allegations in the indictment with respect to the bankers, which does not reference the requirement of a state law violation.

official has a fiduciary relationship with the public (and state law may be relevant to that determination), the Government need only prove "that there was a *quid pro quo*, ... that the benefit was offered in exchange for the official act," *Kemp*, 500 F.3d at 281 (quotations omitted), for an honest services fraud conviction under the bribery theory of §§ 1341, 1343 and 1346.

#### d. The Indictment Adequately Alleges that Bryant Owed a Duty of Honest Services

■ The Indictment alleges that Bryant had a fiduciary relationship with the citizens of New Jersey such that he owed the public a duty of honest services. Indictment, Counts 1–6, ¶ 16 ("At all times relevant to this Indictment, the State of New Jersey and its citizens had an intangible right to the honest services of their State Senators"). Third Circuit case law demonstrates that the Indictment's assertion is correct: "In [*Antico* and *Panarella*] we assumed, based on extensive pre-*McNally* case law, that public officials have a duty to provide honest services to the public." *Murphy*, 323 F.3d at 116. Unlike the county political chairman in *Murphy*, Bryant, a State Senator, was a public official at all times relevant to the Indictment, and the Third Circuit case law has "assumed ... that public officials have a duty to provide honest services to the public." *Id.; see also United States v. Silvano*, 812 F.2d 754, 759 (1st Cir.1987) (interpreting the mail fraud statute to include "schemes to defraud citizens of their 'intangible rights to honest and impartial government' ... is premised upon an underlying theory that a public official acts as 'trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them") (citations omitted). Indeed, in *Murphy* the court recognized that "the anchor of a fiduciary relationship" could be "estab-lished by *state or federal law.*" *Murphy*, 323 F.3d at 105 (emphasis added).

Moreover, the statement of legislative findings proceeding the New Jersey Conflicts of Interest Laws declares that public office in New Jersey is a public trust:

> The Legislature finds and declares:
>
> (a) In our representative form of government, it is essential that the conduct of public officials and employees shall hold the respect and confidence of the people. *Public officials must, therefore, avoid conduct which is in violation of their public trust* or which creates a justifiable impression among the public that such trust is being violated.

N.J.S.A. 52:13D–12 (emphasis added). Just as Pennsylvania law declares that "public office is a public trust," 65 Pa. Cons.Stat. § 1101.1, and *Kemp* held that the defendant public official "violated that trust by soliciting and accepting payment in exchange for taking official action," *Kemp*, 500 F.3d at 280, the Indictment in the case at bar sufficiently alleges that Bryant's public office was a "public trust," N.J.S.A. 52:13D–12, which could similarly be breached through a *quid pro quo* bribery scheme.

Bryant's fiduciary relationship to the public is also clear as a matter of New Jersey common law. As the New Jersey Supreme Court stated in *Driscoll v. Burlington–Bristol Bridge Co.*, 8 N.J. 433, 86 A.2d 201 (1952): "The members of the board of chosen freeholders and of the bridge commission are public officers holding positions of public trust. They stand in a fiduciary relationship to the people whom they have been elected or appointed to serve." *Id.* at 474, 86 A.2d 201 (citations omitted). Since Bryant was a New Jersey state senator during the time period of the allegations in the Indictment, there can be no serious dispute that Bryant had the requisite fiduciary relationship with the public of New Jersey.

### e. The Role of the Specific Duties Listed in Paragraph 16 of the Indictment

The specific duties listed in paragraph 16 of the Indictment—including duties stemming from the New Jersey Bribery Act, N.J.S.A. § 2C:27–2, New Jersey Conflicts of Interest Law, N.J.S.A. § 52: 13D–14, and a duty to disclose (presumably derived from New Jersey common law or the Third Circuit's interpretation of § 1346 in *Antico* and *Panarella*[16])—are illustrative of Bryant's fiduciary relationship with the New Jersey public. Likely, this is what the Government means by its assertion that "those statutes are cited to give contour to what Senator Bryant's fiduciary duty is." Oral Argument, 84. In other words, the specific duties are listed to support the Indictment's assertion that Bryant owed a duty of honest services to the citizens of New Jersey.

However, these duties, and the elements needed to establish their violation, do *not* draw the line that Bryant and Gallagher allegedly crossed when they engaged in "a scheme and artifice to defraud the State of New Jersey and its citizens of the right to defendant WAYNE R. BRYANT's honest services in the affairs of the State of New Jersey." Indictment, Counts 1–6, ¶ 17. That line is drawn by §§ 1341, 1343, and 1346, which, as interpreted by Third Circuit cases going back to *Antico*, make clear that *quid pro quo* bribery by a public official constitutes honest services fraud. The Third Circuit has "repeatedly recognized that accepting money in exchange for an official action is a form of honest services fraud," *Kemp*, 500 F.3d at 280, and has indicated that the "key to whether a gift constitutes a bribe is whether the

parties intended for the benefit to be made in exchange for some official action." *Id.* at 282. The point of the duties listed in paragraph 16 of the Indictment, then, is to support the Indictment's assertion that "the State of New Jersey and its citizens had an intangible right to the honest services of their Senators," Indictment, Counts 1–6, ¶ 16, thereby triggering the application of § 1346. *See Murphy*, 323 F.3d at 116 (conviction reversed for want of "a fiduciary relationship that could then serve as the predicate for determining that Murphy himself owed honest services to Passaic County and its citizens").

### f. The Indictment Sufficiently Alleges that Bryant and Gallagher Defrauded New Jersey of Bryant's Honest Services

After alleging that Bryant had a fiduciary relationship with the citizens of New Jersey, and therefore owed a duty of honest services, the Indictment adequately alleges that Bryant and Gallagher defrauded the public of Bryant's honest services through a *quid pro quo* bribery scheme. *See supra* at II.B.2.

### g. Third Circuit Precedent does not Require a State Law Violation in the Context of the *Quid Pro Quo* Bribery Theory

The above analysis notwithstanding, Defendants contend that Third Circuit cases endorsing a "state law as a limiting principle," *Panarella*, 277 F.3d at 693; *Murphy*, 323 F.3d at 116, in honest services fraud cases *imply* that the bribery theory of honest services fraud requires not just a fiduciary obligation of honest services to the public, but also an *independent* violation of a state law.[17] Bryant's Brief, 8–9;

---

**16.** These decisions left open the question of whether the government must prove a state law violation in the context of the failure to

disclose a conflict of interest theory. *See Panarella,* 277 F.3d at 699 n. 9.

**17.** Because those cases reserve judgment on

Gallagher's Brief 11–12; Defendants' Reply Brief, 15–21. This overstates the holdings of the pertinent case law.

At the outset, it must be emphasized that *Kemp* and *Flemming* are the only Third Circuit case cited by the parties that, in addition to referencing the bribery theory, actually apply it. That the Third Circuit upheld the sufficiency of an indictment's allegation of the bribery theory in *Kemp*, and found sufficient evidence to uphold a conviction based on that theory in both *Kemp* and *Flemming*, without requiring a violation of specific state law, is telling. *See supra* at II.B.3.b.

None of the recent Third Circuit cases dealing with honest services fraud impose a requirement that the government allege and prove a state law violation in the context of the *quid pro quo* bribery theory. Both *Antico* and *Panarella* involved the failure to disclose theory of honest services fraud, rather than the bribery theory. *Antico*, 275 F.3d at 262 [18]; *Panarella*, 277 F.3d at 690–91 ("there is no allegation that Loeper sold his vote to Panarella or that Loeper's financial relationship with Panarella influenced Loeper's decision to speak and vote against the proposed legislation"). Moreover, *Panarella* highlighted its limited holding: "we emphasize the narrowness of our holding. First, Loeper's nondisclosure was in clear violation of Pennsylvania criminal law. The existence of this violation of state law resolves federalism and vagueness concerns that might otherwise arise in cases such as this." *Panarella*, 277 F.3d at 698–99 (emphasis added). The court made clear that the "narrowness" of the holding extended to its reference to the violation of a state criminal law: "Al-

though we hold that the existence of a violation of state law, coupled with the other facts discussed above, is *sufficient* to establish honest services wire fraud in this case, we need not decide whether a violation of state law is *necessary* for nondisclosure of a conflict of interest to amount to honest services fraud." *Id.* at 699 n. 9 (emphasis in original). Moreover, footnote nine emphasizes that the court was concerned with the "nondisclosure of a conflict of interest" theory of honest services fraud, not the bribery theory.

In *Murphy*, the court did not have occasion to apply either the bribery or failure to disclose theory because the "right to honest services" at issue was not founded on a fiduciary relationship to the public: "Without the anchor of a fiduciary relationship established by state or federal law, it was improper for the District Court to create one." *Murphy*, 323 F.3d at 104. As such, the court had no need to address the issue left open by *Panarella*, "[w]hether the violation of a state-law created fiduciary duty is *required* to sustain an honest services fraud conviction." *Id.* at 117 (emphasis in original). Thus, *Murphy* does not require a "violation of state-law created fiduciary duty," *Id.*, to establish the *quid pro quo* bribery theory of honest services fraud, where, as in the case at bar, the fiduciary relationship between Bryant and the public is obvious.

Finally, *United States v. Gordon*, 183 Fed.Appx. 202 (3d Cir.2006), addressed the role of state law in honest services fraud cases:

Thus, although a violation of a state criminal law may be sufficient to lay the

the issue of whether honest services fraud under § 1346 *requires* a state law violation, they clearly do not so *hold*.

**18.** Even with respect to the failure to disclose theory, *Antico* stated that "[d]uties to disclose material information affecting an official's im-

partial decision-making and to recuse himself exist within [the] fiduciary relationship [between a public servant and the public he serves] *regardless of a state or local law codifying a conflict of interest."* *Antico*, 275 F.3d at 264 (emphasis added) (citations omitted).

foundation for honest services fraud, it is clear from our analysis of the requisite fiduciary duty that honest services fraud does not require a violation of *criminal* law, but rather a violation of a state-created fiduciary duty. At the very least, the government must allege a violation of some law—or a recognized fiduciary duty—to adequately charge honest services fraud. Once again, we are here not required to delineate the parameters of the standard beyond this holding because here the government has alleged that Freebery and Gordon violated Delaware laws.

*Gordon,* 183 Fed.Appx. at 211 (emphasis in original). However, this holding does not alter the analysis here because *Gordon* involved the failure to disclose theory of honest services fraud, not the *quid pro quo* bribery theory. *Id.* at 211, 214 (omitting reference to the bribery theory and stating only that "[h]onest services fraud may be found where a public official fails to disclose a conflict of interest in violation of law," and finding that "the indictment clearly alleges that Freebery had a conflict of interest that should have been disclosed") (citations omitted). Further, because the government alleged that the defendants violated state laws, the court's discussion of whether any such violation is required under the failure to disclose theory was dicta. To the extent that *Gordon's* statement, that "honest services fraud does not require a violation of *criminal law,* but rather a violation of a state-created fiduciary duty," implies that the bribery theory requires the violation of a state law, that implication is contradicted by *Flemming* and *Kemp,* which were decided after *Gordon* and actually applied the *quid pro quo* bribery theory. Moreover, *Antico, Panarella,* and *Kemp* make clear that, pursuant to § 1346, as an official in a fiduciary relationship with the public, Bryant had a "recognized fiduciary duty,"

*Id.* at 211, not to engage in a *quid pro quo* bribery scheme with Gallagher.

*Gordon* also noted that, in *Murphy,* the Third Circuit "endorsed" the reasoning of the Fifth Circuit, which has required that the government prove an independent violation of state law in honest services fraud cases:

> In deciding *Murphy,* we also endorsed the reasoning of the Court of Appeals of the Fifth Circuit in *United States v. Brumley,* 116 F.3d 728 (5th Cir.1997). There the court interpreted § 1346 as requiring a state law limiting principle for honest services fraud. *Murphy,* 323 F.3d at 116 & n. 5. The court in *Brumley* stated that an official who does all that is required under state law but who is alleged to have not discharged his or her duties "honestly" cannot be convicted of honest services fraud. *Brumley,* 116 F.3d at 734. Rather, § 1346 "contemplates that there must first be breach of a state-owed duty." *Id.*

*Id.* at 211 n. 6. Again, the Third Circuit's analysis in *Murphy* dealt with the requisite fiduciary relationship required for honest services fraud, and neither *Murphy* nor *Gordon* dealt with the bribery theory of honest services fraud. Accordingly, the contention that *Gordon,* by endorsing *Brumley,* implies that honest services fraud *in general* requires an independent state law violation, cannot be squared with the Third Circuit's subsequent analyses and application of the law of honest services fraud in *Flemming* and *Kemp.*

In sum, none of the Third Circuit cases relied on by Defendants specifically address the role of state law in the context of the bribery theory of honest services fraud except for *Flemming* and *Kemp,* which support the proposition that, given the requisite fiduciary relationship to the public, the bribery prong of honest services

fraud does not require a violation of an independent state law.

### h. Constitutional Concerns do not Require a State Law Violation in the Context of the Bribery Theory of Honest Services Fraud

Relying on *Antico, Panarella* and *Murphy* (none of which dealt with the bribery theory of honest services fraud), Defendants insist that the interpretation of § 1346 in a *quid pro quo* bribery case must take into account serious constitutional concerns regarding fair notice, federalism, legislative independence, and the preservation of adequate breathing room in the sphere of protected political activity. Defendants further argue that due respect for these constitutional values requires that the Government allege and prove a violation of an independent state law to sustain an honest services fraud conviction under the *quid pro quo* bribery theory of § 1346. Bryant's Brief, 8–9; Gallagher's Brief, 11–12.

As *Panarella* states, "rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecutions may chill constitutionally protected political activity." *Panarella*, 277 F.3d at 698. However, "the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citations omitted). Since *Antico*, there is has been no ambiguity in this Circuit as to whether § 1346 prohibits *quid pro quo* bribery involving a public official, which is the conduct alleged in the case at bar. In any event, extending § 1346 to instances of *quid pro quo* bribery by local public officials, as in *Kemp*, poses no risk of chilling "constitutionally protected political activity." *Panarella*, 277 F.3d at 698.

Defendants also argue that fair notice concerns, which the Third Circuit has recognized as pertinent to the interpretation of § 1346, require the Government to allege and prove a state law violation under that statute. In *Panarella*, the Third Circuit explained why notice concerns shape the proper interpretation of § 1346:

> Deprivation of honest services is perforce an imprecise standard ... Moreover, decisions of our own Court stating that "fraud is a broad concept that 'is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community,'" *United States v. Monostra*, 125 F.3d 183, 186 (3d Cir.1997) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)), do little to allay fears that the federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability.

> We believe that the policies underlying the rule of lenity are not implicated in this case, however, because Loeper's deliberate concealment of his income from Panarella clearly violated a Pennsylvania criminal statute, 65 Pa.C.S.A. §§ 1104(a), 1105 & 1109(b).

*Id.*

Thus, at oral argument, when confronted with the suggestion that *quid pro quo* bribery is at the core of what it means to engage in "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, Defendants argued that the Government must prove a violation of a specific state law because "nobody knows what honest services fraud means in the air." Oral Argument, 68. Further, Defendants argued that "everybody knows I suppose analysis of bribery"

will not do, and that "the question is whether or not the particular statute with which the defendant is charged actually gives notice." *Id.* at 73–74.

But the Government does not merely assert that it is intuitively obvious that *quid pro quo* bribery is a federal crime. Given that *Antico, Panarella* and *Kemp,* interpreting the language of § 1346, have held that "accepting money in exchange for an official action is a form of honest services fraud," *Kemp,* 500 F.3d at 280, it is obvious that § 1346 prohibits *quid pro quo* bribery. Thus, that the *quid pro quo* bribery theory is at the "core" of honest services fraud, *Murphy,* 323 F.3d at 115 ("bribery ... may even be the paradigm case of honest services fraud committed by public officials"), is not a matter of common sense, or a matter of judge-made criminal common law, but rather, it is a matter of clearly established statutory interpretation in the Third Circuit. Indeed, the Supreme Court has stated with respect to constitutional notice concerns, that "clarity at the requisite level may be supplied by *judicial gloss* on an otherwise uncertain statute." *Lanier,* 520 U.S. at 266, 117 S.Ct. 1219 (emphasis added). Further, that "bribery ... may even be the paradigm case of honest services fraud committed by public officials," *Murphy,* 323 F.3d at 115, should "allay fears that the federal fraud statutes ... delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability." *Panarella,* 277 F.3d at 698. Moreover, to the extent that §§ 1341 and 1343 were applied to bribery in pre-*McNally* case law, *see United States v. Mandel,* 591 F.2d 1347, 1362 (4th Cir.1979) ("As to whether a scheme involving the bribery of a public official satisfies the fraud element of the mail fraud statute, the question has long since been answered in the affirmative"), and it was the intent of § 1346 to restore the pre-*McNally* interpretation of §§ 1341 and 1343, *Antico,*

275 F.3d at 262 n. 16 ("commentary and judicial reflection indicate that the statute was enacted to overturn *McNally* and restore the evolution of mail and wire fraud to its pre-*McNally* status"), Congress intended to criminalize *quid pro quo* bribery schemes through § 1346. Thus, constitutional concerns regarding fair notice do not require the Indictment to allege, or the Government to prove, an independent state law violation under the bribery theory of honest services fraud.

Defendants next argue that federalism concerns informing the interpretation of § 1346 require a state law violation even under the bribery theory of honest services fraud. In *Panarella,* the Third Circuit explained that "the existence of a violation of state law in this case mitigates the federalism concerns that arise from federal prosecutions of local public officials." *Panarella,* 277 F.3d at 693. Further, the court noted that "[i]n this case, the intrusion into state autonomy is significantly muted, since the conduct that amounts to honest services fraud is conduct that the state itself has chosen to criminalize." *Id.* at 694 (citation omitted). But *Panarella* was not a *quid pro quo* bribery case. Additionally, the court made clear that federalism concerns are not *always* an issue in honest services fraud cases: "In our view, use of state law as a limiting principle defining the scope of honest services fraud *in close cases* better addresses these federalism concerns than does the limiting principle of misuse of office for personal gain." *Id.* at 693–94 (emphasis added). Assuming the allegations in the Indictment to be true, this is not a "close case." The allegations of the Indictment fall squarely within the bribery theory of honest services fraud as set forth in *Kemp,* and thus, it is difficult to see *why* state autonomy is threatened by the criminalization of *quid pro quo* bribery schemes by public officials under § 1346. In any

event, *Kemp* and *Flemming* did not indicate that § 1346 requires the violation of an independent state or local law under the bribery theory of honest services fraud, and thereby implicitly reject the notion that federalism concerns require otherwise.

Thus, if a defendant has a sufficient fiduciary relationship with the public, constitutional concerns involving fair notice, federalism, and breathing room in the political sphere of the state legislature do not support Defendants' claim that the bribery theory of honest services requires the Government to allege or prove a violation of state law.

### 4. Defendants' State Law Arguments

■ Nonetheless, federalism concerns might be implicated if the Government sought to apply the *quid pro quo* bribery theory of honest services fraud to conduct that New Jersey law sought to "immunize" but that "would otherwise be a federal crime," *United States v. Urciuoli*, 513 F.3d 290, 298 (1st Cir.2008), or to actions or conduct that New Jersey state law declined to prohibit. Further, if state law is ambiguous as to whether the conduct alleged in the Indictment constitutes a deprivation of "honest services" in New Jersey, even though it is clear that § 1346 prohibits *quid pro quo* bribery, notice concerns might be raised. Thus, even though the Indictment need not allege, and the Government need not prove, a violation of state law under the bribery theory of § 1346, Defendants' arguments regarding New Jersey state law are relevant, by way of federalism and fair notice concerns, to the application of § 1346 in this case. The issue here is not whether the Indictment alleges a violation of New Jersey state law (it need not), but whether New Jersey state law renders § 1346 either unconstitutionally vague or inconsistent with due regard for federalism concerns as applied to the conduct alleged in the Indictment.

For the reasons below, the Court finds that Defendants' state law arguments in no way impugn the application of § 1346 to the alleged *quid pro quo* bribery arrangement between Bryant and Gallagher.

#### a. The New Jersey Bribery Act

The New Jersey Bribery Act reads, in pertinent part:

2C:27–2. Bribery in official and political matters

A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or . . .

c. Any benefit as consideration for a violation of an official duty of a public servant or party official; or

d. Any benefit as consideration for the performance of official duties.

For the purposes of this section "benefit as consideration" shall be deemed to mean any benefit not authorized by law.

N.J.S.A. 2C:27–2.

As a matter of New Jersey law, it is clear that when a public official accepts a benefit in exchange for official action it is a violation of the New Jersey Bribery Act, N.J.S.A. 2C:27–2: "The proofs were sufficient to show that . . . defendants accepted a benefit *in exchange* for their promise or agreement to influence official action." *State v. Schenkolewski*, 301 N.J.Super. 115, 141, 693 A.2d 1173 (App.Div., 1997) (emphasis added). Similarly, under N.J.S.A. 2C:27–2 the payor of a bribe must satisfy the same requirement—intent to engage in an exchange:

Applying these standards here, there was substantial evidence that defendant Buckley *paid the money for the benefit of defendant Schenkolewski in exchange*

*for a "promised" or "definitive" vote on the Township Committee.* A factfinder could reasonably conclude that Buckley paid $500,000 to a school headed by Rabbi Schenkolewski, which paid his salary, as a consideration for the Rabbi using his influence to insure favorable action by the three Committee members whose votes were necessary. Thus, there was sufficient evidence to sustain the bribery charge against Buckley.

*Id.* at 140, 693 A.2d 1173 (emphasis added). Thus, the Indictment's allegation that Bryant accepted his SOM salary in exchange for taking official action in favor of SOM falls squarely *within the terms of* N.J.S.A. 2C:27-2.a. Defendants, however, dispute that conclusion.

Defendants' primary argument with respect to the New Jersey Bribery Act is that it is unconstitutionally vague as applied to the conduct alleged in the Indictment's *quid pro quo* bribery scheme: that Bryant knowingly received his SOM salary in exchange for taking official action in favor of SOM. Defendants make several specific arguments on this front, but all of them are unavailing.

First, Defendants argue that the bribery statute is circular or tautological, and as a result, ordinary people cannot understand what conduct it prohibits; hence, it is unconstitutionally vague as applied. Defendants argue that the last sentence of N.J.S.A. 2C:27-2, defining "benefit as consideration" as "any benefit not authorized by law" renders the statute circular: "the statute provides only that an illegal benefit is an illegal benefit." Gallagher's Brief, 34; *see also* Bryant's Brief, 12–13. The Court disagrees.

When the phrase "benefit as consideration" is replaced with the statute's supposedly "circular" definition of that phrase, the pertinent language of the statute reads as follows: "A person is guilty of bribery if he ... solicits, accepts or agrees to accept from another: a. Any benefit [not authorized by law] for a decision, opinion, recommendation, vote or exercise of discretion ... on any public issue." This clearly means that an official cannot accept any benefit as consideration for an exercise of his official discretion *unless* such benefit is authorized by some law, i.e., a law other than the bribery statute. In other words, all "benefits" fall within the statute's prohibition unless they are authorized elsewhere. As the Government explains: "definition of 'benefit as consideration' as 'any benefit not authorized by law' simply and quite obviously means that if a particular benefit provided to the alleged bribe-taker is authorized by some law, then the payment of the benefit does not violate the bribery statute." Government's Brief, 59. Absent such authorization, a benefit given as consideration for official action falls within the statute's prohibition. It follows that if a person offers or accepts a benefit as consideration for official action in New Jersey, that person must check to see if some other source of law provides an exception to the statute's general ban of the offer or acceptance of benefits as consideration. Yet Defendants have provided no case law for the proposition that a penal law is unconstitutionally vague merely because it states that other laws can carve out exceptions to the conduct it prohibits.

While cases might arise where it is unclear whether a benefit given as consideration is "authorized by law" in New Jersey, there is no question that the Indictment's alleged *quid pro quo* bribery scheme is not. Defendants have pointed to no New Jersey law authorizing a state legislator to accept a salary from UMDNJ that was paid in exchange for the legislator taking action in his official capacity as a legislator.[19]

---

19. Defendants' contention that the Conflicts of Interest Laws authorize, or at least fail to

An as applied vagueness challenge against a similarly structured bribery statute has been rejected in *People v. Johnson*, 335 Ill.App.3d 805, 269 Ill.Dec. 331, 780 N.E.2d 803 (Ill.App. 4 Dist.2002). The provision stated as follows

A person commits bribery when: (a) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage *which he is not authorized by law to accept.*

720 ILCS 5/331(a) (emphasis added). The recipient of the bribe was prohibited by a county ordinance from receiving the payment at issue. *Johnson*, 335 Ill.App.3d at 808–9, 269 Ill.Dec. 331, 780 N.E.2d 803. The court found that the defendant, the payor, had adequate notice because "[t]he statute plainly prohibits the tender of property to *any* public employee who is not authorized to accept it." *Id.* at 807, 269 Ill.Dec. 331, 780 N.E.2d 803 (emphasis in original). Thus, the fact that the bribery statute defined prohibited benefits as "property or personal advantage which [the recipient] is not authorized by law to accept"—thereby incorporating exceptions made in other laws—did not render the statute unconstitutionally vague.

Finally, the cases Defendants rely on are inapposite. In *Goldy v. Beal*, 429 F.Supp. 640 (M.D.Pa.1976), the court found that an involuntary civil commitment statute was void for vagueness. Defendants here argue that *Goldy* was predicated on a finding that the Pennsylvania statute was circular, just as they characterize the New Jersey Bribery Act: "The most apparent aspect of the Pennsylvania civil commitment standard as embodied in sections 406 and 102 is that it is circular [-] a person may be committed if he is in need

of care because of a mental disability which so lessens his capacity 'as to make it necessary or advisable for him to be under care....'" *Id.* at 648. First, as explained above, the New Jersey Bribery statute is not circular; it merely has exceptions which may be found in other laws. Second, the *Goldy* court's finding that the statute was unconstitutionally vague was *not* based upon it being "circular"

Thus, the primary restriction on the discretion of a court to order commitment pursuant to section 406 is the requirement that the person to be committed be in need of care because of reduced capacity to use his customary self-control, judgment and discretion in the conduct of his affairs. Such a standard is impermissibly vague, if only because the key phrase "in need of care" is susceptible of several interpretations. How incapacitated must a person be before he needs care within the meaning of the statute?

*Id.* (citations omitted). The constitutional problem, then, was that the phrase "in need of care" was susceptible of multiple interpretations, which rendered the statute vague. In contrast, the meaning of "benefit as consideration" in the New Jersey Bribery Act is not open to competing interpretations. There is only one reasonable way the phrase can be understood: all benefits as consideration that are not authorized by some other law are prohibited. Thus, Defendants' reliance on *Goldy* is misplaced.

Defendants also cite *Connally v. General Const. Co*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), where the Supreme Court invalidated the following section of a criminal statute as unconstitutionally vague: "That not less than the *current rate of per diem wages* in the *locality* where the work is performed shall be

unambiguously prohibit, the alleged *quid pro quo* bribery arrangement between Bryant and

Gallagher will be addressed *infra* at § II.B.4.b.

paid...." *Id.* at 388, 46 S.Ct. 126 (emphasis added). The Court found that the statute "presents a double uncertainty." *Id.* at 393, 46 S.Ct. 126. First, the phrase "current rate of per diem wages" was ambiguous as to what rate was required

> In the first place, the words "current rate of wages" do not denote a specific or definite sum, but minimum, maximum, and intermediate amounts, indeterminately, varying from time to time and dependent upon the class and kind of work done, the efficiency of the workmen, etc., as the bill alleges is the case in respect of the territory surrounding the bridges under construction.

*Id.* (citation omitted). Second, the term "locality" was open to various interpretations: "In the second place, additional obscurity is imparted to the statute by the use of the qualifying word 'locality.' Who can say, with any degree of accuracy, what areas constitute the locality where a given piece of work is being done?" *Id.* at 394, 46 S.Ct. 126. The problem with the phrase "current rate of wages" and the term "locality" was that each marked out a range of conduct with hazy boundaries—boundaries that could only be defined arbitrarily.

The phrase "benefit as consideration" does not render the New Jersey Bribery Act susceptible to a similarly ambiguous range of conduct. Since the phrase "benefit as consideration" includes all benefits paid in consideration that are not authorized by some other law, *Connally* would be relevant only if Defendants could point to a law that is ambiguous as to whether it authorizes a state legislator to accept a salary from UMDNJ as a bribe. Absent such a showing, *Connally* is inapposite.[20]

Defendants' second argument is that the New Jersey Bribery Act does not provide adequate notice for Defendants to "determine whether and when the services Sen. Bryant rendered were either qualitatively or quantitatively so inadequate so as to render acceptance and receipt of salary an illegal payment." Gallgher's Brief, 35; Bryant's Brief, 13. This is a misreading of the Indictment's *quid pro quo* bribery allegations. Defendants are not being prosecuted because Bryant's work was deficient qualitatively or quantitatively, but because, regardless of what legitimate work he may have done, Bryant allegedly accepted his SOM salary in exchange for taking official action. The New Jersey Bribery Act clearly applies to this conduct.

Defendants' third argument is that the vagueness of the New Jersey Bribery Act is compounded because the statute applies to log rolling among legislators, i.e., the trading of votes and other official acts, and to deals made between legislators and executive branch officials—conduct that Defendants contend is clearly permissible. This argument is unpersuasive for two reasons. First, to the extent that Defendants mount an *as applied* challenge to the New Jersey Bribery Act, the bribery scheme alleged in the Indictment is far afield from Defendants' hypothetical applications of the New Jersey Bribery Act. Even if the statute is vague or otherwise constitutionally infirm when applied to Defendants' hypotheticals, the conduct alleged in the Indictment falls within the heartland of the New Jersey Bribery Act. Second, even if the New Jersey Bribery Act is constitutionally overbroad because of potential application to protected First Amendment activities, that does not in any way raise notice or federalism concerns regarding the application of § 1346 to the conduct alleged in the Indictment.

---

**20.** Again, Defendants' contentions regarding the Conflict of Interest Laws will be addressed *infra* at § II.B.4.b.

Thus, the New Jersey Bribery Act raises no constitutional concerns regarding the application of § 1346 to the allegations in the Indictment.

**b. The Conflicts of Interest Laws**

Defendants argue that the New Jersey Conflicts of Interest Laws actually authorize Bryant's alleged conduct, and if not, that they are ambiguous as to whether Bryant's conduct was prohibited. Defendants also argue that because the New Jersey Bribery Act only prohibits the receipt of benefits that are not authorized by law—and, on their view, it is questionable whether the New Jersey Conflicts of Interest Laws authorize the conduct alleged in the Indictment—the ambiguity of the New Jersey Conflict of Interest Laws render the New Jersey Bribery Act unconstitutionally vague as applied. These arguments lack merit, and therefore do not render the application of § 1346 to the allegations in the Indictment constitutionally suspect.

Defendants argue that N.J.S.A. 52:13D–24 either authorizes the conduct alleged in the Indictment or creates ambiguity as to whether Bryant's conduct was unlawful. N.J.S.A. 52:13D24 provides in pertinent part:

Solicitation, receipt or agreement to receive, thing of value for service related to official duties; exceptions

a. No State officer or employee, special State officer or employee, or member of the Legislature shall solicit, receive or agree to receive, whether directly or indirectly, any compensation, reward, employment, gift, honorarium, out-of-State travel or subsistence expense or other thing of value *from any source other than the State of New Jersey,* for any service, advice, assistance, appearance, speech or other matter related to the officer, employee, or member's official duties, except as authorized in this section.

N.J.S.A. 52:13D–24 (emphasis added). Defendants argue that, by implication, this statute authorizes compensation from "the State of New Jersey" for activities related to Bryant's official duties—even payments from SOM in exchange for official action in Bryant's capacity as a state legislator. Defendants rely on the interpretive maxim that the "express mention of one thing implies the exclusion of another." *Gangemi v. Berry,* 25 N.J. 1, 11, 134 A.2d 1 (1957). First, this is an untoward and illogical construction of the statute. If a member of the legislature fraudulently arranges a no-show job and then receives payment for the job through the "the State of New Jersey," on Defendants view, N.J.S.A. 52:13D–24 authorizes such conduct. Second, this is an obviously unreasonable application of the maxim *expressio unius est exclusio alterius.* As the Supreme Court has recently explained: "the canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (citation omitted). That cannon is inapplicable because the mention of "the State of New Jersey" is not part of an associated group or series in the provision at issue. More importantly, even if *expressio unius est exclusio alterius* does apply, and "any compensation ..." from the State of New Jersey was "excluded by deliberate choice," *Id.,* it hardly follows from the prohibition of N.J. S.A. 52:13D–24 that "any compensation ..." paid from "the State of New Jersey" is *unequivocally authorized.*

Third, *Gangemi*, on which Defendants rely, clearly provides that "[t]he maxim that the express mention of one thing implies the exclusion of another is purely interpretive in aid of intention, and not a rule of law." *Gangemi*, 25 N.J. at 11, 134 A.2d 1. Thus, that maxim cannot be reasonably applied to construe N.J.S.A. 52:13D–24 so that it conflicts with N.J.S.A. 52:13D–14, which directly addresses the conduct at issue. N.J.S.A. 52:13D–14 explicitly states that *some payments* derived from "the State of New Jersey" violate the New Jersey Conflict of Interest Laws— namely, payments offered with intent to influence an official in the performance of his public duties. N.J.S.A. 52:13D–14 provides:

> No State officer or employee, special State officer or employee, or member of the Legislature shall accept from any *person*, whether *directly or indirectly* and whether by himself or through his spouse or any member of his family or through any partner or associate, any gift, favor, service, employment or offer of employment or any other thing of value which he knows or has reason to believe is offered to him with intent to influence him in the performance of his public duties and responsibilities. This section shall not apply to the acceptance of contributions to the campaign of an announced candidate for elective public office.

N.J.S.A. 52:13D–14 (emphasis added).

Defendants argue that N.J.S.A. 52:13D–14 is inapplicable to the conduct alleged in the Indictment because Bryant's salary was received from UMDNJ, which is not a "person" within the meaning of N.J.S.A. 52:13D–14. Gallagher's Brief, 42. N.J.S.A. 13D–13 defines "person" as "any natural person, association or corporation." N.J.S.A. 13D–13.f. As the Government points out, New Jersey law provides for "the establishment of a body corporate and politic known as the University of Medi-cine and Dentistry of New Jersey." N.J.S.A. 18A:64G–3. Defendants may be correct that UMDNJ is not a "business corporation" because it was created by statute. *Id.* But the term "person" as defined in N.J.S.A. 13D–13.f., and thus as used in N.J.S.A. 52:13D–14, is not limited to business corporations. Thus, the Court finds that UMDNJ may constitute a "person" within the meaning of N.J.S.A. 52:13D–14, and hence Bryant's alleged receipt of a "thing of value" from UMDNJ that he had reason to believe was offered to influence his discretion and actions as a state legislator was prohibited by N.J.S.A. 52:13D–14.

There is another reason why Bryant's alleged conduct clearly violated N.J.S.A. 52:13D–14, even granting Defendants construction of N.J.S.A. 52:13D–24. Defendants' argument with respect to N.J.S.A. 52:13D–24 and N.J.S.A. 52:13D–14 presupposes that the payor of Bryant's alleged bribes was UMDNJ, and hence "the State of New Jersey" within the meaning of N.J.S.A. 52:13D–24. But the Indictment alleges that the salary payments were arranged by Gallagher: "defendant R. MICHAEL GALLAGHER used his position as Dean of SOM to put defendant WAYNE R. BRYANT on the SOM payroll, and ... caused defendant Bryant to receive a stream of corrupt payments ... from SOM, in exchange" for official action. Indictment, Counts 1–6, ¶ 18. Gallagher is obviously a "person" within the meaning of N.J.S.A. 52:13D–14. Further, N.J.S.A. 52:13D–14 clearly applies to payments arranged by Gallagher, even if they were provided indirectly as a salary from SOM: "No ... member of the Legislature shall accept from any person, whether directly *or indirectly* ... any gift, favor, service, employment or offer of employment or any other thing of value which he knows or has reason to believe is offered to him with intent to influence him in the performance

of his public duties and responsibilities." N.J.S.A. 52:13D–14 (emphasis added). Thus, the alleged *quid pro quo* bribery arrangement, whereby Bryant received a stream of payments from UMDNJ, arranged by Gallagher, falls within the terms of N.J.S.A. 52:13D–14. Moreover, because Defendants' conduct, as alleged in the Indictment, was not authorized by N.J. S.A. 52:13D–24, that statute in no way renders the New Jersey Bribery Act vague as applied.

Next, Defendants contend that even if Bryant's conduct falls within the proscription of N.J.S.A. 52:13D–14, there was insufficient notice that such a violation could give rise to criminal liability. Bryant's Brief, 14–15. Whether or not N.J.S.A. 52:13D–14 itself gives rise to criminal liability is irrelevant to the present issue, i.e., whether the New Jersey Conflicts of Interest Laws provide any constitutional reason, as a matter of federalism or fair notice concerns, why § 1346 cannot be applied to the conduct alleged in the Indictment. As explained *supra* at § II.B.3.a., Defendants' notice that their conduct was criminal derives from §§ 1341, 1343 and

1346 as construed by the Third Circuit in *Antico.*[21]

### 5. Defendants' Remaining Objections to the *Quid Pro Quo* Bribery Theory

In light of the above holding, the remainder of Gallagher's arguments pertaining to the Indictment's *quid pro quo* bribery theory are rejected. Citing *Murphy*, Gallagher argues that the New Jersey Bribery Act does not, in and of itself, create the fiduciary duty required for an allegation of honest services fraud. Gallagher's Brief, 13. This argument confuses the analysis of the requisite fiduciary relationship with the analysis of a whether a defendant has defrauded the public of the honest services he owes by virtue of the requisite fiduciary relationship. *Murphy* held that a local party official lacked the requisite fiduciary relationship, and that a violation of the New Jersey Bribery Act was insufficient to establish such relationship. Here, Bryant's fiduciary relationship to the public is obvious, under both Third Circuit and New Jersey law. *See supra* at § II.B.3.d. Further, Bryant allegedly breached his fiduciary duty of honest services by engaging in a *quid pro quo*

**21.** The above analysis explains why Bryant's four-pronged summary of the Conflicts of Interest Laws vagueness defects do not call into question the constitutionality of applying § 1346 to the conduct alleged in the Indictment. Bryant argues: "At a minimum, no legislator evaluating the Conflict of Interest laws would have constitutionally-sufficient notice that, among other factors, (1) UMDNJ is *not* a state agency, (2) UMDNJ *is* a 'person,' i.e., an association or corporation, (3) UMDNJ's interests conflict with the interests of the state, and (4) misapprehending these first three factors carries criminal penalties." Bryant's Brief, 16 (emphasis in original). As to (1), it is irrelevant whether UMNDJ is a state agency under N.J.S.A. 52:13D24 because that statute plainly does not authorize the conduct alleged in the Indictment, and N.J.S.A. 52:13D–14 plainly prohibits such conduct. As to (2), it is irrelevant whether

UMDNJ is a 'person' within the meaning of N.J.S.A. 52:13D–14 because Gallagher is clearly a "person," and N.J.S.A. 52:13D–14 is applicable to payments made by Gallagher whether "directly or indirectly," i.e., through an SOM salary as alleged in the Indictment. *See* N.J.S.A. 52:13D–14. As to (3), whether the interests of UMNDJ and the state of New Jersey are aligned has nothing to do with the *quid pro quo* bribery alleged in the Indictment. As to (4), Defendants need not have appreciated (1)-(3) because they are irrelevant, and moreover, the Government seeks to impose criminal liability based on §§ 1341, 1343 and 1346, not New Jersey law. The Court is only considering Defendants' state law arguments for the purpose of assessing whether New Jersey state law renders the application of § 1346 to the allegations in the Indictment constitutionally suspect. It does not.

bribery scheme, which Third Circuit case law establishes is a violation of § 1346, not by violating the New Jersey Bribery Act.

Next, Gallagher argues that the Indictment fails to allege that Defendants' conduct caused Bryant to breach any of the fiduciary duties the Indictment enumerates in paragraph 16, and that merely labeling his salary payments as "corrupt" will not suffice. Gallagher's Brief, 18–19. However, the Indictment need not allege a breach of any of the specific duties articulated in paragraph 16. Rather, what the Indictment must allege, and does allege, is that Bryant had a fiduciary relationship such that he owed a duty of honest services within the meaning of § 1346, Indictment, Counts 1–6, ¶ 16, and that the Defendants defrauded the public of such services within the meaning of § 1346 by engaging in a *quid pro quo* bribery scheme. *Id.* at ¶ 18.

Finally, Gallagher argues that even if Bryant owed a duty of honest services to the public, the Indictment fails to allege that he *deprived* the public of such services. But the Indictment alleges that Bryant and Gallagher engaged in a *quid pro quo* bribery scheme, which clearly deprives the New Jersey public of Bryant's honest services. Gallagher's Brief, 24 ("One way to show deprivation, of course, is to show that the defendant traded a special official action for something of value").

### 6. The Failure to Disclose Theory

#### a. The Failure to Disclose Theory is Derivative of the *Quid Pro Quo* Bribery Theory

The Third Circuit has made clear that honest services fraud is typically committed by a *quid pro quo* bribery arrangement or "a failure to disclose a conflict of interest resulting in personal gain." *Kemp,* 500 F.3d at 279 (citation omitted); *see also Gordon,* 183 Fed.Appx. at 211

("Honest services fraud may be found where a public official fails to disclose a conflict of interest in violation of law") (citing *Panarella,* 277 F.3d at 694, and *Antico,* 275 F.3d at 263). The Indictment alleges the failure to disclose theory of honest services fraud: "It was a further object of this scheme and artifice to defraud that defendants BRYANT and GALLAGHER did not disclose and attempted to conceal material information regarding the nature of defendant BRYANT's corrupt arrangement at SOM." Indictment, Counts 1–6, ¶ 18.

Defendants argue that the Indictment's failure to disclose theory should be stricken from the Indictment as surplusage. Specifically, they contend that the failure to disclose theory is a "semantic repackaging" of the *quid pro quo* bribery theory, rather than an alternative theory of honest services fraud. Defendants Reply Brief, 13. Further, they argue that a jury could not logically accept the failure to disclose theory without already accepting the *quid pro quo* bribery theory. It follows, Defendants argue, that the failure to disclose theory is redundant and confusing, and hence prejudicial to Defendants.

The Government has confirmed that the failure to disclose theory here is derivative of the *quid pro quo* bribery theory. The Government's briefing clearly identifies what it considers to be the pertinent conflict of interest in the case at bar: Bryant's *quid pro quo* arrangement with Gallagher, i.e., that Bryant's SOM salary was paid in exchange for official action. The Government writes:

> The conflict of interest at issue here is Bryant's conflict between his duty to honestly serve, without corrupt preference, all of the citizens of New Jersey who he was elected to represent on one hand, and his paid-for interest in promoting the concerns of Gallagher and

SOM at the expense of other beneficiaries of public spending, on the other hand.

Government's Brief, 24. Again, the Government explains:

The conflict ... is not that Bryant was employed by SOM while serving as a State Senator, so disclosure of the position did not disclose the conflict. Rather it was that he had a secret agreement with Gallagher that his SOM salary was consideration for Bryant's official efforts to lobby his senatorial colleagues and support legislation to increase public financing of SOM.

*Id.* at 25. Further, the Government argues that "[t]he Indictment adequately alleges that Bryant failed to disclose the *true nature* of his SOM job," i.e., the "secret agreement" between himself and Gallagher. *Id.* (emphasis added).

The Government confirmed at oral argument that "[c]learly what [Bryant] is concealing is the improper unlawful agreement." Oral Argument, 47. The Court asked the Government to confirm that "you are not suggesting [Bryant] concealed that he was employed by UMDNJ; but that you are saying that he concealed what his actual role was going to be," and the Government responded, "[t]hat's right." *Id.* at 52–53. Again, the Government stated that "the concealment ... I believe is the corrupt agreement." *Id.* at 55. Finally, the Government stated: "But of course it's not the payments that are the *quid pro quo*. It's the *reasons* for the payments [, i.e., the corrupt agreement.] That's the nondisclosure." *Id.* at 58 (emphasis added).

Importantly, the Government conceded that the jury's acceptance of the *quid pro quo* bribery theory is a logical precondition to the jury's acceptance of the failure to disclose theory. When asked whether "a jury [could] find them guilty of the concealment without a *quid pro quo*," the Government responded, "perhaps as a logical matter they could not." *Id.* at 56. Further, when asked "whether you think for purposes of the concealment the jury would have to find *quid pro quo* as well in this agreement," the Government confirmed "[y]es that's right." *Id.* at 57.

Finally, the Government acknowledged that, although the Indictment alleges both theories of honest services fraud, there is "essentially" only one theory. When the Court asked the Government if "you have agreed that the only theory here is essentially the bribery theory because you indicated that the concealment really is based as you said on the *quid pro quo*," the Government responded, "That's correct." Oral Argument, 79.

The Indictment itself makes clear that the Government's failure to disclose theory is parasitic of the bribery theory-that is, a jury could not logically find a failure to disclose without first finding that there was a bribery arrangement between Bryant and Gallagher. To begin, the Indictment alleges that it was "an object of [the] scheme and artifice to defraud" that Gallagher caused Bryant to receive his SOM salary in exchange for official action. Indictment, Counts 1–6, ¶ 18. Then, in the next sentence, the Indictment alleges that "[i]t was a further object of this scheme and artifice to defraud that defendants Bryant and Gallagher did not disclose and attempted to conceal material information regarding *the nature of defendant Bryant's corrupt arrangement* at SOM." *Id.* (emphasis added). Thus, an "object" of the scheme and artifice to defraud, as alleged in the Indictment, was the failure to disclose the "corrupt arrangement," i.e., the *quid pro quo* exchange described in the previous sentence of paragraph 18.

The structure of the subsequent allegations is consistent with this interpretation of the Indictment. All of the allegations

that follow paragraph 18, which are alleged to be "part of this scheme," i.e., the scheme laid out in paragraph 18, make no distinction as to whether they are supportive of the "object" to engage in the *quid pro quo* exchange or the "object" to fail to disclose the *quid pro quo* exchange, because they are inextricably linked. Obviously the participants in a *quid pro quo* bribery agreement will not knowingly disclose, and indeed, likely take steps to conceal, the nature of their agreement. Thus, as the Government argued in its briefing and conceded at oral argument, what Bryant and Gallagher criminally failed to disclose, at least as alleged in the Indictment, is *not* Bryant's employment with SOM, but the corrupt arrangement underpinning his employment, i.e., that his salary was paid in exchange for official action.

Of course, a failure to disclose a conflict of interest theory is not necessarily the same as a bribery theory. Putting aside the allegations that Bryant's SOM employment was nothing more than a *quid pro quo* bribery arrangement with Gallagher, the Government *could* have alleged a failure to disclose a conflict of interest theory that was independent of the bribery theory: that Bryant failed to disclose the fact of his SOM employment, to the extent any of it was *bona fide,* when such employment constituted a conflict of interest. For example, the Indictment alleges that "[c]ontrary to the New Jersey Legislative Code of Ethics requirement that state legislators identify all sources of income in excess of $1,000, defendant … Bryant intentionally failed to disclose his payments from SOM on his 2003 Legislator's Financial Disclosure statement." Indictment, Counts 1–6, ¶ 22.b. Further, it is alleged that "[a]t meetings with state officials regarding UMDNJ and SOM business, and in his dealings with staff and members of the New Jersey State Legislature with whom he worked on state budget issues related to UMDNJ and SOM, defendant

… Bryant did not disclose that he was being paid by SOM." *Id.* at ¶ 22.d. Whether or not these allegations could potentially support a failure to disclose a conflict of interest theory that is independent of any bribery scheme, such a theory is not set forth in the Indictment. This was confirmed by the Government's briefing and at oral argument.

There is an additional reason why the Indictment's failure to disclose theory is derivative of the *quid pro quo* bribery theory here. If the "object" of the honest services fraud was merely a failure by Bryant to disclose *bona fide* employment with SOM when it presented a conflict of interest, per the allegations of paragraph 22 of the Indictment, without any assistance from Gallagher, then Gallagher would have no role in Bryant's alleged commission of honest services fraud. Hence, the Government emphasizes that it is the corrupt purpose of Bryant's SOM salary that triggers Gallagher's liability:

> [I]t is not the "the fact of the salary payments" to Bryant from SOM that was at the heart of the fraudulent scheme, but the purpose of those payments: to influence Bryant to take discretionary action as a State Senator on behalf of SOM. The Indictment alleges that Gallagher took affirmative steps to conceal from the public this corrupt purpose.

Government's Brief, 68. Moreover, the Indictment clearly charges both Bryant and Gallagher with a single scheme to "defraud the State of New Jersey and its citizens of the right to defendant … BRYANT'S honest services." Indictment, ¶ 17. Thus, an interpretation of the failure to disclose theory that makes it independent of the bribery theory would require a separate allegation of honest services fraud against only Bryant, which, of course, is nowhere to be found in the Indictment.

In the context of this case, the Third Circuit's recent explanation of the policy justification for the failure to disclose theory is useful:

> Were it easy to detect and prosecute public officials for bribery, the need for public officials to disclose conflicts of interest would be greatly reduced. As long as a public official does not act on a conflict of interest, the conflict of interest by itself poses little threat to the public. One reason why federal and state law mandates disclosure of conflicts of interest, however, is that it is often difficult or impossible to know for sure whether a public official has acted on a conflict of interest. *Cf. Holzer*, 816 F.2d at 308 ("How can anyone prove how a judge would have ruled if he had not been bribed?"). *The only difference between a public official who accepts a bribe and a public official who receives payments while taking discretionary action that benefits that payor, as Loeper did in this case, is the existence of a quid pro quo whereby the public official and the payor agree that the discretionary action taken by the public official is in exchange for payment.* Recognizing the practical difficulties in proving the existence of such a *quid pro quo,* disclosure laws permit the public to judge for itself whether an official has acted on a conflict of interest.

*Panarella,* 277 F.3d at 698 (emphasis added). The conceptual distinction between the bribery theory and failure to disclose theory is that, under the failure to disclose theory, the conflict of interest that is not disclosed can be something *less* than a *quid pro quo* agreement to exercise official discretion. The reason that the failure to disclose theory applies even when the conduct at issue falls short of a quid pro quo arrangement is that, by failing to disclose a conflict of interest, the official deprives the public of the ability "to judge for itself when an official has acted on a conflict of

interest," *Id.*, and hence deprives the public of his honest services—even if the official was not actually influenced by a conflict of interest, or did not agree to be influenced. However, when the alleged conflict of interest is solely the official's involvement in a bribery arrangement, the failure to disclose theory does not prohibit any conduct that the bribery theory does not already prohibit, and, as such, the failure to disclose theory is redundant.

The case at bar poses precisely that scenario: the Government conceded that a finding of *quid pro quo* bribery is a logical prerequisite to a finding that Bryant failed to disclose a conflict of interest, i.e., the one posed by the *quid pro quo* arrangement. Indeed, the Government stated, with respect to the failure to disclose theory, it need not prove anything in addition to the *quid pro quo* arrangement. Oral Argument, 55 (with respect to the failure to disclose theory, the Government stated: "I'm just trying to think here if we have to prove anything more than the existence of the *quid pro quo* and I guess I don't think we do"). Thus, the Court agrees with Defendants' premise that, in this case, the Government's failure to disclose theory is derivative of its *quid pro quo* bribery theory, and hence redundant.

### b. Defendants' Motion to Strike the Failure to Disclose Theory as Surplusage

██ The question, then, is what follows from the premise that the failure to disclose theory is entirely derivative of the bribery theory. The Government argues that, even if it would be illogical to convict on the failure to disclose theory but not on the bribery theory, nonetheless the Government should be permitted to allege and prove both theories. The Government asserts that "the jury is allowed to return an inconsistent verdict which could be wholly illogical, and that is why we are entitled to

go to the jury with both prongs of honest services fraud. There is simply no basis to dismiss one of the two independent prongs because ... there is a logical overlapping of them." Oral Argument, 56. Defendants respond that the Government's pursuit of both prongs will invite juror confusion that will cause them severe prejudice:

> [A]t trial the jury will no doubt be bombarded with all manner of purported concealments, [e.g., the allegations in paragraph ¶ 22 of the Indictment,] which it understandably may mistake for the concealment prong of the fraud charge. Because logically the jury would never need to deliberate on the concealment theory unless it had already convicted on the bribery theory, the concealment theory is dangerously and unfairly redundant—unnecessary for the government but potentially highly prejudicial to the defense.

Defendants' Reply Brief, 14. Thus, the Defendants argue that the failure to disclose theory should be stricken as surplusage; they, however, do not identify which specific allegations in the Indictment should be stricken.

The Government made two replies at oral argument. First, the Government points out that cases charging both prongs of honest services fraud are legion. Oral Argument, 57–58. Second, the Government argues that "completely coherent instructions on what we need to prove" would address any potential juror confusion. *Id.* at 58.

Defendants' motion to strike the failure to disclose theory as surplusage is governed by *Fed.R.Crim.P.* 7(d). "[U]pon the defendant's motion, the court may strike surplusage from the indictment or information." *United States v. Hedgepeth,* 434 F.3d 609, 612 (3d Cir.2006). In *Hedgepeth,* the court held that "upon the defendant's timely motion, the court may strike surplusage from the indictment or information

when it is both irrelevant (or immaterial) and prejudicial. Logic demands the conjunctive standard." *Id.* at 612.

Although Defendants do not specify the allegations in the Indictment which they believe should be stricken as surplusage, presumably they have in mind the second sentence of paragraph 18 and all of paragraph 22. The second sentence of paragraph 18 identifies the second "object" of the Defendants' alleged scheme, and in doing so, charges the failure to disclose theory: "It was a further object of this scheme and artifice to defraud that defendants Bryant and Gallagher did not disclose and attempted to conceal material information regarding the nature of defendant Bryant's corrupt arrangement at SOM." Indictment, Counts 1–6, ¶ 18.

Furthermore, in paragraph 22, the Indictment specifically alleges that Gallagher took actions to conceal the nature of his corrupt agreement with Bryant and that Bryant failed to disclose his employment at SOM on a number of occasions. It is alleged that Gallagher "caused the publicly disclosed description for defendant BRYANT's position to misleadingly state that defendant BRYANT's job was to 'improve University communications ... with local governments, community and civic organizations and local residents,' while omitting any reference to defendant BRYANT's use of his position and influence as a State Senator on behalf of SOM." *Id.* at ¶ 22.a. This job description lead unknowing third parties to describe Bryant's position as "an 'external affairs' or 'public relations job.'" *Id.* The Indictment also alleges that it was "further part of this scheme" that Bryant failed to disclose his SOM income on his 2003 Legislator's Financial Disclosure Statement until April 22, 2005, after UMDNJ announced it was conducting an investigation into the breakdown of financial controls at

UMDNJ, and that he failed to disclose his employment with SOM at meetings with state officials and in his dealings with staff and members of the state legislature, with whom he worked on issues pertaining to SOM and UMDNJ. *Id.* at ¶ 22 b.d. The sentence in which the Indictment charges the failure to disclose theory (¶ 18) and the Indictment's specific allegations that Bryant failed to disclose his employment with SOM (¶ 22) require separate analysis.

The above discussion makes clear that the Indictment's charge of the failure to disclose theory in paragraph 18 is irrelevant. Because the conflict that the Indictment alleges that Bryant failed to disclose *is* the *quid pro quo* bribery arrangement, a jury could not convict Defendants under the failure to disclose theory without already finding that Defendants committed *quid pro quo* bribery. Indeed, the Government conceded this at oral argument. Again, when asked whether "you think for purposes of the concealment the jury would have to find *quid pro quo* as well in this agreement," the Government confirmed "[y]es that's right." Oral Argument, 57. Although a single count may allege that a defendant committed a crime through more than one specified means, *Fed. R. Crim P.* 7(c)(1), the Indictment's failure to disclose theory is not an *alternative* means by which Defendants committed honest services fraud; it is the same theory of criminal liability stated in different language.

Further, Defendants could be severely prejudiced if a jury were to confuse the Indictment's failure to disclose theory—that Bryant and Gallagher failed to disclose and attempted to conceal the *quid pro quo* bribery arrangement—with the allegations, *inter alia,* that Bryant failed to disclose the fact of his employment at SOM. Since the failure to disclose theory is redundant and immaterial, yet poses a significant risk of prejudice, the Court finds that it should be stricken as surplusage.[22]

In contrast, the Indictment's factual allegations in paragraphs 22.a. through 22.d. are highly relevant. Actions allegedly taken by Gallagher to conceal the true nature of Bryant's employment at SOM, as well as Bryant's failure to disclose the fact of his employment at SOM at various times where it might have presented a conflict of interest, are relevant to whether or not a *quid pro quo* agreement actually existed between Bryant and Gallagher. *Cf. Panarella,* 277 F.3d at 697 (recognizing that "[w]ere it easy to detect and prosecute public officials for bribery, the need for public officials to disclose conflicts of interest would be greatly reduced," and that there are "practical difficulties in proving the existence of . . . a *quid pro quo* "). In other words, these allegations are relevant to what both the Government (implicitly) and Defendants (explicitly) claim to be the singular theory of honest services fraud in this case: the *quid pro quo* bribery theory.

---

22. To be clear, the Court does not find that it is improper for an indictment to ever allege both the bribery and the failure to disclose theories of honest services fraud. For example, if the Indictment charged that the "object" of the scheme was that Bryant failed to disclose and concealed the fact that he was receiving a salary from SOM, that would provide the basis for a failure to disclose theory in addition to the bribery theory. According to the specific allegations of the Indictment and as confirmed by the Government, however, Bryant's SOM salary is not the pertinent conflict of interest. Oral Argument, 58 ("But of course it's not the payments that are the *quid pro quo[,* i]t's the *reasons* for the payments and [t]hat's the nondisclosure") (emphasis added); *Id.* at 79. The conflict of interest that the Indictment charges that Defendants concealed and failed to disclose is the *reason* for Bryant's SOM salary: it was paid in "exchange" for official action. Because the Indictment fails to allege a conflict of interest independent of Defendants' bribery arrangement, the failure to disclose theory is unnecessary.

If the Court were to strike these allegations as irrelevant surplusage, it would be tantamount to holding that an Indictment alleging a *quid pro quo* bribery arrangement must omit allegations that the *quid pro quo* arrangement was concealed or otherwise not disclosed. That cannot be correct; such allegations are relevant to showing a scheme to defraud and state of mind.

Further, the Indictment's specific allegations in paragraphs 22.a. through 22.d. are not *in and of themselves* prejudicial or confusing. These allegations are potentially confusing, and hence prejudicial, *only* when they are enlisted in support of a finding of criminal liability on a separate failure to disclose theory of honest services fraud. Thus, Defendants' motion to strike the failure to disclose theory from the Indictment, as charged in the second sentence of paragraph 18, is granted. However, the factual allegations that Gallagher attempted to conceal the corrupt nature of Bryant's employment at SOM and that Bryant failed to disclose the fact of his employment with SOM, Indictment, Counts 1–6, ¶ 22a.-d., are relevant, and as such, are properly included in the Indictment.

### C. Analysis of Counts 7–8

Counts 7 and 8, based upon the bribery scheme alleged in counts 1–6, also charge violations of 18 U.S.C. § 666. That statute provides, in pertinent part:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) *corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such* organization, *government,* or agency involving any thing of value of $5,000 or more; or

(2) *corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of* an organization or *of a State,* local or Indian tribal *government,* or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) *This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.*

18 U.S.C. § 666 (emphasis added).

Based on the same facts underlying the honest services fraud counts,[23] it is alleged

---

**23.** Counts 7 and 8 incorporate by reference the paragraphs alleging the scheme underlying Counts 1–6. "A count may incorporate by reference an allegation made in another count." *Fed.R.Crim.P.* 7(c)(1).

in Count 7 that Bryant "knowingly and willingly did corruptly solicit and demand for the benefit of himself ... a salaried and pensionable position at SOM permitting him to receive a stream of payments and pensionable income ... intending to be influenced and rewarded in connection with a ... series of transactions of the State of New Jersey involving a thing of value of $5000 or more," in violation of 18 U.S.C. § 666(a)(1)(B). Indictment, Count 7, ¶ 3. Count 8 alleges that Gallagher "knowingly and wilfully did corruptly give, offer, and agree to give a thing of value, namely ... a stream of payments and pensionable income to WAYNE R. BRYANT, with intent to influence and reward an agent of the State of New Jersey," in violation of 18 U.S.C. § 666(a)(2). *Id.* at Count 8, ¶ 2.

The Third Circuit has recognized that the following elements constitute a § 666(a)(1)(B) crime: "1) corrupt solicitation; 2) of anything of value; 3) with the intention of being influenced in connection with any transaction of a local government or organization receiving at least $10,000 in federal funds annually; 4) where the transaction involves anything of value of $5,000 or more." *United States v. Cicco*, 938 F.2d 441, 444 (3d Cir.1991). The elements of § 666(a)(2) are similar: "the government [is] required to prove that [the defendant] '[1] corruptly gave ... [2] anything of value to any person, [3] with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, [4] in connection with any business ... of such organization, government, or agency involving anything of value of $5,000 or more.'" *Flemming*, 223 Fed.Appx. at 123. Both Bryant and Gallagher assert various reasons why the Indictment fails to adequately allege the first and third elements, and also raise constitutional objections. The Court, however, finds Defendants' contentions unavailing.

First, rehashing his argument with respect to Counts 1–6, Bryant argues that the third element required for a violation of § 666(a)(1)(B)—"intending to be influenced"—has not been adequately plead. Bryant argues that the Indictment fails to allege a "but for" causal link between the *quid* and the *quo* in the alleged bribery agreement, i.e., that in return for his SOM salary, Bryant, in his official capacity as a state legislator, took favorable action toward SOM "that he would not otherwise have taken." Bryant's Brief, 20.

█ The Court does not need to reach the issue of whether "intending to be influenced or rewarded" within the meaning of § 666(a)(1)(B) requires that a defendant take actions he would otherwise not have taken. This is because Count 7 clearly alleges a "but for" causal link between the *quid*, the SOM salary, and the *quo*, Bryant's conduct in transactions involving the state of New Jersey: Bryant "did corruptly solicit ... a salaried and pensionable position at SOM ... *intending to be influenced* and rewarded in connection with...." Indictment, Count 7, ¶ 3 (emphasis added). Thus, Count 7 alleges that Bryant accepted salary payments from SOM, the *quid*, while intending to be influenced in taking favorable actions toward SOM in his capacity as a state legislator, the *quo*. *See Id.* at Counts 1–6, ¶¶ 20–21. Bryant's contention that, "[a]s far as the Indictment states, Senator Bryant's actions remained unaffected by the payments" from SOM misreads the plain language of the Indictment. Bryant's Brief, 21. Count 7 clearly alleges that, far from being unaffected by the payments, Bryant intended to be influenced by the payments when taking the actions described in the Indictment.[24]

**24.** This motion challenges the sufficiency of the Indictment and is not addressed to the proofs.

██ Bryant cites authority for the proposition that to be "influenced" in taking action means that the action is "induced" or "affected" by a bribe. Bryant's Brief, 20. Though the Indictment does not specifically state that Bryant's official actions were "induced" or "affected," that is the plain import of the Indictment's language: Bryant accepted a stream of payments from SOM "intending to be influenced and rewarded" in connection with transactions of the State of New Jersey.[25] Indictment, Count 7, ¶ 3. When evaluating the sufficiency of an Indictment, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Kemp*, 500 F.3d at 280 (quotations and citations omitted). The allegation that Bryant accepted the SOM salary "intending to be influenced and rewarded" tracks the statutory language of § 666(a)(1)(B), and the description of the *quid pro quo* exchange in the Indictment provides "sufficient factual orientation" for that allegation.

Moreover, the *Ford* case that Bryant relies upon supports the sufficiency of the allegations in the Indictment with respect to Count 7. In *Ford*, the Second Circuit described the intent required by the recipient of a bribe under § 666:

The recipient's "awareness" that the donor gave something of value for the purpose of influencing the recipient might well constitute strong circumstantial evidence that the recipient acted with the requisite culpable state of mind in accepting the item, but a jury should be clearly instructed that it is *the recipient's intent to make good on the bargain,* not simply her awareness of the

donor's intent that is essential to establishing guilt under Section 666.

*Ford,* 435 F.3d at 213 (emphasis added). Because the Indictment alleges that Bryant accepted his SOM salary "intending to be influenced," it makes clear that Bryant acted with the "intent to make good on the bargain" he struck with Gallagher. Thus, Count 7 is sufficient.

██ Second, Defendants attack the sufficiency of the Indictment's allegations of a "corrupt solicitation" and a "corrupt giving" of the SOM salary. They contend that a corrupt act within the meaning of § 666 must be a violation of an official duty, and that state law defines the scope of Bryant's official duties as a state legislator. Thus, through the "corruptness" element of § 666, Defendants assert the same objections to the state law predicates that they raised in the context of the honest services fraud Counts. First, Defendants argue that the absence of an allegation that Defendants breached a state law duty means that the Indictment fails to sufficiently allege the element of "corruptness" in Counts 7 and 8. Second, Defendants argue that the vagueness of the pertinent state law duties render § 666 unconstitutionally vague as applied to the allegations in the Indictment. Both arguments fail because Defendants cannot provide authority for the proposition that a violation of § 666 requires that the Government prove the violation of an independent state law, and I do not find that it is so required.

Defendants principally rely on *United States v. Rooney,* 37 F.3d 847, 853 (2d Cir.1994), where the Second Circuit held that "it is clear to us that the use of the term corruptly in § 666 entails the violation of some duty owed to the government or to the public in general." *Rooney,* 37

---

25. As explained *supra* at § II.B.2.c., the Government need not allege or prove that Bryant took official actions that he otherwise would not have taken for Bryant to have accepted a bribe while "intending to be influenced or rewarded."

F.3d at 852–53. In *Rooney*, the defendant was a private developer working on a private project in which the federal government was a lender. The defendant told a general contractor that, in return for constructing a pond adjacent to the project, the defendant would apply for further funding from the federal government, and thereby repay his debt to the general contractor immediately. *Id.* at 849–50. "It was the government's theory at trial that Rooney's offer to apply for further [federal] funds so he could immediately pay [the general contractor] in exchange for the contractor's construction of a pond adjacent to the project constituted a corrupt solicitation of a thing of value by Rooney." *Id.* at 852. The court found that Rooney's actions did not violate a duty he owed to the government "when he conditioned further loan requests and thus prompter payment upon the construction of a pond." *Id.* at 853. *Rooney* does not support Defendants' arguments here.

First, *Rooney* did not hold, as Defendants imply, that the breach of duty needed for a finding of "corrupt solicitation" requires a violation of an independent state law predicate. Second, and more importantly, *Rooney* makes clear that in the typical § 666 case—one where a government official accepts a bribe with the intent to be influenced in the exercise of

his official discretion—the breach of duty, and hence the corruptness of the solicitation, is obvious. The court said:

> As discussed above, the typical § 666 case easily meets this test [, i.e., the violation of some duty owed to the government or to the public in general.] It is an obvious violation of duty and public trust for. a public official or some other person responsible for parceling out government benefits to accept or demand a personal benefit intending to be improperly influenced in one's official duties.
>
> In contrast, Rooney's duty, as a private developer trying to maximize revenues while minimizing costs, is far less clear.

*Id.* (citations omitted). Bryant's position as a state legislator makes it "an obvious violation of duty and public trust" for him to solicit a salary from SOM in return for being influenced in the exercise of his official discretion. Thus, according to *Rooney*, the allegations in the Indictment are sufficient to state a violation of § 666(a)(1)(B).[26]

Moreover, the Third Circuit has recently upheld the sufficiency of the evidence for a § 666(a)(2) conviction without any reference to, or even the slightest implication that, the violation of a state law is required for a § 666 conviction: "the evidence is

---

**26.** Defendants also cite *Ford,* 435 F.3d at 211, *United States v. Seitz,* 952 F.Supp. 229, 237 (E.D.Pa.1997), and *United States v. Aguilar,* 515 U.S. 593, 616–17, 115 S.Ct. 2357, 132 L.Ed.2d 520, but these authorities do not impose the requirement of a state law predicate for a § 666 violation. Neither do they call into question the proposition that (1) a state legislator acts "corruptly" by accepting a bribe while intending to be influenced in his official capacity, or that (2) a person acts "corruptly" by offering a bribe with the intent to influence a state legislator in his official capacity. In *Ford,* the court overturned a § 666 conviction because the jury instructions "appear to have told the jury that the 'cor-

ruptly' requirement was fully satisfied by the recipient's knowledge of the donor's intent and omitted any reference to the recipient's intent in accepting the thing of value." *Ford,* 435 F.3d at 211. In contrast, the allegations against Bryant in Count 7 make clear that he accepted the SOM salary "intending to be influenced." Indictment, Count 7, ¶ 3. *Seitz* and *Aguilar* do not even involve § 666. If anything, Defendants' citation to Justice Scalia's opinion in *Aguilar* makes clear that the allegations with respect to Counts 7 and 8 sufficiently plead "corrupt" acts: "the term 'corruptly' ... includes bribery." *Aguilar,* 515 U.S. at 616, 115 S.Ct. 2357 (Scalia, J., concurring in part, dissenting in part).

sufficient for a reasonable jury to find that Flemming corruptly gave [a procurement official] money to influence [the procurement official] to expedite payments to Flemming's company under the contract." *Flemming*, 223 Fed.Appx. at 123. Because Bryant was a state legislator during the time period pertinent to the allegations of the Indictment, there is no question that, as in *Flemming*, it was "an obvious violation of duty and public trust for [Bryant, a] person responsible for parceling out government benefits [,] to accept or demand a personal benefit intending to be improperly influenced" in his official duties. *Rooney*, 37 F.3d at 853. Hence, Defendants' attack on the duties specified by the Indictment in the context of the honest services fraud charges in Counts 1–6 are irrelevant to the sufficiency of the allegations in the Indictment with respect to § 666.

State law duties aside, Gallagher relies on *United States v. Thompson*, 484 F.3d 877 (7th Cir.2007) for his contention that the § 666 counts are unconstitutionally vague as applied. *Thompson*, however, is inapposite. Thompson was convicted of violating § 666(a)(1)(a), the embezzlement prong of § 666, not the bribery prong at issue here, on the theory that she "intentionally misapplied" government funds because she "deflected [a procurement decision] from the one that should have been made under the administrative process." *Thompson*, 484 F.3d at 880. "Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback." *Id.* at 881. That the court employed the following hypothetical in its analysis shows how far afield the facts of *Thompson* are from the case at bar:

> Imagine how the prosecutor's reading of § 666 would apply to a state official charged with implementing the Medicaid program. Someone applies for payment of medical expenses; a state employee approves; later it comes to light that the applicant made just a little too much money to be eligible, so the decision was erroneous. A violation of regulations and perhaps of some statutes has occurred, but is the error a crime? As we read § 666, the answer is no *unless the public employee is on the take* or the applicant is a relative (for indirect benefits are another form of payoff). An error-even a deliberate one, in which the employee winks at the rules in order to help out someone he believes deserving but barely over the eligibility threshold-is a civil rather than a criminal transgression. Likewise the sin is civil (if it is any wrong at all) when a public employee manipulates the rules, as Thompson did, to save the state money or favor a home-state producer that supports elected officials.

*Id.* (emphasis added). Counts 7 and 8 are not based on the manipulation of any regulations or procurement rules, but effectively allege that Bryant agreed to be influenced in his official capacity as state senator in exchange for his SOM salary. Thus, on the "narrow reading" of § 666 that the court adopted out of respect for the constitutional concerns that Gallagher presses here, *Id.*, *Thompson* makes clear that there is no "haziness" in the application of § 666 to the allegations in Counts 7 and 8. *Id.* at 884.

██ Third, Defendants argue that the conduct alleged in the Indictment falls within the "safe harbor" provision of § 666(c), or in the alternative, that ambiguity in the application of § 666(c) renders § 666 unconstitutionally vague as applied. The provision reads: "This section does not apply to bona fide salary ... or other compensation paid ... in the usual course of business." 18 U.S.C. § 666(c). Although there is authority suggesting that the § 666(c) exception is a question of fact for the jury, *see United States v. Williams*, 507 F.3d 905, 909 (5th Cir.2007); *United*

*States v. Dwyer,* 238 Fed.Appx. 631, 647–48 (1st Cir.2007), Defendants rely on cases where, before trial, the court has dismissed § 666 counts as a matter of law based on the "safe harbor" provision of § 666(c). *See United States v. Harloff,* 815 F.Supp. 618 (W.D.N.Y.1993); *United States v. Mills,* 140 F.3d 630 (6th Cir. 1998). Thus, for purposes of this motion, the Court will accept that there may be situations where it is appropriate to dismiss an Indictment pursuant to § 666(c).

Nonetheless, the Court finds that § 666(c) is inapplicable to the allegations of Counts 7 and 8. The salary payments at issue were allegedly paid to Bryant as the *quid* in a *quid pro quo* bribery arrangement with Gallagher. Moreover, the Indictment alleges:

> GALLAGHER caused the publicly-disclosed description for defendant Bryant's position to misleadingly state that defendant Bryant's job was to "improve University communications, image, receptivity, and relationships with local governments, community and civic organizations and local residents," while omitting any reference to defendant Bryant's use of his position and influence as a State Senator on behalf of SOM. Based on this description, the position was inaccurately described by unknowing third parties as an 'external affairs' or 'public relations' job. In reality, defendant Bryant's *primary role* at SOM was to use his official position to advocate on behalf of SOM with state officials and legislators to provide official assistance in obtaining state funds for SOM.

Indictment, Counts 1–6, ¶ 22.a. (emphasis added). Since the payments at issue were allegedly compensation for Bryant's undisclosed, "primary role" as a legislator on the take, rather than simply for work pursuant to Bryant's publicly disclosed job description, it cannot be argued with a straight face that the payments were "bona fide" salary paid in the "usual course of business," for purposes of this motion to dismiss.

Furthermore, the cases relied upon by Defendants for their § 666(c) argument are inapposite. In *United States v. Harloff,* 815 F.Supp. 618 (W.D.N.Y.), the court dismissed several counts of an indictment because the conduct, as a matter of law, fell within § 666(c)'s safe harbor. The defendants allegedly violated § 666 by "falsifying payroll records by claiming to have worked 40–hour weeks when in fact they worked 'substantially fewer hours.'" *Harloff,* 815 F.Supp. at 618. The court found, however, that a "plain reading of [§ 666(c) ] ... prohibits a prosecution under § 666 based on an employee's accepting wages for more hours than s/he actually worked," because Congress did not "intend[ ] to criminalize an employee's early departure from work." *Id.* at 619. Thus, *Harloff* stands merely for the proposition that § 666(c) is applicable to allegations that an employee worked fewer hours than that for which she was obligated. But the Indictment in the case at bar is not so structured. Bryant is not alleged to have violated § 666 by accepting a salary for more hours than he actually worked, thereby embezzling money from SOM, but rather by accepting a salary "intending to be influenced and rewarded" in connection with his official duties as a state legislator. Indictment, Count 7, ¶ 3. That Bryant failed to fulfill his publicly-disclosed job responsibilities may be relevant evidence of the bribery arrangement, but, unlike the defendants in *Harloff,* that is not the *reason* Bryant is being prosecuted under § 666(a)(1)(B).

In *United States v. Mann,* 172 F.3d 50 (6th Cir.1999), the Sixth Circuit found § 666(c) applicable to allegations that a school principal intentionally misapplied funds, his salary paid through the usual channels, from the school district in viola-

tion of § 666(a)(1)(a). "Because under Kentucky law [the defendant] was certified to be a teacher but not a principal, the government [argued] that the salary he received in excess of a teacher's salary [was] improper," and hence the basis for a violation of § 666. *Mann*, 172 F.3d 50, 1999 WL 17647 at *1. Even though the defendant lacked a required certification, the Court found that the salary was "bona fide" within the meaning of § 666(c): "the position of principal of Chapman Academic Vocational School is clearly a real and necessary one, and the government concedes that [the defendant] performed the duties of his job." *Id.* at 172 F.3d 50, 1999 WL 17647 at *3. Again, unlike the salary paid to the principal in Mann, Bryant's SOM salary was not paid in the "usual course of business" because it was allegedly the *quid* in a *quid pro quo* bribery arrangement. The salary in *Mann* was paid for legitimate work, albeit work that the defendant was not certified to perform.

Finally, Defendants rely on *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998), where the court dismissed § 666 counts pursuant to § 666(c) because the transactions at issue did not exceed $5,000. A county sheriff and special deputy were paid $3500 and $3930 in exchange for hiring two men as deputy sheriffs. The government argued that "the salaries paid to the [bribers] who obtained deputy sheriff positions could not have been bona fide because of the illegal nature of the procurement process," and therefore that their respective salaries should be included in the amount of money involved in the illegal transaction. *Mills*, 140 F.3d at 633. The court rejected the government's argument and excluded the salaries from the

amount of money involved because "the Indictment does not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment," and "absen[t] ... such allegations, the government has no support for its claims that the salaries were not properly earned 'in the usual course of business.'" *Id.* at 633–34.

Despite the fact that *Mills* applied § 666(c) to a case involving bribery, it is distinguishable. The reason why Bryant's salary is not "bona fide" and "in the usual course of business" is not because of the alleged illegal nature of the procurement process. The allegations at issue in *Mills* were consistent with the possibility that, once the bribers were hired, the salary at issue was paid only for legitimate work, leaving the procurement process as the only reason to claim their salary was not "bona fide." If the Indictment alleged that Gallagher, like the *Mills* defendants, was paid a bribe in exchange for giving Bryant an otherwise totally legitimate job at SOM, a different result might follow. But the bribery arrangement, as alleged in the Indictment, is very different. The Indictment alleges that whatever legitimate work Bryant may have done at SOM, his "primary role" was to use his legislative office to advocate on behalf of SOM. Indictment, Counts 1–6, ¶ 22.a. Thus, because Bryant accepted his SOM salary "intending to be influenced" as a state legislator, his salary was not merely corruptly procured, but also constituted payment for on-going corrupt activity.[27]

Put another way, because the SOM salary itself constitutes the bribe—the

---

27. *Mills* and *Mann* would also be distinguishable for the more obvious reason that, despite being paid a salary for a legitimate position at SOM, "the only material service performed by defendant WAYNE R. BRYANT in exchange

for his pensionable income was to unlawfully use his position as State Senator ... to lobby on behalf of SOM and obtain increased state funding for SOM." Indictment, Counts 9–14, ¶ 11.i. However, because this allegation is not

"[ ]thing of value" accepted with the intent to be influenced for purposes of § 666(a)(1)(B), and offered with the intent to influence for purposes of § 666(a)(2)—it was not "bona fide" or paid "in the regular course of business." The continuing SOM salary is the functional equivalent of the $3500 and $3930 bribes in *Mills*, which, of course, the *Mills* court did not exclude from calculation of the amount involved in the transaction pursuant to § 666(c).

*United States v. Cornier–Ortiz*, 361 F.3d 29 (1st Cir.2004), provides authority for the proposition that a salary is not "bona fide" simply because it is paid for legitimate work. In *Cornier–Ortiz*, the defendant engaged in a scheme to use HUD funds to pay someone for work which that person was barred by conflict of interest rules from performing. "[T]he government made no effort to prove that the underlying work paid for by the HUD monies was not done ... The government's strategy ... was not to prove that the work was not done, but rather, to prove that the work was done by someone who could not lawfully do it." *Cornier–Ortiz*, 361 F.3d at 34–35 (citation omitted). In response to the defendant's argument that the salary was "bona fide" because the pertinent work was completed, the court responded: "A scheme designed to evade conflict of interest rules is hardly legitimate or acceptable. That the payments were made for a legitimate purpose—to hire a CGP expert to obtain funding for maintenance work that was indeed done—does not render them bona fide under the statute if they were intentionally misapplied, as they were here via sham contracts that skirted conflict of interest rules." *Id.* at 36. Similarly, even if Bryant's SOM salary was paid in exchange for some legitimate work, that "salary" is not "bona fide" when it is also paid as the incorporated into Counts 7–8, they must be

*quid* in a *quid pro quo* bribery agreement that constitutes an "obvious violation of duty and public trust." *Rooney*, 37 F.3d at 853; *see also Dwyer*, 238 Fed.Appx. at 648 ("We would add that to the extent the payments were, as was argued, not intended as wages for work actually performed but reflected some kind of informal and unauthorized compensatory time reimbursement, they were also not bona fide wages").

Because Defendants rely on cases that do not hold that a bribe paid in the form of a salary falls within § 666(c), they fail to support Defendants' argument that § 666 is unconstitutionally vague as applied to Counts 7 and 8. If a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages, it is sufficiently clear that such wages are not "bona fide."

Defendants also argue that Counts 7 and 8 are unconstitutionally vague as applied because they require a jury to subjectively value the services Bryant rendered to SOM. Again, the reason why Bryant's SOM salary was not "bona fide" has nothing to do with the value of the legitimate work he did. Even if Bryant did provide value to SOM—by whatever yardstick—in the form of legitimate work, his salary cannot be "bona fide" if it was part of a *quid pro quo* bribery deal. The SOM salary was allegedly offered to Bryant with the intent to influence his discretion as Senator, Indictment, Count 8, and allegedly accepted by him over a three year period with the intent to be so influenced. Indictment, Count 7. Thus, Defendants' void for vagueness arguments fail.

## III. Counts 9–14

### A. Factual Background

Counts nine through fourteen are based on the Indictment's allegation that Bryant assessed without reference to it.

devised and intended to devise a scheme or artifice to defraud The New Jersey Division of Pensions and Benefits (the "Division") to obtain money and property "by means of materially false and fraudulent pretenses, representations and promises." Indictment, Counts 15–17, ¶ 8. The following facts are based on the allegations relevant to Counts 9–14 of the Indictment.

The Division administers the New Jersey Public Employees Retirement System ("PERS"), a post-retirement benefits plan for government employees and elected officials. *Id.* at ¶ 2.b. Under New Jersey law, a government employee or elected official can only receive PERS benefits for the performance of "honorable service." *Id.* A government employee or elected official is eligible to accumulate PERS benefits for salary properly received for multiple government positions. *Id.* at ¶ 2.c. PERS benefits are determined by a formula using the "high three," the average salary for a retiree's three highest paid years as a government employee or elected official. *Id.* at ¶ 2.d.

Bryant was enrolled in PERS from in or about 1980 to in or about 2006. *Id.* at ¶ 4. From in or about the middle of 2002 to in or about the end of 2006, Bryant received pensionable income from the New Jersey Legislature, "a substantial increase in pensionable income from [the Gloucester County Board of Social Services ('GCBSS')], as well as new pensionable income from the UMDNJ–SOM and Rutgers University." *Id.* at ¶ 6. As of 2006, defendant Bryant's three highest salaried calendar years were 2003, 2004 and 2005, and

[a]s a result, defendant BRYANT's average "high three" as calculated for these years was increased to approximately $170,492. This resulted in an increase

in his annual retirement benefits from approximately $28,000 to approximately $81,269. In sum, between in or about 2002 and in or about 2006, defendant BRYANT almost tripled his total pensionable income, and thereby increased his potential retirement benefits by approximately $53,000 per year.

*Id.* at ¶ 7.

Thus, the "object" of Bryant's scheme to defraud was a follows: "The object of [Bryant's] scheme and artifice to defraud was for defendant WAYNE R. BRYANT to inflate his 'high three' by fraudulently acquiring pensionable income from the GCBSS, UMDNJ–SOM, and Rutgers University, to thereby enable defendant BRYANT to obtain PERS retirement benefits to which he was not legally entitled." *Id.* at ¶ 9. As the Indictment explains, Bryant's pensionable income at GCBSS, UMDNJ–SOM and Rutgers was "fraudulently acquir[ed]," *Id.*, because Bryant made misrepresentations in the course of his scheme to obtain benefits from the Division to which he was not entitled. *Id.* at ¶¶ 10–12. Simply put, Bryant made misrepresentations in the course of acquiring pensionable income from several employers for work he did not do, and then fraudulently sought to obtain retirement benefits on the basis of that pensionable income.[28]

## B. The Meaning of a Scheme or Artifice to Defraud

To prove mail fraud, the government must prove: "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails ... in furtherance of the scheme." *Kemp,* 500 F.3d at 279 (citing *Antico,* 275

---

**28.** The Court notes that the Indictment does not charge Bryant with mail fraud simply for attempting to inflate his "high three." The Indictment's charges are based on the fraudulent means by which Bryant did so.

F.3d at 261). A proper understanding of the first element—"a scheme or artifice to defraud"—is critical to addressing Bryant's various contentions, so it must be clarified at the outset. "[T]he words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (citation omitted). "[G]enerally, [the mail fraud statute] has been expansively construed to prohibit all schemes to defraud by any means of misrepresentation that in some way involve the use of the postal system." *United States v. Olatunji,* 872 F.2d 1161, 1167 (3d Cir.1989) (citation omitted). "We agree that 'fraudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments.'" *Id.* (quoting *United States v. Allen,* 554 F.2d 398, 410 (10th Cir.1977)); *United States v. Fumo,* Docket No. 06-319, 2007 WL 3132816, *10 (E.D.Pa. Oct. 26, 2007) (citing, *Olatunji,* 872 F.2d at 1167). "We have stated that fraud convictions ... are valid where they are premised on 'a scheme or artifice to defraud ... involving some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension,' and that '[t]he scheme need not involve affirmative misrepresentation.'" *United States v. Stackpole,* 64 Fed.Appx. 842, 842–43 (3d Cir. 2003) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415 (3d Cir. 1991)) (quotations and citations omitted).

Because Bryant's alleged fraudulent conduct differs with respect to each of the entities that employed him, the Court will analyze the counts involving each entity separately.

## C. Rutgers University

■ Count 9 is based on an enrollment form that Bryant sent to Rutgers–Camden allegedly in furtherance of a scheme to defraud the Division. The Indictment alleges that Bryant targeted Rutgers for his scheme because Rutgers was dependent on him for political support, and that after being placed on the Rutgers payroll around the summer of 2002, Bryant did "little or no legitimate and meaningful work in exchange for the pensionable income that he received from Rutgers–Camden." Indictment, Counts 9–14, ¶ 12.a.-d. Further, in December 2006, Bryant submitted an application to the Division to receive retirement benefits based on "actual work and honorable service provided to Rutgers–Camden, which, in fact, defendant Bryant had not performed." *Id.* at ¶ 12.e. Bryant presses a constitutional vagueness challenge against these allegations, contending that, as applied to the conduct at issue in Count 9, the mail fraud statute is unconstitutionally vague. Bryant's Brief, 31–32. I agree.

As plead, the allegations pertaining to Rutgers apply the mail fraud statute in a way that (1) could not have provided Bryant with constitutionally sufficient notice and (2) permits a finding of criminal liability for a "standardless sweep" of conduct. As the Supreme Court explained in *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983):

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine fo-

cuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

*Kolender*, 461 U.S. at 357–58, 103 S.Ct. 1855 (citations omitted).

According to the Indictment, Bryant's application to the Division for pension benefits for "actual work . . . which, in fact, [he] had not performed," Indictment, Counts 9–14, ¶ 12.e., and the enrollment form that Rutgers sent to the Division on behalf of Bryant, *Id.* at ¶ 13, were part of a "scheme or artifice to defraud" the Division. Based on the allegations in paragraph 12, the deceptive "scheme or artifice" is that mailings to the Division wrongfully implied that Bryant should receive benefits for "actual work and honorable service," *Id.* at ¶ 12.e., when in reality he "did little or no legitimate and meaningful work in exchange for the pensionable income that he received." *Id.* at ¶ 12.d. In other words, Bryant misrepresented that he performed "actual work and honorable service" when he really did "little or no legitimate and meaningful work."

This allegation runs afoul of the strictures of the vagueness doctrine set forth in *Kolender*. First, there is no standard by which Bryant could have known whether his "little or no" work was sufficiently "legitimate or meaningful" to warrant pension benefits, and hence allow him to apply for such benefits without committing fraud. Second, and more troubling, the Indictment's allegations invite a jury to find that Bryant made a misrepresentation based on the jury's evaluation of whether the "little or no" work he did was "legitimate or meaningful." Applying the mail fraud statute in this way would permit "a standardless sweep [that] allows . . . juries to pursue their personal predilections" about legitimate and meaningful work. *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (quotations and citation omitted). Any allegations regarding a "scheme or artifice to defraud" involving Bryant's work at Rutgers would require a jury to speculate about what "little or no legitimate and meaningful work" *means*, and thereby invite the jury to second-guess the fairness of the arrangement between Bryant and Rutgers. For example, if Bryant merely gave one lecture or seminar a year, that could be seen as doing "little work." But if Rutgers believed, even if others might not agree, that a single seminar was so valuable or "meaningful" to the School—much like an honorarium paid to a guest speaker—that the salary was fairly paid, such judgment may not be explored in a criminal proceeding. That judgment is for Rutgers, and cannot, consistent with the Due Process Clause, be second-guessed by the Government, a jury or this Court.

The Government argues that the allegation that Bryant "did little or no legitimate and meaningful work" is not in and of itself a fact that the Government would have to prove at trial. Instead, the Government argues that it is merely evidence that Bryant defrauded the Division. But as explained above, according to the allegations in the Indictment pertaining to Rutgers, the determination of whether Bryant "defrauded" Rutgers and the Division presupposes a determination that Bryant did "little or no legitimate and meaningful work"—otherwise no deception is alleged. And, the Indictment does not allege what quantity or quality of work Rutgers agreed or expected that Bryant

would perform. Thus, there is no standard by which to judge Bryant's work on Rutgers' behalf. This issue does not go to the proofs, as the Government contends, but to the constitutional adequacy of notice and of the legal standard which the Government will have to address in its proofs at trial. Thus, Bryant's vagueness argument is properly dealt with on a motion to dismiss.

Because the Constitution does not permit criminal liability to arise pursuant to standardless second-guessing, the Court finds that Count 9 of the Indictment violates Bryant's right to due process of law. Thus, Count 9 is dismissed.

### D. The Remaining Counts: GCBSS and UMDNJ

Although the Court finds that the Indictment's allegations with respect to each entity that employed Bryant require separate analysis, Bryant makes several general arguments as to why all the remaining Counts should be dismissed. The Court will address these general arguments before turning to Bryant's contentions that are specific to each employer.

Bryant's first argument is the same vagueness challenge that he leveled against the Rutgers Count of the Indictment. With respect to both GCBSS and UMDNJ, the Indictment also alleges that Bryant did "little or no meaningful work in exchange for the pensionable income" he received. Indictment, Counts 9–14, ¶¶ 10.-c., 11.d. Bryant contends that this is an impossible charge to answer, i.e., there is no standard by which a jury could assess whether Bryant's work was sufficiently "meaningful." But a lack of "legitimate" or "meaningful" work is not an element of the crimes with which Bryant is charged in Counts 10–14, nor is it the legal standard with which a jury would be instructed. The Indictment sufficiently alleges mail fraud if it alleges Bryant's willful participation in a "scheme or artifice to defraud" the Division out of money or property, and a mailing in furtherance of the scheme. *Kemp,* 500 F.3d at 279 (citation omitted). A "scheme or artifice to defraud" may involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Stackpole,* 64 Fed.Appx. at 843 (quotations and citations omitted). With respect to the Rutgers Count, the application of that standard required a precise answer to the question of whether Bryant did "little or no meaningful or legitimate work." This is not the case with respect to the allegations regarding GCBSS and UMDNJ.

The Indictment specifically alleges that Bryant submitted false statements to the GCBSS in his "Attorney's time Accountability/Work Unit Reports." Indictment, Counts 9–14, ¶ 10.g. As to UMDNJ, it is alleged that Bryant made two sorts of misrepresentations or omissions. First, Bryant allegedly "fraudulently caused [himself] to receive pensionable income and accrue retirement benefits as if he worked three full days per week, when, in fact, his position at SOM required him to be present at SOM one-half of one day per week." *Id.* at ¶ 11.e. Further, it is alleged that "[t]he only material service performed by Defendant WAYNE R. BRYANT in exchange for his pensionable income was to unlawfully use his position as a State Senator . . . to lobby on behalf of SOM and to obtain increased state funding for SOM." *Id.* at ¶ 11.i. If a jury were find to find that Bryant made these misrepresentations in the course of a scheme to obtain pension benefits from the Division, whether or not Bryant did "little or no legitimate or meaningful work"—whatever that means—for either GCBSS and UMDNJ is beside the point. Indeed, in these Counts, in contrast to the Rutgers Count, the Government is correct that the

allegation of "little or no legitimate or meaningful work" is merely an item of evidence or proof. Thus, because the elements of mail fraud do not require application of the standard that Bryant attacks as vague, at least with respect to the allegations pertaining to GCBSS and UMDNJ, Bryant's void for vagueness challenge fails. Again, the pertinent issue is not whether Bryant actually performed "little or no meaningful and legitimate work," but whether the Indictment adequately alleges that Bryant made "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension," *Stackpole,* 64 Fed.Appx. at 843 (quotations and citations omitted), regarding the nature of his employment in a scheme to defraud the Division.

Bryant's second general argument is that the allegations in the Indictment presuppose that, as a matter of state law, the Division would have denied Bryant the compensation at issue had it known the facts alleged in the Indictment. In other words, according to Bryant, unless the Division would have denied Bryant pension benefits, the Indictment cannot sufficiently allege that Bryant engaged in a scheme to defraud the Division of such benefits. It follows, Bryant says, that the Indictment is defective because it does not allege, nor could it be proven, that his benefits would necessarily have been denied by the Division. Bryant provides several reasons why, as a matter of law, the Indictment

does not, and cannot, allege Bryant's benefits would have been denied by the Division. First, he points to the eleven factor balancing test that governs the forfeiture of retirement benefits for public service in New Jersey. N.J.S.A. 43:1–3.[29] Second, Bryant says it is a "dubious proposition" that the Division would find that Bryant engaged in misconduct given the ambiguity of state law and the wide practice of dual employment.[30] Bryant's Brief, 26. Third, Bryant claims (in a manner analogous to his void for vagueness claim) that the Indictment's allegations simply express skepticism about whether Bryant fairly earned his salary at the various entities. Bryant points out that the Division would, as a matter of state law, rely on the certifications provided by the entities employing Bryant, N.J.S.A. 43:15A–15, and would not engage in second-guessing regarding the "meaningfulness" or "legitimacy" of Bryant's work. Bryant's Brief, 25–27.

■■■ This entire line of argument is a red herring. Whether or not the Division would have ultimately denied Bryant his pension *if it knew* the facts alleged in the Indictment is beside the point if Bryant took actions to make sure the Division would not know those facts. The law does not require the Indictment to allege that the Division actually lost money or property: "to satisfy the elements for mail fraud, '[p]roof of actual loss by the intended victim is not necessary.'" *United States. v. Sokolow,* 91 F.3d 396, 406 (3d Cir.1996) (citing *United States v. Copple,* 24 F.3d

---

29. Whether or not the Division would have granted Bryant the benefits at issue according to the standard of N.J.S.A. 43:1–3 is beside the point if Bryant caused misrepresentations to be made in the course of a scheme to obtain benefits from the Division. Such misrepresentations are what brings Bryant's alleged conduct within the purview of the mail fraud statute, even if the Division would ultimately have decided that Bryant's pension should not be forfeited under N.J. S.A. 43:1–3.

30. This argument fails on its own terms. First, it only deals with the counts pertaining to UMDNJ. Second, for the reasons given *supra* at II.B.1.4., the Court has rejected Defendants' challenge to the sufficiency of the allegations with respect to Bryant's alleged *quid pro quo* bribery scheme involving UMDNJ.

535, 544 (3d Cir.1994)); *see also United States v. King,* 860 F.2d 54, 55 (2d Cir. 1988) ("as we have said many times, the validity of a mail fraud conviction does not hinge upon a showing of actual loss by the intended victim[;][i]t is enough that appellant knowingly devised a scheme to defraud and caused the use of the mails in furtherance of the scheme"). It is sufficient that the Indictment alleges Bryant willfully engaged in a scheme to fraudulently manipulate the Division's decision-making process. Whether or not Bryant would have received benefits even if the Division were aware of every fact in the Indictment, Bryant nonetheless would have violated the mail fraud statute if he engaged in a scheme to apply for and obtain benefits from the Division in a manner that purposefully obscured the nature of the work he actually performed.

At oral argument, Bryant argued that even if he could have violated the mail fraud statute by deceiving the Division as to the true nature of his employment arrangements at GCBSS and UMDNJ, as a matter of law, the Indictment fails to allege that he deceived the Division. According to Bryant, this is because the application(s) he submitted to the Division, cannot constitute true, false, or misleading representations. *See* Indictment, ¶¶ 10.h., 11.f., j. According to Bryant, such applications are merely requests to be considered for pension benefits, and do not fraudulently assert, or imply, that Bryant committed no misconduct. Oral Argument, 124 ("this is not an analysis capable of falsity because in applying for pension benefits Senator Bryant did not have to certify the absence of misconduct"). On Bryant's view, then, his applications to the Division are analogous to the writing of a check: "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true or false.'" *United States v. Frankel,* 721 F.2d 917, 919 (3d Cir.1983) (citing *Williams v. Unit-*

*ed States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982)). Just as a check cannot constitute a fraudulent misrepresentation as a matter of law, Bryant's argument goes, neither can his applications to the Division.

This argument fails for two reasons. First, Bryant's applications to the Division are not the *only* misrepresentations alleged in the Indictment. The Indictment alleges that Bryant engaged in a scheme to defraud the Division and "to obtain money and property by means of materially false and fraudulent, pretenses, representations and promises." Indictment, Counts 9–14, ¶ 8. These include allegations that Bryant submitted false time sheets to the GCBSS. *Id.* at ¶ 10.g. Further, Bryant allegedly "fraudulently caused [himself] to receive pensionable income and accrue retirement benefits as if he worked three full days per week, when, in fact, his position at SOM required him to be present at SOM one-half of one day per week." *Id.* at ¶ 11.e. Moreover, the Indictment alleges that Bryant was actually being paid in exchange for unlawfully using his position as a State Senator to assist SOM. *Id.* at ¶ 11.i. Thus, the Indictment alleges that Bryant engaged in fraudulent conduct independent of his applications to the Division (whether or not such applications were in and of themselves fraudulent).

■ Second, Bryant's argument mistakenly relies on the convergence doctrine—that mail fraud requires that Bryant, the defendant, made misrepresentations to the alleged victim, the Division—as the basis to attack the sufficiency of the Indictment. *See United States v. Lew,* 875 F.2d 219, 221 (9th Cir.1989) ("the intent must be to obtain money or property from the one who is deceived" and "[t]he government ... has been unable to refer us to, and we have been unable to

find, *any* evidence in the record that Lew deceived his clients") (italics in original). But the Third Circuit has expressly rejected the proposition that "as a matter of law . . . an Indictment alleging 'false and fraudulent pretenses and representations' under 18 U.S.C. § 1341 must specifically allege that such false statements and representations were made *directly* to the ultimate victim." *Olatunji*, 872 F.2d at 1168 (emphasis in original); *see also Fumo*, 2007 WL 3132816 at *10 ("there is no requirement that the government specifically allege that 'such false statements were made *directly* to the ultimate victim' ") (citing *Olatunji*, 872 F.2d at 1168) (emphasis in original). Thus, the Indictment adequately alleges that Bryant engaged in deception in connection with his employment at GCBSS and UMDNJ in a scheme to defraud the Division.

Finally, Bryant's argument fails because it was clearly part of his alleged scheme that the Division would be deceived as to the work he actually performed. Whether or not Byant's applications are, as a matter of law, capable of falsity or deception, it is clear that such applications would require GCBSS and UMDNJ to make false or misleading statements to the Division. N.J.S.A. 43:15A–15 states: "The head of a department or branch of the State service not included in a department employing a member shall submit to the retirement system a statement showing the name, title, compensation, *duties,* date of birth and length of service of the member and any other information the system requires." N.J.S.A. 43:15A–15 (emphasis added). Thus, Bryant clearly knew that applying to the Division for benefits would cause GCBSS and UMDNJ to send misleading statements to the Division because such statements would be predicated upon the deception that Bryant had engaged in with respect to these employers, as alleged in the Indictment. Indeed, Count 10 is based on an enrollment application for Bryant which was sent from UMDNJ to the Division on January 12, 2003, and Count 14 is based on a Certification sent from GCBSS to the Division on January 10, 2007. Assuming the allegations of the Indictment to be true, as I must in the context of this motion, the statements in these forms are adequately alleged to be misrepresentations because they are predicated on Bryant's deception in connection with his employment GCBSS and UMDNJ. Thus, even if the Indictment does not allege that Bryant personally or directly sent any misrepresentations to the Division, it adequately alleges that, pursuant to N.J.S.A. 43:15A–15, it was part of his "scheme or artifice to defraud" that he caused his employers to send misleading representations to the Division.

Next, the Court turns to the specific arguments that Bryant makes with respect to the Indictment's allegations concerning GCBSS and UMDNJ. With respect to each entity, Bryant claims that the Indictment's allegations fail to allege that this income was "fraudulently acquir[ed]," as required by the "object" of the Indictment. Indictment, Counts 9–14, ¶ 9.

## 1. GCBSS

As to GCBSS, Bryant reiterates his vagueness challenge regarding the allegation that Bryant did "little or no meaningful work in exchange for the pensionable income that he received from GCBSS." *Id.* at ¶ 10.c. Again, this argument fails because Bryant's income from his work at GCBSS was "fraudulently acquir[ed]," *Id.* at ¶ 9, not because he did "little or no meaningful work," but because he made material misrepresentations about the amount of work that he did, whether or not it was in some sense "meaningful." *Id.* at ¶ 10.e.-g.

Second, Bryant argues that the Indictment does not adequately allege that

Bryant made any misrepresentations in connection with his employment at GCBSS because Bryant's certifications regarding the hours he worked can only be false if the GCBSS required Bryant to refrain from delegating work to other attorneys. Bryant's construction of his certifications is not consistent with the allegations. The Indictment clearly avers that "[e]ach pay period, defendant WAYNE R. BRYANT submitted a form titled 'Attorney's Time Accountability/Work Unit Reports' to the GCBSS, in which Bryant signed a statement which falsely declared, 'I hereby submit that the above entries represent the hours *I have worked* in the listed work units.'" *Id.* at ¶ 10.g (emphasis added). Meanwhile, the Indictment alleges that Bryant hardly worked any of the hours that he certified from July 2002 through August 2006. *Id.* at ¶ 10.e.-f. This sufficiently alleges a misrepresentation. Even if Bryant's argument is that his alleged misstatements were somehow understood by GCBSS as representations that he, along with, or as a supervisor to, other attorneys performed the work he attested to, this is an argument that goes to the proofs, not the sufficiency of the Indictment. A dismissal of an Indictment "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." *DeLaurentis,* 230 F.3d at 661 (3d Cir.2000).

## 2. UMDNJ

Bryant attacks each allegation of fraud with respect to his employment at UMDNJ. First, as to the claim that the only material service Bryant provided was to unlawfully exploit his office as Senator for the benefit of SOM, *Id.* at ¶ 11.i, Bryant argues that this allegation is derivative of the honest service charges against him. So it is. But since the Indictment's allegations of honest services fraud are sufficient, the allegation that Bryant allegedly committed honest services fraud while working under the guise of a false, publicly-disclosed job description sufficiently alleges a misrepresentation to satisfy the element of a "scheme or artifice to defraud."

Next, Bryant argues that the allegation that Byrant accrued pensionable income "as if he worked three full days per week, when, in fact, his position at SOM required him to be present at SOM one-half of one day per week," *Id.* at ¶ 11.e, is not necessarily an allegation of deception. According to this argument, the Indictment does not rule out the possibility that Bryant's employment responsibilities did not require him to be physically present at SOM for three days a week, and therefore, consistent with the allegations in the Indictment, Bryant might have fulfilled his job responsibilities off-location. The answer to this contention is that paragraph 11.i. of the Indictment alleges that the only "material" service performed by Bryant was to unlawfully use his official position to benefit SOM. This allegation clearly implies that Bryant did not work three full days a week for SOM—at least not in a lawful capacity, or in the capacity disclosed as his official position at SOM.

Finally, Bryant argues that the Indictment alleges no misrepresentation by Bryant to UMDNJ. This claim simply ignores the misrepresentation alleged in the Indictment: that Bryant caused himself to receive pensionable income as if he worked for SOM three-days a week when the only material service he performed was to use his official discretion as a Senator to benefit SOM.

For the foregoing reasons, Bryant's challenges to the Indictment's specific allegations as to GCBSS and UMDNJ lack merit and Bryant's motion to dismiss Counts 10–14 is denied.

## IV. Counts 15–20

### A. Factual Background

Counts 15–17 allege that, from June 2002 through December 2004, Gallagher engaged in a scheme to defraud SOM of the right to Gallagher's honest services in the financial administration of SOM and of money and property. Counts 18–20 allege that Gallagher committed fraud involving an organization receiving federal funds. The following facts are based on the allegations relevant to Counts 15–20 of the Indictment.

SOM had various clinical departments which provided patient clinical care and conducted clinical research, one of which was the University Headache Center ("Headache Center"). The Headache Center received payments from patients for their treatment, and received fees from private entities, such as pharmaceutical companies, for clinical trials conducted by SOM. Indictment, Counts 15–17, ¶ 2.a. Gallagher became the Interim Dean of SOM in May 2002, and the permanent Dean of SOM in November 2002. Indictment, Counts 1–6, ¶ 8. Once he became Dean, Gallagher also maintained his position as Chairperson of the Headache Center, a position he had held since 1989. Indictment, Counts 15–17, ¶ 2.b.

At all times relevant to Counts 15–20, the distribution of the income received from the Headache Center was governed by the Faculty Practice Service Plan By–Laws (the "FPP"). The FPP was "a written agreement between the SOM administration and the SOM faculty physicians who performed clinical and research work. The FPP prescribed, among other things, how money in the form of fees generated by the clinical departments would be distributed." *Id.* at ¶ 3.a. The "object" of Gallagher's scheme was as follows:

> The object of the scheme and artifice to defraud was for defendant R. MI-CHAEL GALLAGHER to use his posi-tion as Dean of SOM and as a Chairper-son of the Headache Center to unjustly enrich himself by deciding to pay, and then paying, himself an annual bonus in violation of the terms of the FPP by improperly steering SOM funds to the Headache Center and using funds obli-gated for the Chairperson's Fund to fi-nance his self-awarded bonuses.

*Id.* at ¶ 6.

According to the Indictment, "in order for defendant R. MICHAEL GALLA-GHER to receive a bonus in accordance with the FPP, the Headache Center had to show a net profit at the end of each fiscal year. Therefore, defendant GALLA-GHER informed his subordinates in the SOM Finance Office that he wanted the Headache Center to show annual profits, and that he wanted to receive annual bo-nuses of approximately $15,000." *Id.* at ¶ 7. Even though the Headache Center produced a net operating loss in each of the years, 2002, 2003, and 2004, "finance staff, acting at the direction of defendant R. MICHAEL GALLAGHER, caused funds controlled by the Dean's Office to be transferred to the Headache Center in or-der to show . . . fraudulent profits in the Headache Center's financial statements." *Id.*

After creating fraudulent profits in the Headache Center in fiscal years 2002, 2003 and 2004, it is alleged the Gallagher paid himself, and the physician who operated the Headache Center, bonuses in violation of the FPP and his fiduciary duty to SOM. *Id.* at ¶ 8a., b. Finally, in furtherance of this scheme, "[d]uring fiscal years 2002, 2003 and 2004, defendant R. MICHAEL GALLAGHER intentionally failed to con-tribute half of the Headache Center's 'profits' to the Chairperson's Fund as re-quired by the FPP by-laws." *Id.* at ¶ 8.c.

## B. Analysis of Counts 15–17

### 1. Arguments Relating to the Construction of the FPP

Counts 15–20 ("the FPP Counts") charge Gallagher with mail and wire fraud, honest services fraud, and fraud involving an organization receiving federal funds. A careful reading of the Indictment reveals that these counts are predicated on the assumption that Gallagher's conduct, as alleged in the Indictment, was a violation of the FPP. Gallagher argues, however, that the FPP is too ambiguous to serve as a predicate for the Indictment's allegations of criminal conduct, and that, when properly interpreted, the FPP affirmatively authorizes Gallagher's conduct.[31] If the conduct alleged in the Indictment can reasonably be thought to be authorized by the terms of the FPP, then these Counts would run afoul of Gallagher's Fifth Amendment right to due process of law, specifically to fair warning of criminal liability. However, for the reasons given below, the Court cannot decide this serious issue, as a matter of law, at this stage of the proceedings. Instead, Gallagher may renew his motion regarding the FPP Counts at the close of the Government's case, in a separate trial to be held in accordance with this Court's rulings regarding severance of the FPP Counts. *See infra* at § V.

The Court will first address the allegations of mail and wire fraud, and then explain why the same analysis holds for the Indictment's allegations of honest services fraud and fraud involving an organization receiving federal funds.

### a. Mail and Wire Fraud

### i. The Centrality of the FPP to the Indictment's Allegations

"To prove mail fraud, the Government must establish: '(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails ... in furtherance of the scheme.'" *Kemp,* 500 F.3d at 279 (citing *Antico,* 275 F.3d at 261). "Identical standards apply to the 'scheme to defraud' under both the mail and the wire fraud statutes." *Antico,* 275 F.3d at 261 (citation omitted).

In Counts 15–17, the Indictment alleges that Gallagher, using the mails and wires, engaged in a scheme to defraud SOM by awarding himself illegitimate bonuses. The "object" of the scheme makes clear that the FPP is the lynchpin:

> The object of the scheme and artifice to defraud was for defendant R. MICHAEL GALLAGHER to use his position as Dean of SOM and as Chairperson of the Headache Center to unjustly enrich himself by deciding to pay, and then paying, himself an annual bonus *in violation of the terms of the FPP* by improperly steering SOM funds to the Headache Center and using funds obligated for the Chairperson's Fund to finance his self-awarded bonuses.

Indictment, Count 15–17, ¶ 6 (emphasis added).[32] According to this paragraph,

---

**31.** The FPP is attached as Exhibit 5 to Gallagher's Brief. Since the FPP is referenced in the Indictment—indeed, as explained below, it is central to the allegations in the Indictment—the Government stated in its briefing that it has no objection to the Court considering the terms of FPP in resolving Gallagher's motion to dismiss. *See also General Dynamics Corp.,* 644 F.Supp. 1497, 1500 (C.D.Cal. 1986), *reversed on other grounds, U.S. v. General Dynamics Corp.,* 828 F.2d 1356 (9th Cir.

1987) ("[t]he Court ... will consider the Contract" in a motion to dismiss the indictment).

Gallagher also argues that, even if he did violate the FPP, the Indictment's allegations do not allege a breach of fiduciary duty absent some "extrinsic misconduct," i.e., deception or injury to UMDNJ. Gallagher's Brief, 61. This argument, and related arguments, will be considered *infra* at § IV.B.2.

**32.** Paragraph 3 of the Indictment lays out, in detail, the pertinent provisions of the FPP,

Gallagher's self-paid bonuses were a form of "unjust enrichment," and his steering of funds to the Headache Center and then paying bonuses with funds obligated for the Chairperson's Fund were "improper" because his actions were "in violation of the terms of the FPP." *Id.* at ¶ 6.

Additionally, the Indictment's allegations pertaining to the first element of mail and wire fraud—a "scheme or artifice to defraud"—also presuppose that Gallagher violated the FPP. As explained *supra* at § III.B., deception is critical to this element: "We have stated that fraud convictions . . . are valid where they are premised on 'a scheme or artifice to defraud . . . involving some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension,' and that '[t]he scheme need not involve affirmative misrepresentation.' " *Stackpole,* 64 Fed.Appx. at 842–43 (internal quotations and citations omitted). The Indictment alleges that "R. MICHAEL GALLAGHER did knowingly and willfully devise and intend to devise a scheme and artifice to defraud UMDNJ and SOM . . . to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." Indictment, Counts 15–20, ¶ 5. As they are plead in the Indictment, the "materially false and fraudulent pretenses, representations and promises" are only "false and fraudulent" if they are prohibited by the FPP.

The first allegation of fraudulent conduct involves the Dean's Fund. The Indictment alleges that Gallagher caused the transfer of funds from the Dean's Fund to the Operations Account of the Headache Center in order to show "fraudulent profits" in the Headache Center's financial statements:

> It was part of the scheme and artifice to defraud that, in order for defendant R.

MICHAEL GALLAGHER to receive a bonus in accordance with the FPP, the Headache Center had to show a net profit at the end of each fiscal year. Therefore, defendant Gallagher informed his subordinates in the SOM Finance Office that he wanted the Headache Center to show annual profits, and that he wanted to receive annual bonuses of approximately $15,000. During fiscal years 2002, 2003 and 2004 . . . the Headache Center produced net operating losses. As set forth below, during fiscal years 2002, 2003 and 2004, finance staff, acting at the direction of defendant R. MICHAEL GALLAGHER, caused funds controlled by the Dean's Office to be transferred to the Headache Center in order to show . . . *fraudulent profits* in the Headache Center's financial statements.

*Id.* at ¶ 7 (emphasis added).

The deception here—what makes the profits "fraudulent"—is the *transfer* of funds from one account to the other, and hence, through support from the Dean's Fund, the creation of "profits" in the financial statements of the Headache Center. The Indictment does not allege that Gallagher attempted to conceal or misrepresent the nature of the transfer in any way. Instead, the Indictment's allegation that the profits are "fraudulent" assumes that the FPP prohibited the transfer of funds from the Dean's Fund to the Headache Center in order to create a "profit" when, absent the transfer of such funds, there would be a net operating loss at the Headache Center. On the other hand, if, as Gallagher argues, that assumption is incorrect, and the FPP authorized the transfer of Dean's Funds to the Headache Center so as to create profits for the purpose of paying bonuses, then the transfer of funds at issue would not constitute the deception

and paragraphs 7 and 8 identify the conduct alleged to be in violation of the FPP.

required for "a scheme or artifice to defraud." Acting in accordance with the terms of an employment contract, absent some further deceptive misrepresentation or omission, is not a "scheme or artifice" to defraud. *Cf.* cases cited *infra* at § IV.B.1.a.ii.; *Thompson*, 484 F.3d at 884 ("Treating § 1346 as limited to [situations where the 'private gain' comes from third parties who suborn the employee with side payments] is consistent with its language: recall that it defines a means to implement a 'scheme or artifice,' and getting a raise through normal personnel practices does not sound like an aspect of a 'scheme or artifice' "); *United States v. Race*, 632 F.2d 1114, 1119 (4th Cir.1980) ("there was nothing inaccurate, false, or fraudulent in CSI's billing the Navy *in accordance with [the] contract language* ") (emphasis added).

The Indictment's other allegation of fraudulent conduct is again couched in terms of a violation of the FPP: "During fiscal years 2002, 2003 and 2004, defendant R. MICHAEL GALLAGHER intentionally failed to contribute half of the Headache Center's 'profits' to the Chairperson's Fund *as required by the FPP by-laws.*" Indictment, Counts 15–17, ¶ 8.c. (emphasis added). Thus, the Indictment's specific allegations of fraudulent conduct, like the Indictment's general statement of the "object" of the "scheme and artifice to defraud," *Id.* at ¶ 6, are dependent on the allegation that Gallagher's conduct violated the FPP.

### ii. The FPP Must Have Provided Gallagher Fair Warning

The Supreme Court has made clear that "one application" of "the right to due process" is the requirement that a defendant have "fair warning" that his conduct is criminal:

[W]hat Justice HOLMES spoke of as "fair warning ... in language that the common world will understand, of what

the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." " 'The ... principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed' "

*Lanier*, 520 U.S. at 265, 117 S.Ct. 1219 (citations omitted). In *Lanier*, the Supreme Court elaborated on three "manifestations" of the fair warning requirement:

First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*Id.* at 266–67, 117 S.Ct. 1219. (citations omitted). Thus, the vagueness doctrine prevents the government from enforcing a criminal statute that is "so vague that men of common intelligence must necessarily *guess at its meaning and differ as to its application,*" and the rule of lenity requires that criminal statutes apply only to "conduct *clearly* covered." *Id.* (emphasis added). If reasonable people can disagree

about whether a statute (as previously construed by judicial decision) prohibits certain conduct, i.e., the statute does not provide *"reasonably clear"* notice that the conduct is prohibited, *Id.* (emphasis added), the Due Process Clause of the Fifth Amendment protects a defendant from criminal liability for such conduct.

As the Third Circuit has recently explained:

> In a void-for-vagueness challenge, we must ensure that a statute or standard is fair in that it is not so vague that a party would not know what conduct is prohibited. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir.1992). Thus, a statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." *Broadrick*, 413 U.S. at 607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The inquiry is completed on a case-by-case basis, and the party opposing the statute or standard must show that it is vague as applied to him. *San Filippo*, 961 F.2d at 1136.

*Borden v. School Dist. of Tp. East Brunswick*, 523 F.3d 153, 166–67 (3d Cir.2008). Simply stated, Gallagher's claim is that the mail and wire fraud statutes are unconstitutionally vague as applied to the specific "scheme or artifice to defraud" alleged in Counts 15–17 of the Indictment, i.e., Gallagher's scheme to fraudulently pay himself bonuses "in violation of the terms of the FPP." Indictment, Counts 15–17, ¶ 6; *see also* ¶¶ 7–8.

Given the Indictment's description of Gallagher's scheme, the "fair warning" principle of the Due Process Clause must be applied to the terms of the FPP. The mail and wire fraud statutes, as applied to a "scheme or artifice to defraud" predicated on a violation of the FPP, cannot have provided Gallagher with constitutionally sufficient notice of criminal liability unless the FPP makes it reasonably clear that Gallagher's conduct was prohibited. Thus, the terms of the FPP must not be "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Lanier*, 520 U.S. at 266, 117 S.Ct. 1219 (quotations and citations omitted). Further, the application of the vagueness doctrine to the FPP requires not just that a jury might reasonably find that Gallagher violated the FPP, but that the FPP gave "fair warning"—a warning that is *"reasonably clear"*—that Gallagher's conduct was prohibited. *Id.* at 267, 117 S.Ct. 1219 (emphasis added).

There is case law, albeit not in the Third Circuit, directly supporting the proposition that an ambiguous contract [33] cannot serve as the basis for a criminal prosecution when an element of the offense is predicated on a violation of the contract. For example, in *United States v. Race*, 632 F.2d 1114 (4th Cir.1980), the Fourth Circuit reversed the defendants' convictions for false statement charges relating to the submission of false and fraudulent invoices to the government, where the controverted billings were allegedly "for amounts in excess of the amounts allowed under the contract" between the defendants and the government. *Id.* at 1116. Just as Galla-

---

**33.** Although the Government refers to the FPP as a contract between the SOM administration and the SOM faculty, and it does function as an agreement that *inter alia,* defines Gallagher's authority to distribute FPP funds, it is not the typical bilateral contract. Instead, the FPP, entitled "Faculty Practice Service Plan (By–Laws)" is a set of binding by-laws governing the handling and distribution of funds generated by the clinical practice of the Headache Center, and the meaning of the various provisions therefore hinges on the institutional context in which they are applied.

gher argues that his conduct was permitted by the FPP in the case at bar, there, "the defendants defended as to these items by asserting the billings *were in accordance with the terms of the contract itself* and were not false." *Id.* at 1117 (emphasis added).

The court framed the issue as follows:

This presented basically a question of the construction of the pertinent terms of the contract. Save in the exceptional cases, such a question presents an issue to be resolved solely by the court ... We are, however, of the opinion that the District Court erred in concluding that the billings in the first group, covering what was alleged to be excess billings, were false and fraudulent and in failing to dismiss as a matter of law the charges based on billings for per diem and material handling. Since these billings were an integral part of all the charges against the defendants, the failure of the District Court to eliminate these billings from the consideration of the jury requires the reversal of the convictions.

*Id.* (emphasis added). Further, the court found that, given the nature of the contract language at issue, the contract's meaning was appropriately construed by the court as a matter of law:

The clause includes no words of art, but only words of common understanding and use, requiring no special expertise for their interpretation. Expert testimony on the meaning of such language is both superfluous and improper. *Marx & Co., Inc. v. Diners' Club, Inc.,* (2nd Cir.) 550 F.2d 505, 510, cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court, which should have granted the defendants' motion to dismiss any

charge based on the defendants' billing for per diem under the contract.

*Id.* at 1119–20.

Though the court in *Race* held that the contract clearly authorized some of the defendants' billings as a matter of law, the court explained that such a finding was not necessary for the court to reverse the convictions. It was enough, the court stated, that there was room for *reasonable disagreement* about the meaning of the contract:

Even if we were to accept the Government's argument that the per diem clause is ambiguous, which would be the best that could be said for the Government's argument, the result would not be different. To be ambiguous a contract must be susceptible of at least two reasonable constructions. When the Government concedes that the clause is ambiguous, it necessarily concedes that the defendants' construction of the per diem clause, which is one of the constructions, is reasonable. Such a conclusion requires a ruling that the defendants cannot be convicted under [§ ] 1001 for a statement or billing which may be said to be accurate within a reasonable construction of the contract. This is so because one cannot be found guilty of a false statement under a contract beyond a reasonable doubt when his statement is within a reasonable construction of the contract. This was clearly stated in the recent case of *United States v. Anderson,* (8th Cir.) 579 F.2d 455, 460, cert. denied, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). There the court said:

"In light of these ambiguities, under Counts II–V of the Indictment, it was incumbent upon the government to introduce proof sufficient to establish the falsity of the statements as well as the defendant's knowing and willful submis-

sion of the statements. In carrying out that burden the government must negative any reasonable interpretation that would make the defendant's statement factually correct. *See United States v. Steinhilber,* 484 F.2d 386, 389–90 (8th Cir.1973); *United States v. Diogo,* 320 F.2d 898, 907 (2d Cir.1963). Our review of the record compels us to find that the government failed to clarify the facial ambiguities in the certification clause, and therefore failed to establish that Leslie Anderson willfully submitted the reimbursement invoices knowing the certifications to be false. We thus reverse Judge Anderson's conviction on Counts II–V."

It follows from this statement that whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of the contract, the Government will not have carried its burden of "negativ(ing) any reasonable interpretation that would make the defendant's statement factually correct" and thus a conviction under [§ ] 1001 cannot stand under those circumstances.

*Id.* at 1120.

*Race* differs from Gallagher's case in that the defendants in *Race* were charged with making a false statement in violation of 18 U.S.C. § 1001, "in which the cornerstone of the stated offense is always the falsity of the statement." *Id.* at 1119 (citation omitted). The convictions were reversed because the "falsity" of the defendants' statements turned on the government's interpretation of the contract, which the court rejected, or alternatively, found to be one of two reasonable interpretations. But the legal principle controlling in *Race*—that when an element of a crime is predicated on the violation of a contract, the contract must be unambiguous on the pertinent point—is equally applicable here. Just as the element of "falsity" was predicated on a violation of

the contract in *Race,* the element of a "scheme or artifice to defraud" is predicated on a violation of the FPP in the case at bar. In *Race,* the Fourth Circuit made clear that, for a jury to convict the defendants of the crime of making a false statement, the government had the "burden of 'negativ(ing) any reasonable interpretation [of the contract] that would make the defendant's statement factually correct.'" *Id.* at 1120. Similarly, on the facts alleged in the Indictment here, the Government has the burden of negating any reasonable interpretation of the FPP that would make Gallagher's conduct consistent with a reasonable exercise of his discretion under the FPP, rather than a "scheme or artifice to defraud" SOM. In short, ultimately, to sustain the weight of a conviction for mail and wire fraud that depends on a violation of the FPP, the FPP must unambiguously prohibit Gallagher's conduct, and the Indictment must so allege. *Cf. United States v. Whiteside,* 285 F.3d 1345, 1351 (11th Cir.2002) ("In a case where the truth or falsity of statement *centers on an interpretive question of law,* the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law") (emphasis added) (citations omitted).

Consequently, in *United States v. General Dynamics Corp.,* 644 F.Supp. 1497 (C.D.Cal.1986), *reversed on other grounds, U.S. v. General Dynamics Corp.,* 828 F.2d 1356 (9th Cir.1987), the court cited *Race* for the proposition that criminal liability cannot be based on the violation of an ambiguous contract. *General Dynamics* was also a false statement prosecution; the defendants were prosecuted for making false statements to the government in the course of allegedly misappropriating funds from the Department of Defense in violation of a contract. In a motion to

dismiss the indictment, the defendants argued that the contract permitted their conduct, or was at least ambiguous as to whether their conduct was permissible. First, the court rejected the government's argument that the contract should not be considered in a motion to dismiss the indictment:

> If [the terms of the contract] make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence. For example, if a contract explicitly and clearly said that a contractor could do "X", and if an indictment were returned that said the contractor had conspired to commit a fraud under the contract by doing "X", it would be absurd to require a trial. Yet that would seem to be the result of the position the Government has asked this Court to take. The Court will not do so. It will consider the Contract.

*Id.* at 1500. Relying on the vagueness doctrine and *Race*, the court in *General Dynamics* further stated:

> If this Court felt certain that the Contract included "no words of art, but only words of common understanding and use" then it may well feel constrained to hold that the Contract is so ambiguous and so susceptible of differing reasonable interpretations that the Indictment should be dismissed at this time, *unless the actions of the Defendant's in allocat-*

> *ing funds ... could not be supported under any of those interpretations.*

*Id.* at 1501 (citing *Race*, 632 F.2d at 1119) (emphasis added).

Nonetheless, given the difficulty of construing the military contract at issue,[34] the court found that it was inappropriate to decide the issue on a motion to dismiss the indictment. "Even if there are instances when a Rule 12(b) motion of this type should be granted, and the Court thinks that there are, it would be improper to grant the motion to dismiss at this time, and the motion will be denied without prejudice." *Id.* at 1502.

The principles underlying *Race* and *General Dynamics* have been found equally applicable in the context of mail fraud, and specifically, to the element of deception, i.e., the "scheme or artifice to defraud." For example, in *United States v. Migliaccio*, 34 F.3d 1517 (10th Cir.1994), the Tenth Circuit reversed a mail fraud conviction because the district court failed to instruct the jury that the government was required to negate, beyond a reasonable doubt, all reasonable interpretations of the applicable "reporting requirements" that would make the allegedly fraudulent misrepresentations truthful. The basic contentions of the government and the defendant were as follows:

> The government accused Defendant of using incorrect medical terminology in order to mislead CHAMPUS [, the Civilian Health and Medical Program of the Uniformed Services.] The Defendant's theory was that the relevant medical

---

**34.** The Court later noted:

> Government regulation of the defense industry proceeds through contracts laced with specialized provisions and jargon, sets of military specifications, regulations, on the spot inspections, management systems, review committees, contracting officers, and a myriad of other devices, all of which are designed to assure the ultimate protec-

> tion of the national interests, both technologically and economically.
> The desire, if not the need, for detailed controls has generated a situation in which contracts are linked to specifications and regulations in a reticulated manner that makes it almost impossible to consider one without the other.

*General Dynamics*, 644 F.Supp. at 1504.

terms and CHAMPUS reporting requirements are ambiguous, that his interpretations were reasonable, and that his reasonable compliance therefore negates an intent to deceive.

*Migliaccio,* 34 F.3d at 1523. The court held that the defendant was entitled to jury instructions explaining that the government must negate all reasonable interpretations of the CHAMPUS regulations under which defendant's statements were not misleading. Indeed, the court found the analysis underlying the above false statement cases applicable to a mail fraud prosecution:

In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous. *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir. 1978), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). *See United States v. Race,* 632 F.2d 1114, 1120 (4th Cir.1980) (adopting Anderson to hold that one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction). *This reasoning applies equally well to the false statement element of mail fraud.* It necessarily follows that, where the evidence supports a defendant's position, the jury must be instructed concerning reasonable interpretations of ambiguous requirements and the government's ensuing burden.

*Id.* at 1525 (emphasis added) (citations omitted). Thus, to the extent that a fraud-

ulent misrepresentation turns on the Government's interpretation of a legal standard, the government must negative any reasonable interpretation of the legal standard under which the alleged "misrepresentation" is not false or misleading.[35] Other courts have also recognized that the principles underlying *Race* are applicable in the context of mail fraud. *See United States v. Parker,* 364 F.3d 934, 945 (8th Cir.2004) (discussing the burden of "negativing reasonable interpretations" when assessing the sufficiency of the evidence of a "scheme to defraud" under the mail fraud statute); *United States v. Calhoon,* 97 F.3d 518, 523 (11th Cir.1996) (the "government charged that [defendant's] submissions by mail of the Medicare claims at issue constituted a scheme to obtain money by virtue of the false documentary claims [and thus] the mail fraud convictions rest on the false statement convictions," but the court then rejected the defendant's *Race* argument). Here, since Gallagher's alleged "scheme and artifice to defraud . . . in violation of the terms of the FPP" turns on the Government's interpretation of the FPP, the Government must negative any reasonable interpretation of the FPP that would make Gallagher's alleged fraudulent conduct permissible.

Additionally, the Government conceded at oral argument that in the context of assessing the sufficiency of the FPP Counts, the FPP must survive a vagueness challenge. Oral Argument, 146 ("Your Honor I certainly don't take issue with the notion that if the contract was fundamentally ambiguous such that it didn't provide notice to the defendant, violation of that contract could not be the basis for a crimi-

---

**35.** Magiliaccio treated the issue of negativing alternative reasonable interpretations of the reporting requirements as a question for the jury in the context of the government's burden to prove the elements of the crime, i.e., mail fraud. However, to the extent that the

Government must negative alternative reasonable interpretations of the FPP in order to meet the "fair warning" requirement of the Due Process Clause, this presents an issue of law for the Court. *See infra* at § IV.B.1.a.iii.

nal charge, and the Court could dismiss the FPP counts"); *Id.* at 151 (When asked if "you agree that if I found that the clear reading, fair reading was not, that it was unambiguous, that there was an ambiguity, does that mean the counts get dismissed," the Government replied, "I think if you find that the agreement is so ambiguous that it doesn't put Dr. Gallagher on notice that that is how he is supposed to determine how the bonus is supposed to be paid, yes, then you can dismiss"). As the Government stated, "[w]e would have to make the argument that the contract is *sufficiently clear on its face* to inform Dr. Gallagher that he was not allowed to pay the bonus in the way that he paid it." *Id.* at 153 (emphasis added). I agree with that analysis.

### iii. The Legal Standard to be Applied to the FPP

Since the vagueness doctrine must be applied to the FPP when assessing Gallagher's void for vagueness argument, the next issue is what standard of clarity the FPP must meet to be "reasonably clear." *Lanier,* 520 U.S. at 267, 117 S.Ct. 1219. The Government contends that there is a distinction between finding a mere "ambiguity" in the FPP and finding that it provides constitutionally sufficient fair warning: "Once again I don't mean to quibble, but you can't dismiss [the FPP Counts] based on a finding of an ambiguity. I think you can dismiss it only based on a finding that it was so ambiguous that it didn't give Dr. Gallagher fair notice." Oral Argument, 154.

Ultimately, any alleged ambiguity in the FPP, to be pertinent to this analysis, must be a material one, i.e., it is relevant to determining whether the conduct alleged in the Indictment can, as a matter of law, constitute a "scheme or artifice to defraud ... in violation of the terms of the FPP," Indictment, Counts 15–17, ¶ 6. If the FPP is ambiguous as to whether Gallagher's alleged conduct was permissible under the terms of the FPP, then it cannot provide sufficiently fair warning to support a criminal prosecution.

*Race* helpfully frames the issue of contractual ambiguity: "To be ambiguous a contract must be susceptible of at least two reasonable constructions." *Race,* 632 F.2d at 1120; *see also Einhorn v. Fleming Foods of Pennsylvania, Inc.,* 258 F.3d 192, 194 (3d Cir.2001) ("A [contract] term is ambiguous if it is susceptible to reasonable alternative interpretations") (citations omitted). Thus, if a reasonable construction of the FPP (even if there was another, or even a more, reasonable construction), could validate Gallagher's actions, it follows that he could not have had constitutionally sufficient notice that his conduct constituted the "scheme or artifice to defraud" alleged in the Indictment, i.e., one that was "in violation of the terms of the FPP." Indictment, Counts 15–20, ¶ 6. The Supreme Court's explication of the vagueness doctrine in *Lanier* is telling: a statute does not provide fair notice if it is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Lanier,* 520 U.S. at 266, 117 S.Ct. 1219. Given the basis for Counts 15–17 of the Indictment, no less can be required of the FPP.

The Government argues in its brief that the proper construction of the FPP, as a contract, is a question of fact for the jury to resolve rather than a question of law for the Court. Government's Brief, 98–99. But the Government conceded at oral argument that, pursuant to the Due Process Clause, the FPP must be sufficiently clear to provide fair warning to Gallagher that his conduct was prohibited. Accordingly, the *constitutional* issue of fair warning, a fundamental prerequisite to any criminal prosecution, is a question of law for the Court, not a question of fact for a jury.

*U.S. v. Paradies,* 98 F.3d 1266, 1284 (11th Cir.1996) ("We agree that the issue of whether a statute is void for vagueness is a question of law for the court to determine") (citations omitted).[36]

In sum, the Court must determine whether Gallagher's actions, as alleged in the Indictment, fall within a reasonable interpretation of the FPP as a matter of law. The touchstone here is a reasonable construction, not just any ambiguity. If such a reasonable construction supports Gallagher's actions, even if another reasonable interpretation prohibits those actions, the contract would be ambiguous, and Gallagher's prosecution for mail and wire fraud for such conduct would be barred by the Due Process Clause of the Fifth Amendment. "Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the Government to warn citizens whether particular conduct is legal or illegal." *United States v. Pirro,* 212 F.3d 86, 91 (2d Cir. 2000) (citations omitted).

### iv. Ruling on the Ambiguity of the FPP Would be Premature

In *Race,* the nature of the contractual language at issue was critical to the Fourth Circuit's holding that the district court "should have granted the defendants' motion to dismiss any charge based on the defendants' billing ... under the contract." *Race,* 632 F.2d at 1120. Again, with respect to the contractual provisions at issue, the court stated:

The clause includes no words of art, but only words of common understanding and use, requiring no special expertise for their interpretation ... The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court.

*Id.* at 1119–20.[37]

When a contract is not "couched ... in language of common use and understanding," *Id.* at 1120, it may not be possible for a court to determine whether that contract is ambiguous on a Rule 12(b)(3) motion to dismiss an indictment. Indeed, when faced with a motion to dismiss an indictment based on the ambiguity of a contract, several courts have held that the issue is properly deferred until after the court has the opportunity to consider the government's presentation of pertinent extrinsic evidence. As the court explained in *General Dynamics:*

The word "ambiguous" is not itself free from ambiguity. Surely one cannot decide ambiguity in a vacuum. What appears problematic to an outsider may seem perfectly clear to a cognoscenti of the area in question. Perhaps there truly is no lack of clarity in the Contract to one who is expert or otherwise familiar with the words, laws and regulations that pervade the area of military contracting. Given that situation, this Court is unable to say that the Contract is clearly one for best efforts or clearly a firm fixed-price contract or clearly some

---

**36.** The Government argues that "a jury could reasonably conclude" that the Government's interpretation of the FPP is the correct one. Government's Brief, 102. As explained above, that is not constitutionally sufficient. If the FPP is to provide fair warning, it must be *unreasonable* to conclude the FPP authorized Gallagher's conduct—a more stringent standard. In other words, the Government must negate any reasonable construction of the FPP that would make Gallagher's conduct

permissible under the FPP. *See Race,* 632 F.2d at 1120.

**37.** Although the court held that the "District Court erred ... in failing to dismiss as a matter of law the charges based on the billings," *Id.* at 1117, the court did not state whether or not it would have been appropriate to dismiss the charges pursuant to a Rule 12(b)(3) motion before trial.

kind of hybrid. Nor is it able to say at this juncture that its own feeling that the Contract is vague and ambiguous is a valid one . . .

Therefore, even if there are instances when a Rule 12(b) motion of this type should be granted, and the Court thinks that there are, it would be improper to grant the motion to dismiss at this time, and the motion will be denied without prejudice.

*General Dynamics*, 644 F.Supp. at 1501–02.[38] In *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125 (D.C.Va. 1981), *reversed on other grounds*, 689 F.2d 1181 (4th Cir.1982), the court also declined to rule on a motion to dismiss false statement charges based on the ambiguity of a contract until the close of the government's evidence. As in *General Dynamics*, the court deferred a decision on the issue of contractual ambiguity because of the nature of the contract:

The NTS contract is not "clear-cut," "precise," or comprised of "words of common understanding." At this stage of the proceedings, it is impossible for the court to make a determination of what is and is not reasonable under the complex and technical NTS contract. The *Race* decision does not compel a district court to conduct a lengthy pre-trial hearing to determine the meaning of a complex, highly technical contract where the identical issues will have to be put before the jury again if the matter is tried.

*Computer Sciences Corp.*, 511 F.Supp. at 1136. Finally, in *United States v. Dale*, 782 F.Supp. 615 (D.D.C.1991), the court cited *Race* and *Computer Sciences Corp.*

for the proposition that determination of ambiguity in a false statement case may be properly deferred until after the government is afforded an opportunity to present its evidence:

While the Court feels that the *Race* decision may be applicable to Count Ten of the Indictment, the Court feels that it would not be possible to make a determination on this issue at this stage of the proceedings. The Court will follow the approach taken by other Courts which have held that a *Race* motion should be made at the close of the government's evidence. *See, e.g., United States v. General Dynamics Corp.*, 644 F.Supp. 1497 (C.D.Cal.1986), rev'd on other grounds, 828 F.2d 1356 (9th Cir. 1987); *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125, 1136 (E.D.Va.1981), rev'd on other grounds, 689 F.2d 1181 (4th Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953(1983). At that time defendants may bring the motion under Fed. R.Crim.P. 29. *Id.* Accordingly, defendants' motion to dismiss Count Ten on grounds that the statement alleged in Count Ten is not false as a matter of law is denied without prejudice.

*Dale*, 782 F.Supp. at 627.

 As in *General Dynamics, Computer Sciences Corp.*, and *Dale*, the Court finds that it is not possible at this stage of the proceedings to determine whether there is an ambiguity in the FPP such that Gallagher's interpretation is a reasonable one. Indeed, the FPP is a set of by-laws prescribing, among other things, the distribution of fees generated by physicians

---

**38.** Although the district court's decision to refer the issue of the proper construction of the contract to ASBCA was reversed by the Ninth Circuit, and the charges were apparently dropped without further proceedings in the district court, *see General Dynamics Corp. v. U.S.*, 139 F.3d 1280, 1282 (9th Cir.1998), the

court's reasoning supports the proposition that it may be appropriate to consider the Government's proffer of extrinsic evidence concerning the interpretation of a contract before determining whether it is too ambiguous to support a prosecution.

within the institutional structure of SOM. As such, the FPP is not "couched ... in language of common use and understanding." *Race,* 632 F.2d at 1120. Its meaning is highly context dependent. Without affording the Government an opportunity to explain that context, the Court is unable ascertain whether or not the terms of the FPP are sufficiently clear to meet the threshold required by the Due Process Clause. When asked at oral argument if the Government intended to present extrinsic evidence regarding how the contract was "dealt with over the years," the Government responded: "Yes we would your Honor because I think that clearly goes to his state of mind and his intent ... And I think perhaps your Honor it may also go to the intent of the parties to the FPP. But it's not alleged in the Indictment." Oral Argument, 153. As the following analysis will illustrate, the Court finds that consideration of extrinsic evidence is necessary to make a determination whether Gallagher's conduct was authorized under a reasonable interpretation of the FPP.

### v. The FPP Framework

The Indictment alleges that Gallagher engaged in a two-step scheme to defraud SOM in violation of the FPP. First, Gallagher allegedly directed subordinates to transfer funds from the Dean's Office to the Headache Center in order to show what the Indictment calls "fraudulent profits" in the Headache Center's financial statements. Indictment, Counts 15–17, ¶ 7; *see also Id.* at ¶ 6 (Gallagher allegedly "improperly steer[ed] SOM funds to the Headache Center"). He did this, according to the Indictment, because "in order for R. MICHAEL GALLAGHER to receive a bonus in accordance with the FPP, the Headache Center had to show a net profit at the end of each fiscal year." *Id.* at ¶ 7. Second, Gallagher "intentionally failed to contribute half of the Headache

Center's 'profits' to the Chairperson's Fund as required by the FPP by-laws." *Id.* at ¶ 8; *see also Id.* at ¶ 6 (Gallagher used "funds obligated for the Chairperson's Fund to finance his self-awarded bonuses"). By directing these allegedly fraudulent accounting maneuvers, Gallagher arranged to award himself the bonuses at issue.

Before examining how the specific steps allegedly taken by Gallagher fit within the FPP, the Court must set forth the general framework for distributing funds generated under the FPP. In that regard, I note the difficulties of interpretation posed by Gallagher's dual roles as Dean of SOM and Chairperson of the Headache Center.

### vi. The Distribution of FPP Funds

The FPP governed the funds generated by the clinical practice carried out by professors at SOM: "The Faculty Practice Plan shall apply to all full-time clinical faculty in the New Jersey School of Osteopathic Medicine, and it shall apply to the collection, distribution, and use of all clinical income attributable to the professional activities of such faculty." FPP, IV.A. Each department had a separate account: "The Executive Director of the Practice Plan shall establish a separate account for each of the income-producing clinical departments." *Id.* at VI. Section VII of the FPP, entitled "DISTRIBUTION AND USE OF FUNDS," governs the distribution of income generated by each department, including the Headache Center.

First, 10% of the previous year's gross collections must be paid to the Deans's Fund. The FPP states:

Each income-producing clinical department shall first *pay an amount equal to ten percent of the previous year's departmental gross collections to an account, to be established by the Practice Plan,* hereinafter referred to as the "De-

ans Fund" ... *The Dean's Fund shall be administered and managed solely at the discretion of the Dean and in accordance with University policies.* The Dean's Fund shall be used to enhance education and research within the institution *consistent with the purposes and objectives of the Plan as stated in Article II.*

FPP, VII.A. (italics emphasized in original; other emphasis added). Second, an unspecified percentage of gross collections from each department must go toward the billing and collection functions of the FPP. *Id.* at VII.B. Third, each department is required to pay two percent of its gross collections to an account used to repay the Plan loan. *Id.* at VII.C.

Finally, the remaining funds are placed in each respective department's Operations Account and used to pay budgeted expenses. The FPP provides:

D. Operations Account

All funds other than those distributed under the requirements ... above shall be placed in the respective department's Operations Account. Funds in each department's Operations Account shall be first applied by the Practice Plan to meet each department's expenses on a monthly accrual basis, for operational and staff support which is included in the established budget for each of the departments, and for the physician augmentation component of the budget ...

*In the event that there are no[t] sufficient funds in a department's Operations Account to cover budgeted expenditures, the Executive Director shall call a meeting of the Dean and the appropriate Departmental Chairperson to develop a contingency plan to remedy the deficit.* In no case may funds from one department's Operations Account be used to cover the deficit from another department unless the transferring Department's Chairperson and the majori-

ty of the Faculty Practice Committee approve of such transfer.

*Id.* at VII.D. Section VII.E. of the FPP governs the use of the funds remaining in the Operations Account that exceed the budgeted expenses enumerated in Article VII.D. It reads: "When all budgeted expenses of the individual department's Operations Account have been met, and when the required working balance has been exceeded, the remaining funds shall be transferred by the Plan, on a quarterly basis, to the following accounts." *Id.* at VII.E.

Section VII.E. then describes the transfer of funds to two accounts. First, fifty percent of the "remaining departmental funds" are allocated to the Chairperson's Fund. The FPP provides:

1. *Chairperson's Fund*

Fifty percent (50%) of the remaining departmental funds will be transferred by the Plan, on a quarterly basis, to the respective Departmental Chairperson's Fund. Funds in the Departmental Chairperson's Fund will be used for purposes for academic enrichment in the respective department as determined by the Departmental Chairperson, provided such purposes are within the IRS guidelines for ordinary and necessary business expenses. Such purposes may include the advancement of programs of the Department, funding of teaching research efforts, specific equipment purchases, recruitment of faculty and residents, rental of space, and subject to University policy, contracts with additional faculty, residents, fellows and support staff. Commitments made in regard to items to be funded from the Chairperson's Fund shall be met by the transfer of funds from the Departmental Chairperson's Fund to the departmental Operations Account. All expenditures

or transfers of funds from the Departmental Chairperson's Fund shall require written authorization by the Departmental Chairperson.

*Id.* at VII.E. 1. Second, the remaining fifty percent is allocated for payment of bonuses to participating faculty members:

2. *Incentive Supplemental Account*

The remaining fifty percent (50%) will be allocated by the Plan for payment to Faculty in the individual department as Incentive Supplemental remuneration. The Funds available will be distributed within the department by the Departmental Chairperson, with the written concurrence of the Dean ... When distributing funds in the Incentive Supplemental Account, the Chairperson shall take into account a faculty member's contribution to departmental income, departmental teaching, research and administrative duties, and recognize enhancement of patient care at affiliated hospitals. Payment by the Plan of the amount determined for distribution to individuals shall require written authorization by the Chairperson of the department.

*Id.* at VII.E.2.

### vii. Gallagher's Dual Roles as Dean and Chairperson

Both the Dean of SOM and the Chairperson of each SOM department are granted a great deal of authority and discretion under the FPP. As to the Dean, section III, entitled "GOVERNANCE," provides: "The Dean of the New Jersey School of Osteopathic Medicine shall be considered the Chief Executive Officer of the Plan and shall, within the limits of authority prescribed by the President of the University, have total responsibility for all activities of the Plan, including the financial viability of the Plan, and the professional conduct of the members of the Plan." *Id.* at III.A. Further, "[t]he Dean of

the School or his designate, after consultation with the [FPP] Committee, will represent the School to the president and the Board of Trustees, in all matters having to do with the Faculty Practice Plan." *Id.* at III.F. As for Chairpersons, the section of the FPP establishing separate accounts for each department provides: "Each Departmental Chairperson shall be responsible for the management of his/her account(s) in accordance with policies established by the University, the Dean and the Faculty Practice Committee." *Id.* at VI. Further, in section IX, entitled "ESTABLISHMENT OF PLAN BUDGET FOR EACH DEPARTMENT," the FPP provides:

A. Each fiscal year, a budget for each Department shall be prepared and established in accordance with a schedule which is compatible with the annual budget cycle of the University. The budget for each Department established for a fiscal year will project anticipated income and other fiscal resources and specify the allocations of resources and limits on the Plan expenditures which shall be followed by the Plan during the fiscal year in the management of departmental accounts and funds. *The Executive Director of the Plan and the respective Departmental Chairperson shall be responsible and accountable for management of these funds in accordance with the annual budget.*

*Id.* at IX (emphasis added).

Many provisions of the FPP, including several relevant to the parties' interpretive disputes over the payment of bonuses, appear to *assume* that the positions of Dean of SOM and Chairperson of a Department would be held by different persons. This is because several provisions provide that the Dean and a Chairperson may check each other's discretion. First, "[t]he Funds available [in the Incentive Supplemental Account] will be distributed within the department by the Departmental

Chairperson, with the written concurrence of the Dean." *Id.* at VII.E.2. Thus, the FPP required the Dean to approve the Chairperson's exercise of discretion in awarding bonuses. In addition, any faculty member dissatisfied with a bonus could submit a written request for review by the Dean. *Id.* at X. Second, when a department's Operations Account cannot cover "budgeted expenses," section VII.D requires that the Dean and the pertinent Chairperson collaborate to come up with a "contingency plan": "In the event that there are no[t] sufficient funds in a department's Operations Account to cover budgeted expenditures, the Executive Director shall call a meeting of the Dean and the appropriate Departmental Chairperson to develop a contingency plan to remedy the deficit." *Id.* at VII.D.[39]

By allowing Gallagher to simultaneously serve as both Dean of SOM and Chairperson of the Headache Center, SOM and UMDNJ essentially eviscerated these FPP checks and balances. The requirement that the Dean and Chairperson agree on the payment of bonuses from the Incentive Supplemental Account, and the requirement that the Dean and the Chairperson collaborate on a "contingency plan" in the event of a department's inability to meet "budgeted expenses" become toothless when both positions are held by the same person. To be clear, however, that Gallagher held both positions, with the acquiescence of SOM and UMDNJ, does not necessarily mean that the conduct alleged in the Indictment was authorized. The important point here is that Gallagher's dual roles at SOM during the relevant time period have important implications for the FPP framework and its operation within the institutional context of SOM and the Headache Center. This compounds the difficulty of construing the FPP without the consideration of extrinsic evidence, and provides further reason to defer construction of the FPP until after the Government presents its evidence. With this background in mind, the Court turns to Gallagher's arguments as to why the FPP authorizes, or is at least ambiguous with respect to, the conduct alleged in the Indictment.

### viii. The Creation of Allegedly Fraudulent Profits

The first fraudulent act alleged in the Indictment is that Gallagher caused funds to be transferred from the Dean's Fund to the Operations Account of the Headache Center "in order to show . . . fraudulent profits" in fiscal years 2002, 2003 and 2004. Indictment, Counts 15–17, ¶ 7. Specifically, the Indictment states:

> It was part of the scheme and artifice to defraud that, in order for defendant R. MICHAEL GALLAGHER to receive a bonus in accordance with the FPP, the Headache Center had to show a net profit at the end of each fiscal year. Therefore, defendant Gallagher informed his subordinates in the SOM Finance Office that he wanted the Headache Center to show annual profits, and that he wanted to receive annual bonuses of approximately $15,000. During fiscal years 2002, 2003 and 2004 . . . the

---

**39.** Other provisions not relevant to the payment of bonuses also permit the Dean to check the discretion of the Chairperson of a Department. For example, Section IV.C, pertaining to "APPLICABILITY AND PARTICIPATION," provides: "The degree, manner and number of hours of participation in patient care and the geographic facilities at which such care is rendered are matters of negotiation between the individual faculty member and his Chairperson or, in the absence of a Chairperson, the Dean . . . The Chairperson must certify to the Dean that said participation does not conflict with academic programs and other responsibilities of the individual or the department. All agreements shall become effective only after being approved by the Dean."

454

Headache Center produced net operating losses. As set forth below, during fiscal years 2002, 2003 and 2004, finance staff, acting at the direction of defendant R. MICHAEL GALLAGHER, caused funds controlled by the Dean's Office to be transferred to the Headache Center in order to show ... *fraudulent profits* in the Headache Center's financial statements.

Indictment, Counts 15–20, ¶ 7 (emphasis added).

According to the chart in the Indictment, the financial statements of the HC reveal: in each of the pertinent years, there was a net operating loss in the HC; there was "support" from the Dean's funds which exceeded the loss by approximately $30,000, i.e., a transfer of funds from the Dean's Fund to the Headache Center operating account equivalent to the net loss plus $30,000; this caused the Headache Center's financial statements to show a "profit" of approximately $30,000 each year. *Id.* The Indictment does not allege that Gallagher took any steps to misrepresent that this "profit" was a "net operating profit" without any contribution from the Dean's Fund. It does not allege, for example, that Gallagher disguised the "support" from the Dean's fund as revenue of some sort. The Indictment simply alleges that Gallagher directed sufficient funds be transferred from the Dean's Fund to the Headache Center operating account to (1) offset the net operating loss and (2) provide a $30,000 surplus, or as the Indictment says, "profit." In sum, this aspect of the "scheme or artifice," at least as alleged in the Indictment, is the transfer of funds from the Dean's Fund to the Headache Center Operating Account, resulting in the allegedly "fraudulent profit."

The Indictment states that the *reason* that Gallagher directed the transfer of funds was to facilitate the payment of bonuses to himself and the other Headache Center physician. Thus, the issue is whether the FPP authorizes use of the Dean's Fund for this purpose. If the FPP prohibits this transfer, the Indictment alleges a fraudulent scheme because such a transfer appears calculated to misrepresent that the Headache Center had a net operating profit in order to permit the payment of bonuses. "[F]raud convictions ... are valid where they are premised on 'a scheme or artifice to defraud ... involving some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension,' and that '[t]he scheme need not involve affirmative misrepresentation.'" *Stackpole*, 64 Fed.Appx. at 843 (quotations and citations omitted). If, as Gallagher argues, the transfer was authorized by the FPP, it is difficult to see how the transfer is a "scheme or artifice to defraud," and even if it were, Gallagher could not have had constitutionally sufficient notice of its illegality from the FPP and the mail and wire fraud statutes.

There are at least three potential interpretations of the interplay of the Dean's Fund to the payment of bonuses: (1) the Dean's Fund could be used to pay bonuses directly; (2) bonuses could be paid only through the Incentive Supplemental Account, i.e., half of what is left after the payment of all budgeted expenses and other FPP obligations, but the Dean's Fund can be used to provide fund sufficient funds to (a) cover a deficit in an Operating Account and (b) provide sufficient funds for bonuses; or (3) the Dean's Fund could not be used to pay bonuses—directly or indirectly. The Indictment assumes that the third interpretation is the correct one, and hence, Gallagher's transfer of funds from the Dean's Fund to the Operating Account to facilitate the payment of bonuses was a violation of the FPP.

The first interpretation makes Gallagher's directive to transfer funds from the

Dean's Fund to the Headache Center appear fraudulent. If he wanted to use the Dean's Fund to pay bonuses, according to this interpretation, why, other than for the purposes of deception, didn't he just pay them directly instead of first creating a "profit" in the Headache Center's operating account? Though Gallagher argues that the FPP permits the use of the Dean's Fund to pay bonuses, that by itself would not authorize the conduct alleged in the Indictment, which involved the creation of a "profit" in the Headache Center *before* using the Dean's Fund to pay bonuses.

Gallagher's position, then, must be that the second interpretation is the correct one, or at least a reasonable one. The second interpretation authorizes Gallagher (as Dean) to use the Dean's Fund to ensure that the Headache Center has sufficient funding left over after the payment of expenses, i.e., the "profit" described in the Indictment, to permit Gallagher (as Chairman of the Headache Center) to pay bonuses to himself and the other Headache Center physician. Gallagher argues, correctly, that nothing in the FPP expressly states that the Dean's Fund may not be used to ensure that a department has sufficient funds for the payment of bonuses. *See* FPP, VII.A. The FPP states: "The Dean's Fund shall be administered and managed *solely at the discretion of the Dean* and in accordance with University policies. The Dean's Fund shall be used to enhance education and research within the institution *consistent with the purposes and objectives of the Plan as stated in Article II.*" *Id.* (emphasis added). The "purposes and objectives" of section II, for which the Dean's Fund could be used at Gallagher's discretion, read as follows:

> It is recognized that the funds created by the Faculty Practice Service are to

be used in a manner which will assist in achieving the following objectives:

A. *To attract and retain high quality faculty to teach, do research and engage in patient care.*

B. To enable physicians who are members of the faculty of the School to maintain their skills as practicing physicians in addition to performing their duties as teachers and researchers.

C. To encourage and assist each clinical department to develop and mature within itself and in relation to other departments so that the full clinical potential of [the] School may be attained.

D. To assist the Departmental Chairperson in [using] their personnel, space, and finances so that all departmental functions, and duties are performed in the most efficient manner.

*Id.* at II. (emphasis added). In the most liberal of readings, the payment of bonuses may fall under the objective of "[retention of] high quality faculty," and perhaps derivatively, the objective to "encourage and assist [the Headache Center] to develop and mature within itself" by retaining such faculty. Within these broad objectives, the funds were to be administered "solely at the discretion of" Gallagher as Dean.

Under Gallagher's interpretation of the FPP, the Dean's Fund can be used not merely for the payment of bonuses, but *also* to offset the net operating losses sustained by the Headache Center. Section VII.E. of the FPP states: "When *all budgeted expenses of the individual department's Operations Account have been met,* and *when the required working balance has been exceeded,* the *remaining* funds shall be transferred by the Plan . . . to the following accounts." *Id.* at VII.E. (emphasis added).[40] Half of such funds goes to

---

**40.** These requirements are inconsistent with Gallagher's assertion that the FPP lacks any

rule of accounting. Gallagher's Brief, 68–69. But that does not mean that whatever rule

the Incentive Supplemental Account for the payment of bonuses: "The remaining fifty percent (50%) will be allocated by the Plan for payment . . . as Incentive Supplemental renumeration." *Id.* at VII.E.2. Thus, the "remaining" amount to be allocated for bonuses is half of the funds remaining *after* "budgeted expenses . . . have been met" and the "working balance has been exceeded" in a department Operations Account. Gallagher's position, then, must be that (1) offsetting a deficit in the Headache Center Operating Account was, as the Indictment itself suggests, a prerequisite to the payment of bonuses, *see* Indictment, ¶ 7 ("to receive a bonus in accordance with the FPP, the Headache Center had to show a net profit at the end of each fiscal year"),[41] and (2) that the Dean's Fund could be used to offset a deficit in the Headache Center Operating Account and provide sufficient funds for the payment of bonuses.

For Gallagher's conduct to be permissible, the FPP must be capable of being read as authorizing the use of the Dean's Fund to offset any net operating losses in the Headache Center by roughly $30,000 to facilitate the payment of bonuses, and further, this transfer of funds satisfying "all budged expenses . . . [being] met" and the "working balance . . . [being] exceeded" as described in section VII.E. Whether this is a reasonable interpretation of the

FPP turns, at least partly, on these terms, and they are not "couched . . . in language of common use and understanding." *Race*, 632 F.2d at 1120. Their meaning depends on how they are understood to mesh with, and be consonant with, the other pertinent provisions of the FPP—as they were applied within SOM.

First, the Court must consider the provisions governing the Dean's Fund. Second, the Court must consider the provision that specifically deals with deficits in a department's Operations Account. Section VII.D. expressly states: "In the event that there are no[t] sufficient funds in the department's Operations Account to cover budgeted expenditures, the Executive Director shall call a meeting of the Dean and the appropriate Departmental Chairperson to develop *a contingency plan to remedy the deficit.*" FPP, VII.D. (emphasis added). Thus, assuming that a net operating loss, as the term is used in the Indictment, Counts 15–17, ¶ 7 is the same thing as the inability to "cover budgeted expenditures," *Id.*, the FPP does not contemplate *unilateral* action to remedy a deficit.[42] Yet the Indictment alleges that Gallagher "informed his subordinates . . . that he wanted the Headache Center to show annual profits," Indictment, counts 15–17, ¶ 7, which implies that he circumvented the FPP's provision for a "contingency plan" to deal with deficits under

---

these terms establish is necessarily inconsistent with Gallagher's alleged conduct.

**41.** There is, of course, an important difference between Gallagher's interpretation of the FPP and the Government's interpretation on this point. It is the Government's position that the requirement of a "net profit" implies that the "profit" must be based entirely on the income and expenses of the Headache Center. On Gallagher's view, the "profit" can be created through the receipt of money from the Dean's Fund, and need not be based only on the income and expenses of the Headache Center. Even if the concept of a "net profit"

necessarily excludes funds transferred from the Dean's Fund, the FPP does not explicitly state, although it is certainly a logical conclusion, that bonuses must be paid from a "net profit."

**42.** The FPP also indicates that the "contingency plan"—whatever that means—has certain limits: "In no case may funds from one department's Operations Account be used to cover the deficit from another department unless the transferring Department's Chairperson and the majority of the Faculty Practice Committee approve of such a transfer." *Id.* at VII.D.

section VII.D. Of course, the meaning of the "contingency plan" provision becomes more difficult to discern when the same person occupies the position of both Dean and Chairperson. Further, it is unclear what role, if any, the Executive Director had in Gallagher's handling of the transfer of funds at issue, or whether the Executive Director was even aware of the deficit, i.e., whether the transfer from the Dean's Fund prevented the Executive Director from discovering the deficit. Thus, whether Gallagher's interpretation of the FPP can reasonably be squared with the FPP's provision for a "contingency plan" in the case of a deficit is a technical question that requires familiarity with the workings of the FPP. At a minimum, the FPP's separation of a "deficit" in section VII.D. from "all budgeted expenses ... ha[ving] been met" and "the required working balance ha[ving] been exceeded" in section VII.E. raises questions about whether Gallagher's interpretation of the FPP—and the unfettered discretion it grants him with respect to bonuses—is a reasonable one. The Court is not in a position to resolve that issue at this juncture.

Moreover, the Third Circuit has made clear that, at least in the civil context, a determination of whether a contract is ambiguous requires the consideration of extrinsic evidence:

> Our precedents clearly establish the steps involved in resolving a contractual ambiguity.
>
> To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Sheet Metal Workers [v. 2300 Group, Inc.]*, 949 F.2d [1274] at 1284 [3d Cir.1991] (brackets in original)

(quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. *Id.; [International Union v.] Mack Trucks,* 917 F.2d [107] at 111 [3d Cir. 1990]; *see also* Restatement (Second) of Contracts § 223 cmt. b (1981) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown. . . ."). Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir. 1993). And once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1234 (3d Cir. 1991).

Neither the bankruptcy court nor the district court followed these steps. Both instead adopted, and then misapplied, a "four corners" approach to the contract. *Mellon Bank,* 619 F.2d at 1011 ("Under a 'four corners' approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous."). Since *Mellon Bank,* however, this court has required the judge to hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity, and then to resolve or clarify any ambiguity that may exist.

*In re Valley Corp.*, 89 F.3d 143, 149–50 (3d Cir.1996); *see also In re Strategic Technologies, Inc.*, Docket No. 04–2656, 2006 WL 753151, *3 (D.N.J. Mar. 23, 2006) ("In deciding whether a contract is ambiguous, a court should not limit its analysis to the 'four corners of the document' ") (citing *In re Valley Corp.*, 89 F.3d at 150). Furthermore, consideration of extrinsic evidence, and the weighing of evidence, should not be undertaken on an motion to dismiss an indictment.

Even though the question on this motion is not the correct interpretation of the FPP, but whether the FPP is ambiguous, i.e., whether a reasonable interpretation of the FPP authorizes Gallagher's conduct, the Court "cannot decide ambiguity in a vacuum," *General Dynamics*, 644 F.Supp. at 1501, at least with respect to the pertinent terms of the FPP.[43] Thus, Gallagher's motion to dismiss the tangible rights prong of Counts 15–17 because the FPP authorizes (or is ambiguous as to the permissibility of) the conduct alleged in the Indictment, whether in the guise of an as applied vagueness challenge, or that the Indictment fails to allege "a scheme or artifice to defraud" within the meaning of the mail and wire fraud statutes, is denied without prejudice.

### b. Honest Services Fraud

The same analysis applies to the honest services fraud prong of Counts 15–17, since Gallagher's duty of honest services, as alleged in the Indictment, flows from the FPP. The Indictment lays out Gallagher's duty of honest services as follows:

> At all times relevant to Counts 15 to 17 of this Indictment, UMDNJ and SOM had an intangible right to the honest services of their employees. As Dean of SOM, defendant R. MICHAEL GALLAGHER owed a fiduciary duty to UMDNJ and SOM to (a) distribute the proceeds of the SOM's clinical departments in accordance with the FPP bylaws; (b) make decisions regarding SOM's financial management that were in SOM's best interests and consistent with the philosophy, purpose and governance of SOM; and (c) refrain from self-dealing conduct intended to unjustly enrich defendant Gallagher at the expense of SOM.

Indictment, Counts 15–17, ¶ 4. The Indictment's allegation that Gallagher breached his "fiduciary duty" to UMDNJ and SOM assumes that Gallagher's conduct, as alleged in the Indictment, violated the FPP. This is obvious with respect to duty (a) above. As to duty (b), the FPP outlines the parameters for distributing funds "in SOM's best interests and consistent with the philosophy, purpose and governance of SOM."[44] As to duty (c), Gallagher's self-awarded bonuses cannot be said to be a form of "unjust enrichment" if they are authorized by the FPP. Again, the object of the "scheme and artifice to defraud" SOM of Gallagher's honest services was to "unjustly enrich himself by deciding to pay . . . himself an annual bonus *in violation of the terms of the FPP.*" *Id.* at ¶ 6 (emphasis added).

In *United States v. D'Alessio*, 822 F.Supp. 1134 (D.N.J.1993), the court dismissed several counts of honest services fraud from an indictment that cited a New Jersey court rule as a source of the defen-

---

**43.** The parties also dispute whether Gallagher's use of the Chairperson's Fund for the payment of bonuses was authorized by a reasonable interpretation of the FPP. However, since the Court is not in a position to make a determination as to whether it was permissible for Gallagher to use the Dean's Fund as alleged in the Indictment, there is no need to reach the issue.

**44.** Indeed, if this duty included something *other* than compliance with the FPP, it would be far too vague to serve as a predicate for criminal liability.

dant's duty of honest services. The court found that the notice concerns underlying the rule of lenity applied to the construction of the court rule:

> Although the court here is asked to construe Rule 1:16–2 and not the criminal statute pursuant to which the Indictment was brought, the notice concerns motivating the rule of lenity provide wise guidance to this court. Specifically, they suggest that any uncertainty regarding the applicability of the Rule should be resolved in favor of the defendants.

*D'Alessio*, 822 F.Supp. at 1143. Finding the court rule "arguably ambiguous," the court held that it could not serve as the basis for a criminal prosecution:

> No caselaw or advisory opinion exists that applies Rule 1:16–2 to sheriffs, and the Rule itself is arguably ambiguous. The court thus concludes that defendant D'Alessio, as a sheriff, did not receive "fair warning" that he was bound by Rule 1:16–2. *Accordingly, he cannot be criminally prosecuted for an alleged breach of duties owed as a result of the Rule.* It follows that Thor cannot be prosecuted for aiding D'Alessio in the breach of his supposed duties under Rule 1:16–2 . . .
>
> The court thus concludes that the intangible rights prong of counts one through three is facially invalid because it relies on a Rule that this court concludes is too ambiguous to be applied to defendants for the purposes of a criminal prosecution.

*Id.* at 1144 (emphasis added). The same analysis applies here. Since any duties owed by Gallagher with respect to the bonuses at issue flow from the FPP—just as the duty owed by the defendant in *D'Alessio* flowed from the court rule—the "notice concerns" underlying the vagueness doctrine and the rule of lenity similarly "provide wise guidance to this court"

when construing the FPP. *Id.* at 1143. If a defendant cannot be subject to prosecution for an alleged breach of duties arising from an ambiguous court rule, a defendant cannot be subject to criminal liability for an alleged breach of duties arising from an ambiguous contract. Thus, Gallagher cannot have had constitutionally sufficient notice that the conduct alleged in the Indictment constituted a scheme to defraud SOM of his honest services if his conduct was consistent with a reasonable interpretation of the FPP, and hence of his duties to SOM.

For the reasons given above, Gallagher's motion to dismiss the intangible rights prong of Counts 15–17 because the FPP authorizes (or is ambiguous as to the permissibility of) the conduct alleged in the Indictment is denied without prejudice.

## 2. Gallagher's Alternative Arguments

Even assuming that Gallagher's conduct violated the FPP, Gallagher argues that the Indictment fails to sufficiently allege mail and wire fraud (under both the tangible and intangible rights prongs) for several reasons. These arguments lack merit.

First, Gallagher's argument that the conduct alleged in the Indictment was not prohibited self-dealing *because* it was authorized by the FPP is just a reiteration of the argument already considered. Similarly, Gallagher's argument that his conduct could not constitute a breach of the fiduciary duty of loyalty *because* he was exercising authority granted to him by the FPP is also a reiteration of the same argument. Gallagher's motion to dismiss the FPP Counts based on these claims is denied without prejudice.

Second, Gallagher argues that the Indictment fails to sufficiently allege any deceptive acts, and thus does not sufficiently allege that he engaged in a scheme or artifice to defraud SOM of his honest ser-

vices and obtain money and property "by means of materially false and fraudulent pretenses, representations, and promises." Indictment, Counts 15–17, ¶ 6. Although the Indictment does not allege that Gallagher falsified any documents, the allegation that Gallagher directed the transfer of money from the Dean's Fund to the Headache Center's Operations Account so that the Headache Center would show profits, even though it had sustained a net operating loss, is a sufficient allegation of deception. "We have stated that fraud convictions ... are valid where they are premised on 'a scheme or artifice to defraud ... involving some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension,' and that '[t]he scheme need not involve affirmative misrepresentation.' " *Stackpole,* 64 Fed.Appx. at 842–43 (quotations and citations omitted). Gallagher argues that the allegations in the Indictment are consistent with the fact that the someone could uncover the alleged "scheme or artifice" by reviewing the Headache Center's financial records. But that does not mean the creation of the false impression that there was a net operating profit in the Headache Center was not a misrepresentation "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* at 843 (quotations and citations omitted). *Stackpole* makes clear that an affirmative misrepresentation, e.g., the falsification of the Headache Center's financial records, is not required. Moreover, if the Government's interpretation of the FPP is correct (and an interpretation authorizing Gallagher's transfer of funds is not reasonable), "profits" in the Headache Center sufficient to pay bonuses would reasonably be thought to be based on net operating profits—not profits manufactured through the Dean's Fund. In short, Gallagher's directive to "show a net profit at the end of each fiscal year" in the Headache Center, Indictment, Counts 15–17, ¶ 7, if not authorized by a reasonable interpretation of the FPP, was designed to permit the payment of bonuses under the false pretense that the Headache Center had a net operating profit. This is a sufficient allegation of deception under the mail and wire fraud statutes.

Third, Gallagher argues that even if he violated the FPP, the conduct alleged in the Indictment does not amount to the breach of fiduciary duty that is cognizable as honest services fraud. As previously discussed, *supra* at IV.B. 1.b., paragraph 4 of the Indictment clearly lays out the fiduciary duties owed by Gallagher to SOM. Gallagher concedes he owed SOM a duty of loyalty under New Jersey law by virtue of being an employee of SOM. Gallagher's Brief, 66; *Lamorte Burns v. Walters,* 167 N.J. 285, 300, 770 A.2d 1158 (2001) ("An employee must not while employed act contrary to the employer's interest") (citations omitted). In any event, there is authority for the proposition that "[f]ederal law governs the existence of fiduciary duty under the mail fraud statute" and "[i]t is axiomatic that an employee has a fiduciary duty to protect the property of his employer." *United States v. Frost,* 125 F.3d 346, 366 (6th Cir.1997) (citations omitted); *cf. Antico,* 275 F.3d at 263 (for the purposes of honest services fraud, the "duty to disclose a conflict of interest arises in the private sector from the fiduciary relationship between an employer and an employee"). The FPP gives specific content to the "employer's interest," *Lamorte Burns,* 167 N.J. at 300, 770 A.2d 1158, in the context of Gallagher's employment with SOM, and hence the duties he owed to SOM.

Of course, as Gallagher argues, a mere violation of the FPP does not constitute honest services fraud. But the Indictment does not allege a mere violation of the

FPP. Rather, it alleges "a scheme and artifice to defraud UMDNJ and SOM of the right to defendant Gallagher's honest services in the financial administration of UMDNJ and SOM, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." Indictment, Counts 15–17, ¶ 5. The Indictment alleges not only that Gallagher breached the FPP, and hence his fiduciary duty to SOM, but that he did so through a "scheme or artifice to defraud," i.e., through the misrepresentation of "profits" in the Headache Center that were created with money from the Deans' Fund. That is what makes this a criminal case within the reach of the mail and wire fraud statutes, rather than a civil case.

The Second Circuit has recently summarized the scope of honest services fraud predicated on an employee-employer relationship as follows:

> In sum, we conclude from the cases in the various circuits that had employed an 'honest services' theory prior to Congress's enactment of section 1346 that the term 'scheme or artifice to deprive another of the intangible right to honest services' in section 1346, when applied to private actors, means *a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity* (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) *purporting to act for and in the interests of his or her employer* (or of the other person to whom the duty of loyalty is owed) *secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.* As noted, in self-dealing cases, unlike bribery or kickback cases, there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment.

*United States v. Rybicki,* 354 F.3d 124, 141–42 (2d Cir.2003) (footnote omitted) (emphasis added); *see also Antico,* 275 F.3d at 261 (a scheme or artifice to defraud deprive another of honest services "reaches public and private fraud at the state and local levels"); *Delle Donna,* 2008 WL 1961485 at \*13 ("The Third Circuit recognizes that the honest services doctrine extends beyond solely public corruption, and applies to other areas where a fiduciary duty may be found"). The Indictment clearly alleges conduct that falls within the above reasoning: through a scheme of creating fraudulent profits to facilitate the payment of bonuses, Gallagher secretly acted in his own interests while purporting to comply with the FPP, and directed a material misrepresentation of "profits" in the Headache Center's financial statements.

Gallagher's suggestion that *United States v. Thompson,* 484 F.3d 877 (7th Cir.2007) holds otherwise is incorrect. The court held there that "[i]t would stretch the ordinary understanding of language ... to call a public employee's regular compensation, approved through above-board channels, a kind of 'private gain' " as required for honest services fraud in the Seventh Circuit. *Thompson,* 484 F.3d at 884. Thus, even assuming that the defendant's conduct violated a state procurement rule, the absence of any private gain, other than a raise received through "normal personnel practices," *Id.,* took the defendant's actions outside the scope of honest services fraud. If the FPP authorized Gallagher's conduct, *Thompson* might be on point, as Gallagher's bonuses would have been received "through above-board channels." *Id.* But Gallagher's argument is that, *despite* any violation of the FPP, his conduct does not constitute honest services fraud. That is wrong. Assuming that Gallagher's conduct was not authorized by a reasonable interpretation of the

FPP, he made misrepresentations to facilitate "payoffs out-side proper channels" to himself—precisely the conduct *Thompson* describes as within the heart of honest services fraud. *Id.* at 883 ("All of the examples [of honest services fraud] in *Bloom* involved payoffs outside proper channels"). Moreover, there were no misrepresentations alleged in *Thompson.* Thus, *Thompson* is inapposite.

## C. Analysis of Counts 18–20

Counts 18–20 allege that Gallagher "knowingly and willfully did embezzle, steal, obtain by fraud and without authority convert to his own use, and intentionally misapplied" the bonuses at issue in Counts 15–17 in violation of § 666(a)(1)(A). "Section 666 does not require fraudulent intent per se, for one can knowingly convert or steal money without fraud." *United States v. Weaver,* 220 Fed.Appx. 88, 96 n. 6. (3d Cir.2007). However, because the Indictment incorporates by reference the scheme in Counts 15–17, with the only addition that "Gallagher caused false and fraudulent 'profits' to be created on the financial statements of the Headache Center, and awarded himself bonuses from those funds, contrary to the provisions of the FPP," Indictment, Counts 18–20, ¶ 3, the Indictment proceeds on the "obtains by fraud" prong of § 666(a)(1)(A). *Cf. Id.* ("Here, however, the Government built its case around an allegedly fraudulent scheme, so the Judge correctly instructed the jury only on the 'obtains by fraud' language in the statute. 18 U.S.C. § 666(a)(1)(A)").

Gallagher directs the same arguments against Counts 18–20 that he directed against Counts 15–17. First, Gallagher claims that the FPP authorized the conduct alleged in the Indictment. Whether this is an as-applied vagueness challenge or an argument that the Indictment fails to allege that Gallagher obtained the bonuses "by fraud," the same analysis obtains in the context of § 666.[45] The motion to dismiss based on these arguments is denied without prejudice and may be renewed on a motion pursuant to *Fed. R.Crim.P.* 29 after the Court has considered extrinsic evidence pertinent to the interpretation of the FPP. Second, Gallagher repeats the argument that the Indictment fails to adequately allege the deception required for fraud. This argument fails for the same reasons given above, *supra* at IV.B.2.

Further, Gallagher argues that Counts 18–20 are barred by § 666(c) because the bonuses at issue were "paid in the ordinary course under the authority of the FPP." Gallagher's Brief, 76. This argument is entirely derivative of Gallagher's argument that the FPP Counts fail because Gallagher's conduct was authorized by the FPP, and for the same reasons, is denied without prejudice.

## V. Severance Motions

Defendants move to sever the various counts of the Indictment, as set forth below.

## A. Counts 1–14 Are Appropriately Joined in a Single Trial

### 1. Joinder

Joinder of the various counts in the Indictment is governed by *Fed.R.Crim.P.* 8(b) which provides: "The indictment ... may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting

---

**45.** Indeed, neither Gallagher nor the Government claims that any difference in the analysis obtains for the mail and wire fraud Counts as opposed to the Counts for fraud involving an organization receiving federal funds.

an offense or offenses ... All defendants need not be charged in each count." *Fed. R.Crim.P.* 8(b). The Third Circuit has made clear that Rule 8(b), rather than rule 8(a), applies to cases involving more than one defendant:

> [W]e have held that Rule 8(a) "dealing with the joinder of offenses, applies only to prosecutions involving a single defendant" and that in a multi-defendant case such as this, "the tests for joinder of counts and defendants is merged in Rule 8(b)." Moreover, most courts have held that Rule 8(b) applies exclusively to issues of joinder of multiple defendants and that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses.

*United States v. Irizarry,* 341 F.3d 273, 287, (3d Cir.2003) (citations omitted); *see also United States v. James,* Docket No. 07–578, 2008 WL 370921, *7 (D.N.J. Feb. 11, 2008) ("The propriety of joinder in a multi-defendant case is determined under Rule 8(b)") (citing *Irizarry,* 341 F.3d at 287). "Under Rule 8(b), it is not sufficient that defendants are involved in offenses of the same or similar character; instead, 'there ·must exist a transactional nexus in that the defendants must have participated in the same act or transaction, or in the same series of acts or transactions.'" *James,* 2008 WL 370921 at *7 (quoting *United States v. Jimenez,* 513 F.3d 62, 83 (3d Cir.2008)). "All defendants must have somehow participated in the series of acts from which the charges arose, but since Rule 8(b) is explicit that 'all defendants need not be charged in each count' of the indictment, it is obvious that each defendant need not have participated in every act or transaction in the alleged series." Wright and Leipold, Federal Criminal Procedure, § 144 (2008); *United States v. Natanel,* 938 F.2d 302, 307 ("it is not a

necessary precondition to joinder that a defendant be involved in each offense charged in an indictment; joinder is proper as long as there is some common activity binding the objecting defendant with all the other indictees and that common activity encompasses all the charged offenses").

■ The Defendants argue that Counts 10–14 [46] (based on Bryant's scheme to defraud the Division of PERS retirement benefits) are not properly joined with Counts 1–8 (based on Defendants' bribery scheme) under Rule 8(b). This argument fails because both sets of Counts share a substantial transactional nexus, and are thus part of the "same series of acts or transactions." *Fed. R. Crim P.* 8(b). Counts 1–8 charge that Bryant and Gallagher engaged in bribery scheme whereby Gallagher caused Bryant to receive a salary from SOM in exchange for Bryant taking official action to advocate on its behalf, and to direct funding towards, SOM. Counts 10–14 charge that Bryant defrauded the Division of PERS retirement benefits by "fraudulently acquiring pensionable income from the GCBSS [and] UMDNJ–SOM." Indictment, Counts 9–14, ¶ 9. Part of the reason that it is alleged that Bryant "fraudulently acquir[ed]," *Id.,* pensionable income from SOM is the bribery scheme charged in Counts 1–8: Bryant caused himself "to receive pensionable income ... as if he worked three full days per week, when, in fact, his position ... required him to be present at SOM one-half of one day per week" and "[t]he only material service performed by ... BRYANT in exchange for his pensionable income [from SOM] was to unlawfully use his position as a State Senator ... on behalf of SOM." *Id.* at ¶ 11.e., i. Thus, Gallagher's claim that he is not alleged to have any involvement in Bryant's scheme to fraudulently obtain

---

**46.** Defendants had argued that Counts 9–14 were not properly joined, but in light of the Court's dismissal of Count 9, only Counts 10–14 are implicated in this argument.

PERS benefits is incorrect. Counts 1–8 and 10–14 do not merely have a "but for" relationship, Gallagher's Reply Brief, 12; they involve substantial overlapping proofs. The Defendants' corrupt arrangement regarding SOM is the transactional nexus connecting the two sets of Counts and the "presumptive benefits from joint proof of facts" is obvious. *King v. U.S.*, 355 F.2d 700, 704 (1st Cir.1966). Thus, joinder of these Counts is appropriate under Rule 8(b).

## 2. Severance

 *Fed.R.Crim.P.* 14(a) provides: "If the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." *Fed R.Crim. P.* 14(a). Severance under *Fed. R. Crim P.* 14 is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317; *United States v. Balter*, 91 F.3d 427, 432 (3d Cir.1996) (quoting *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933). In *Zafiro*, the Court stated "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* The Court gave three examples where this might occur, but none of them is relevant here.[47] However, the Court made clear that "[t]he risk of prejudice will vary with the facts in each case, and district courts

may find prejudice in situations not discussed here." *Id.* Further, "[w]hen the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary," although "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* (citation omitted). "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Id.* at 541, 113 S.Ct. 933; *see also James*, 2008 WL 370921 at *7.

 Gallagher argues that his trial on Counts 1–6 and 8 should be severed because of Bryant's status as an "illustrious" person, which will result in a trial in the "limelight." Gallagher's Brief, 81–82. I find that this does not pose a "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. Bryant also argues that severance of Counts 1–8 and Counts 10–14 is warranted because the jury will be confused by the distinction between intangible and tangible rights. The Court finds no "serious risk" of prejudice here. *Id.* Bryant's reference to *Fed. R.Evid.* 404(b) is inapposite because Rule 8(b) authorizes the joinder of separate offenses that have a transactional nexus, and Bryant has pointed to no "serious risk" of prejudice that cannot be dealt with through "less drastic measures, such as limiting instructions." *Id.*

Thus, Defendants' motions to sever Counts 1–8 from Counts 10–14 are denied,

---

47. These were "(1) 'a complex case' involving 'many defendants' with 'markedly different degrees of culpability,' (2) a case such as *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), where evidence that is probative of one defendant's guilt is technically admissible only against a co-defendant, and (3) a case where evidence that exculpates one defendant is unavailable in a joint trial." *Balter*, 91 F.3d at 432–33 (citing *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933).

and Gallagher's motion for a separate trial on Counts 1–6 and 8 is denied.

## B. Counts 15–20 Require a Separate Trial

### 1. Joinder

As explained above, the joinder of Counts 15–20 with the remaining Counts is governed by Rule 8(b). Thus, joinder is appropriate only if Counts 15–20 and 1–14 have a "transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions.'" *James*, 2008 WL 370921 at \*7 (quoting *Jimenez*, at 83). The Indictment does not meet that standard.

The Government argues that the fact that "Gallagher abused his authority as Dean of SOM" in both sets of Counts "militates in favor of joinder under Rule 8(b)." Government's Severance Brief, 20. However, this argument is addressed to the "same or similar character" test of *Fed. R. Crim P.* 8(a), which is inapplicable here. Aside from the fact that Gallagher used his authority as Dean of SOM in both sets of Counts, there is *no* factual overlap between them. The honest services fraud charges in Counts 1–6 allege that Gallagher caused Bryant to receive an SOM salary as part of a bribery arrangement. Counts 15–20 have nothing to do with that scheme. The entire basis of Counts 15–20 is Gallagher's breach of his fiduciary duty to properly distribute funds pursuant to the FPP, and allegations of self-dealing in that connection.

*United States v. Pisani*, 590 F.Supp. 1326 (D.C.N.Y.1984), the only the case the Government cites in its argument on this point, is distinguishable. The court reasoned:

> The acts alleged in the case herein constitute allegations of one series of acts by defendant Pisani (and others not charged in this indictment) to enrich

himself through fraud at the expense of others and to conceal these frauds from the proper authorities-the IRS, the New York State Board of Elections, and the grand jury. *Godfrey is charged with participating, by obstructing justice and perjuring herself, in one part of this scheme to enrich Pisani and herself.* These allegations are all that is necessary to justify joinder of all the charges herein and joinder of the defendants Pisani and Godfrey.

*Pisani*, 590 F.Supp. at 1345 (emphasis added). In contrast, Bryant's involvement in the bribery arrangement with Gallagher has nothing to do with Gallagher's actions relating to the operation of the FPP, and cannot reasonably be called participation in a common scheme. Even from Gallagher's perspective, the Court finds that the mere fact that Gallagher exercised his authority as Dean in both sets of Counts is insufficient to find that the *quid pro quo* bribery arrangement and Gallagher's fraudulent breach of the FPP share a transactional nexus under Rule 8(b). To the extent that *Pisani* suggests otherwise, the Court declines to follow *Pisani*.

### 2. Severance

■ Even assuming that joinder of Counts 1–8 and 15–20 is appropriate under Rule 8(b), the Court finds that severance is appropriate under Rule 14(a). The absence of any overlapping proofs between Counts 1–8 and 15–20 creates a "serious risk that a joint trial would … prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. "[T]here is no allegation that [Bryant] had any knowledge of, or involvement in, the acts comprising" Gallagher's fraudulent conduct under the FPP, and the Court finds a "clear risk that the evidence on those charges would unfairly spill over into the Government's case against [Bryant], and that the jury would be unable to compartmentalize

the distinct evidence against [him.]" *James,* 2008 WL 370921 at *7. In addition, the evidence relating to the FPP Counts would likely prejudice Gallagher with respect to Counts 1–6 and 8, as well.

Moreover, the potential prejudice flowing from a joint trial of Counts 1–14 and 15–20 is compounded by the serious constitutional issue raised by Gallagher's void for vagueness attack on the FPP Counts. *See supra* at § IV.B.1. The Court has flagged the possibility of a Rule 29 motion at the close of the Government's case regarding Gallagher's due process right to fair warning. Should that issue ultimately be resolved in Gallagher's favor, if there were a trial on all counts, the jury's exposure to evidence relating to the FPP Counts—and the Government's inevitable accusations of greed, self-dealing and the like—would result in tremendous prejudice to Bryant and Gallagher. Thus, severance of Counts 15–20 is warranted.

In sum, Counts 1–14 will proceed as a single trial and Counts 15–20 will require a separate trial.

## VI. Conclusion

For the above reasons, Defendants' motions to dismiss are denied, with the exception of Bryant's motion to dismiss Count 9, and Defendants' motion to dismiss the failure to disclose theory of honest services fraud plead in paragraph 18 of Counts 1–6. Furthermore, Counts 15–20 will be severed from all other Counts for trial.

### Order

This matter having come before the Court on the motions of Wayne R. Bryant and R. Michael Gallagher ("Defendants"), to dismiss all counts in the Indictment; to strike the failure to disclose theory of Counts 1–6; and to sever Counts 1–8, 9–14 and 15–20, as well for separate trials on Counts 1–6; the Court having considered Defendants' moving papers, the Government's opposition, Defendants' replies and supplemental papers; and having heard oral argument on March 11, 2008; and for the reasons stated in the Opinion on this date; and for good cause shown:

IT IS on this 5th day of June, 2008,

ORDERED that Defendants' motions to dismiss Counts 1–8 and Counts 10–20 of the Indictment are denied; Bryant's motion to dismiss Count 9 is granted; and

ORDERED that Defendants' motion to strike the second sentence of paragraph 18 of Counts 1–6 as surplusage, which charges the failure to disclose theory, is granted; Defendants' motion to strike allegations in paragraph 22 of Counts 1–6 is denied; and

ORDERED that Defendants' motions to sever Counts 1–8 and 10–14 are denied; Defendants' motions to sever Counts 15–20 from the trial on Counts 1–8 and 10–14 are granted; and Gallagher's motion for separate trials on Counts 1–6 is denied.